# Exhibit B

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF

THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| CHRISTOPHER CARMONA, On Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> HENRY I. BRYANT, PAUL I. CORDDRY, BONNIE G. HILL, JON C. MADONNA, BETH M. PROTCHARD, BEATRIZ RIVERA, WAYNE C. SALES, KATHI P. SEIFERT, ALBERTSON'S IN., LAWRENCE R. JOHNSTON, A. GARY AMES, PAMELA G. BAILEY, and TERESA BECK, <br><br> Defendants. | Case No. CV OC 0601251 <br><br> (REVISED[1]) MEMORANDUM DECISION AND ORDER ON PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETTLEMENT (SETTLEMENT APPROVED) |

Hearing Date:   December 13, 2006 (Plaintiff's Motion for Final Approval of Settlement)
Attorneys:   Plaintiff—Philip Gordon (Gordon Law Offices, CHTD); Marc M. Umeda,
          S. Benjamin Rozwood (Robbins, Umeda, & Fink, LLP)
      Defendants—J. Walter Sinclair, Mark S. Geston (Stoel Rives, LLP); Peter
      Carter (Dorsey & Whitney)
      Objectors—Thomas A. Banducci, Benjamin A. Schwartzman (Greener,
          Banducci, Shoemaker)

---

[1] The revised memorandum is issued solely to correct clerical errors brought to the Courts attention. The substance of the decision remains unchanged. Corrections appear on pages 1, 7, 28, and 38.

MEMORANDUM DECISION AND ORDER- 1

## FACTS AND PROCEDURAL BACKGROUND:

Before the Court is Plaintiff's Motion for Final Approval of the Class Action Settlement filed on behalf of Mr. Carmona seeking to enjoin the sale of Albertson's to Supervalu. The following facts are taken largely from the stipulated facts set forth in the Notice of Settlement mailed to all members of the class. Where relevant, additional facts have been inserted to augment the clarity of the instant proceeding.

In March 2005, Albertson's Board of Directors ("Board") began to consider a variety of strategic alternatives, including a possible sale or other transaction, involving all or a portion of its business, assets, or operations. In June 2005 Albertson's hired the investment banking firms of Goldman Sachs & Co. ("Goldman Sachs") and The Blackstone Group, Inc. ("Blackstone") to advise it in this regard. The Board directed Goldman and Blackstone to solicit indications of interest for a sale of the Company. As a result of such efforts, Albertson's received written indications of intent or interest from multiple institutions in late August 2005 and thereafter.

During September and October 2005, Albertson's provided information to potential buyers and its management team met with several of them, including a group led by Cerberus and Supervalu. By late October, Cerberus and Supervalu had formed a consortium to put in a bid for the Company and commenced their due diligence process.

On October 24, 2005, Plaintiff wrote a letter to the Board that expressed his concern about news reports that Albertson's was entertaining bids from potential buyers for the sale of the Company. After asking the Board to remain cognizant of the fiduciary duties that it owed to the Company and its shareholders, he demanded that the Board obey all applicable laws and to

ensure than any transaction involving a sale of the Company adequately address the interests of its shareholders.

On November 23, 2005, CVS submitted a bid for Albertson's stand-alone drug business.

On November 30, 3005, Albertson's received a proposal from an entity ("The Interested Entity") indicating that it was interested in the Company. This proposal did not involve the acquisition of the Company, but rather was a proposal for a  significant recapitalization transaction in which (i) Albertson's would agree to acquire a smaller traditional grocery operator affiliated with The Interested Entity in a stock for stock transaction., (ii) Albertson's would engage in a leverage repurchase of 50% of the Company's outstanding common stock at a premium to the then current trading price, and (iii) The Interested Entity would invest $1.0 billion in exchange for a significant equity position in Albertson's, including warrants that would allow it to acquire 10% of Albertson's stock in the event that the Company's stock price shares doubled from the projected post tender offer stock price (the "Recapitalization Proposal #1").

At various times during December 2005, Albertson's management and legal and financial advisors had discussions with The Interested Entity about The Interested Entity's proposal. During this time, The Interested Entity made three alternative proposals for its recapitalization transaction: (1) that the self tender offer be conducted at $30 per share, and that its $1.0 billion investment in the equity of Albertson's be at $24 per share; (2) that that self tender offer be conducted at $27.50 per share, and that its $1.0 billion investment in the equity of Albertson's be at $27.50 per share (such $1.0 billion investment to be made through the purchase of newly issued shares from Albertson's or by acquisitions of Albertson's shares in the open market); and

(3) that the self tender offer be conducted at $30.00 per share, and that The Interested Entity's $1.0 billion investment in the equity of Albertson's be at $27.00 per share. Based on the information provided by The Interested Entity, under certain circumstances the recapitizalation proposal would not result in a "change in control" of Albertson's, as defined in certain agreements between Albertson's and various members of its management.

The Board considered the various iterations of The Interested Entity's proposal in several meetings during December 2005, including the potential risks presented such as the relative uncertainty of the value that would be delivered to Albertson's stockholders. As compared to the proposal by the Consortium, the Board concluded that a smaller percentage of the consideration ultimately received by Albertson's stockholders under The Interested Entity's proposal would be cash. In addition, it was uncertain whether the higher trading multiples projected by the proponents of The Interested Entity's proposal would actually be achieved. The Board also considered that the proposed recapitalization involved substantial execution risk: The Interested Entity had not performed as much due diligence as the Consortium had, and as a result, Albertson's advisors believed that the proposal was substantially less firm than the proposal offered by the Consortium. In addition, the contemplated acquisition that was a part of the recapitalization proposal would involve the acquisition of a separate publicly traded company that had not yet reviewed or approved the transaction. The proposal also contemplated future divestitures of Albertson's non-core assets, and it was uncertain whether these divestitures would be achieved on favorable terms or at all. Finally, aside from the relatively greater risks and uncertainties associated with the recapitalization proposal, Albertson's financial advisors

calculated that unless there was a significant increase in the company's trading multiple, the expected aggregate value to Albertson's stockholders under that proposal (taking into account the cash to be received in the self tender offer and the value of the residual equity interests) would be less than the value that would be received by Albertson's stockholders under the proposal offered by the Consortium.  Although The Interested Entity had experience in the grocery business, the Board, in view of the foregoing considerations and the considerations described in the Proxy Statement/Prospectus, taken as a whole, believed that the recapitalization proposal was not as attractive to Albertson's stockholders as the proposal offered by the Consortium.

In connection with its review of the proposed Acquisition, the Board noted, among other things, the fact that Goldman Sachs and Blackstone would be entitled to transaction fees that would be payable upon the completion of the Acquisition, and that the amount of such transaction fees might have been lower if certain other strategic alternatives, such as The Interested Entity's proposal, had been pursued.  The Board also noted, however, that the fees of Goldman Sachs and Blackstone were based on the value to be received by Albertson's stockholders, and that the compensation paid to Albertson's third financial advisor (which had also opined that, as of the date of its opinion, the consideration to be received by Albertson's stockholders in the proposed merger with Supervalu was fair from a financial point of view to such holders) was not contingent on the completion of any transaction.

MEMORANDUM DECISION AND ORDER- 5

On December 8, 2005, the consortium consisting of Supervalu and Cerberus submitted a bid letter to Albertson's.  By December 16, 2005, CVS had joined Supervalu and Cerberus in the Consortium, which submitted a revised proposal to Albertson's.

On December 19, 2005, Plaintiff wrote a second letter to the Board that expressed his concern about the pending sale.  Plaintiff noted that since the Company had announced a potential sale, share values and net income had dropped.  Plaintiff also referenced a possible acquisition by Cerberus, and asked the Board to continue to be aware of the fiduciary duties it owed the Company and its shareholders and to ensure that any transaction adequately address shareholder interests.

On or about December 22, 2005, the Board rejected the Consortium's offer at that time in part due to antitrust issues raised by the substantial market share overlap between Supervalu and Albertson's in certain geographic areas.

On January 20, 2006, the Company announced that it had received an offer from the Consortium for the purchase of the entire Company, and that the Company would once again have negotiations with the Consortium in that connection.  Thereafter on the same day, Plaintiff wrote a third letter to the Board that expressed his concerns about recent developments surrounding the sale of Albertson's, in particular, Plaintiff stated his concern about the Board's decision in December 2005 to reject the Consortium's offer, its decision to later resume negotiations, and the alleged lack of information provided to shareholders about the process to sell the Company.  Plaintiff also reminded the Board about its fiduciary duties to the Company and its shareholders.

On January 23, 2006, Albertson's issued a press release announcing that it had entered into a definitive agreement to effect the Acquisition of the Company by the Consortium.

On January 24, 2006, Plaintiff filed his Complaint, *Carmona v. Bryant et. al.*, Case No. CV OC 0601251, as a putative class action on behalf of all holders, other than defendants, their family members and affiliates, of the common stock of Albertson's from September 2, 2005 to the date of the merger. The Complaint alleged, *inter alia*, that in approving the Consortium's offer to purchase Albertson's, the Defendants, particularly the individual defendants, breached their fiduciary duties of care, diligence, good faith, loyalty, independence, and candor owed to Plaintiff and the Company's shareholders, that in the process advancing their own personal interests and securing disproportionate benefits for themselves. The Complaint sought a variety of equitable remedies, including declaratory, mandatory and prohibitory injunctive relief.

On February 15, 2006, Plaintiff served his first request for production of documents on Defendants.

On February 23, 2006, Defendants removed the Action to the United States District Court for the District of Idaho. After Plaintiff's counsel successfully persuaded the court clerk to agree to an expedited briefing schedule for a motion for remand, on March 1, 2006, pursuant to stipulation, the District Court entered an order that expedited briefing: Plaintiff was to file his remand motion by March 17, 2006; Defendants were to file their response by April 5, 2006; and Plaintiff was to file his reply by April 12, 2006. The district court further ordered a hearing to be held on Plaintiff's remand motion on April 18, 2006. The parties briefed the remand motion pursuant to this stipulation and order.

On April 8, 2006, Plaintiff's counsel wrote to counsel for Defendants to informally request a narrowed production of certain documents in order to facilitate a production.

Following a hearing in the United States District Court for the District of Idaho on April 18, 2006, the federal district court ordered on April 19, 2006, that the Action be remanded to this Court for further proceedings.

On April 21, 2006, Plaintiff caused deposition subpoenas to be served on Albertson's Chief Financial Officer, Felicia Thornton, and upon Eric Cremers, an executive of the Company. Plaintiff also caused a subpoena duces tecum to be served on Supervalu's registered agent for service of process in Idaho and upon an authorized agent of Lehman Brothers. That same day, following a meet and confer session between counsel, Plaintiff's counsel wrote a letter to counsel for Defendants that confirmed their mutual understanding concerning an expedited production of documents. Plaintiff's counsel then signed a protective order on April 21, 2006, that had been prepared by counsel for Defendants. Pursuant to this informal understanding, on that same day, Defendants "produced" by email to Plaintiff's counsel certain documents previously delivered to the Federal Trade Commission in connection with its antitrust review. Defendants also produced 3 CD ROM's of material that, when printed, filled two banker's boxes, including over 50 separate Powerpoint presentations made to the Board by Company management, its advisors and agents that analyzed and summarized the proposed Acquisition.

On April 24, 2006, Defendants produced an index to the material stored in a web-based, virtual "due diligence room" to which potential bidders had been given access to review data regarding the proposed Acquisition. On the following day, Defendants allowed counsel for

Plaintiff to gain access to the "due diligence room." In connection with the review of the "due diligence room" material and the documents produced by Defendants up to that point in time, Plaintiff's counsel had reviewed, indexed and analyzed upwards of 580,000 pages of materials, including many hundreds of pages of projections and their often-complex underlying assumptions. Nevertheless, Plaintiff's counsel concluded that numerous responsive documents had not been produced, and that no privilege log had yet been provided.

On April 28, 2006, Albertson's and Supervalu caused the Proxy Statement to be filed with the SEC and to be otherwise publicly disseminated to the Company's shareholders. The Proxy Statement indicated that the Board recommended that the shareholders approve the Acquisition, and further indicated that the Albertson's stockholders would be asked to vote on the proposed Acquisition on May 30, 2006.

On or about May 1, 2006, pursuant to Plaintiff's discovery requests and the informal agreement of April 21, 2006, Defendants produced copies of the minutes of Board meetings held from March 24, 2005 through January 22, 2006. The material produced included letters of interest from various parties, discussions by the Board of negotiations and evaluations by the Board of alternative proposals.

On May 2, 2006, Supervalu filed and served a motion to quash and for a protective order relative to the subpoena duces tecum that had been served by Plaintiff. That same day, Plaintiff's counsel wrote a letter to counsel for Defendants requesting the production of the assumptions used by Albertson's financial advisors in analyzing the transactions and proposals offered to the Company's shareholders.

MEMORANDUM DECISION AND ORDER- 9

On May 4, 2006, Plaintiff's counsel met and conferred with counsel for Supervalu and wrote a letter to Supervalu's counsel offering to limit document production. Plaintiff's counsel also wrote a letter to counsel for Defendants requesting the immediate production of documents specified in the letter.

On May 5, 2006, Defendants produced two more CD-ROMs containing more than 6,000 pages in over 2,500 documents to Plaintiff's counsel that were responsive to the categories listed in Plaintiff's counsel's April 8, 2006 correspondence. Nevertheless, there remained apparent gaps in the production, with many requested documents still absent and no privilege log having yet been provided.

On May 8, 2006, counsel for the Defendants sent an e-mail to Plaintiff's counsel in which he indicated that Albertson's would not produce certain documents from the Company's financial advisors, including documents that concerned the analysis and recommendations of such advisors relative to the Acquisition, The Interested Entity proposal and other proposals. Defendants' counsel indicated that Albertson's did not have the authority to obtain or require production of such documents from the possession of the Company's financial advisors, and also asserted that the advisors' pro forma analyses of the Recapitalization Proposal 1 was not material.

On May 9, 2006, Plaintiff's counsel wrote a letter to counsel for Defendants that requested, *inter alia*, that Defendants complete their production of documents responsive to Plaintiff's outstanding requests and to identify any responsive documents being withheld by Defendants on the basis of privilege or other grounds.

On May 10, 2006, Plaintiff filed a consolidated motion that addressed pending discovery and equitable relief issues, which was styled Plaintiff's (1) Motion for Limited Expedited Discovery, (2) Motion to Compel Limited Expedited Discovery, and (3) Motion to Set Hearing and Briefing Schedule for Motion for Temporary Restraining Order or Preliminary Injunction. Plaintiff filed its motion because, among other reasons, his counsel believed that: (i) it was not clear whether, or to what extent, Albertson's or its agents and advisors conducted a fill and proper analysis of The Interested Entity proposal *vis a vis* the Consortium deal; (ii) large "change-in-control" payments were to be made in connection with the transaction; (iii) the requested discovery was necessary for Company shareholders to assess, on a comparative basis, the sufficiency of the consideration to be provided by the Acquisition in light of competing proposals, as well as the adequacy of the sale and proposal analysis itself, including the nature and potential impact of the compensation payments triggered by the Supervalu deal in comparison to alternatives possibly available; (iv) the requested discovery was important to help determine whether Albertson's, and its agents and advisors adequately pursued and analyzed alterative proposals that potentially offered more value to the Company's shareholders than the Acquisition; and (v) the discovery was necessary for the Court to be in a position to determine whether any supplemental disclosure to Company shareholders were necessary, and if so, the nature and content of any such disclosures.

On May 11, 2006, Defendants produced yet additional documents to Plaintiff's counsel, but again there appeared to be substantial gaps in the production and there was no privilege log. Also on May 11, Plaintiff filed a Motion to Shorten Time for Hearing of Plaintiff's (1) Motion

for Limited Expedited Discovery, (2) Motion to Compel Limited Expedited Discovery, and (3) Motion to Set Hearing and Briefing Schedule for Motion for Temporary Restraining Order or Preliminary Injunction and (4) Supervalu's Motion to Quash.  The Parties agreed that the Motion would be heard on May 15, 2006, subject to the Court's availability.

On May 12, 2006, Plaintiff's counsel wrote to counsel for Defendants, identifying gaps in document productions made by Defendants on May 5 and 11, 2006, and requested production of such documents along with a privilege log by May 15, 2006.  Also on May 12, in an effort to evaluate the potential and desirability of settlement, Plaintiff's counsel participated in a telephone conference with counsel for Defendants.  Also participating in the call were representatives from Defendant's financial advisors, with Plaintiff's expert listening, but not participating actively in the call.  The Parties engage in a frank and candid exchange of views concerning a variety of issues in the case, including a number of highly technical points relative to the valuation methods used by Defendants in connection with The Interested Entity proposal.

On May 15, 2006, Defendants filed papers (including a memorandum, affidavits, and exhibits) opposing Plaintiff's motions and Plaintiff submitted a supplemental brief and affidavit in support of the pending motions, once again focusing on the existence and potential role of the change-in-control compensation payments to be paid on connection with the Supervalu Consortium transaction.  That afternoon, the Parties appeared in Court for the hearing of: (1) the motion to quash and protective order filed by Supervalu, and (2) Plaintiff's motions to compel limited expedited discovery and to set a hearing on a motion for a preliminary injunction.  The Court received presentations from the parties; following an overnight recess the Court

MEMORANDUM DECISION AND ORDER- 12

reconvened the next morning for additional argument; and held a supplemental telephone hearing that evening. As a result of the multi-session hearing, the Court granted Supervalu's Motion to Quash and for a Protective Order, and granted in part Plaintiff's Motion for Limited Expedited Discovery, to Compel Limited Expedited Discovery and for a hearing and briefing schedule for a preliminary injunction. With regard to Plaintiff's motion, the Court set a hearing date of May 26, 2006 on Plaintiff's Motion for Preliminary Injunction and established an expedited briefing schedule relative thereto. The Court further ordered that the Defendants make certain persons available for depositions to take place over the ensuing days, beginning on May 18: (1) Albertson's CEO; (2) a member of the Board who was also a member of the Special Committee of the Board; (3) Managing Director at either Blackstone or Goldman Sachs; (4) and the person at Deloitte & Touche LLP principally responsible for conducting due diligence on Supervalu's financial and/or business condition. Additionally, Defendants were ordered to make an expert witness available for deposition. Plaintiff was ordered to produce himself for deposition and an expert witness. With regard to document production, after Plaintiff narrowed the scope of his requests, the Court ordered Defendants to make prompt production of an extensive array of documents, together with a privilege log.

At the hearing, the Court also indicated an immediate interest in examining pertinent Delaware law relative to the fiduciary duties owed by directors of a public corporation to the shareholders, and expressed a desire to receive preliminary briefing on the question of whether the potential availability of monetary damages would preclude the Court from granting a preliminary injunction. Toward the end of the first hearing day, Plaintiff submitted a

Compendium of Non-Idaho Authorities that addressed the fiduciary duty issue, and the following afternoon, submitted a short brief to the Court that addressed the issue of monetary damages as the sole remedy available to Plaintiff.

Plaintiff continued pressing for additional document production. On May 16, 2006, with the telephonic assistance of the Court, the parties agreed on a list of e-mail search terms. Defendants produced many thousands of additional pages of documents and provided access to a website in which Plaintiff was able to review certain analyses performed by the financial advisors for Defendants relative to the Acquisition. Defendants also provided a privilege log. Plaintiff prepared for the ordered depositions. However, on the evening of May 17, 2006, the Parties reached tentative agreement on the terms of a settlement, and over the ensuing 24 hours reduced their understanding to writing in a document entitled "Memorandum of Understanding" that was signed by counsel for Plaintiff and the Defendants late in the evening on May 18, 2006.

On May 26, 2006, a separate action was filed in Ada County entitled *Nordby v. Bryant et. al.*, Case No. CV OC 0609708, which was a derivative action filed on behalf of Albertson's seeking, *inter alia*, to enjoin the sale of Albertson's as well as to challenge the executive compensation received by former Albertson's CEO, Larry Johnston as a result of his termination from the company pursuant to the sale of the company.

Pursuant to the Notice sent out to all Class members regarding the proposed settlement, any member of the Class was permitted to file an objection with the Court. The permissible objections pertained to (1) the settlement; (2) the entry of the Final Judgment and Order of Dismissal with Prejudice to be entered in the Action; (3) the application for attorney's fees and

expenses; and/or (4) presenting additional evidence or argument that may be proper and relevant. In order to preserve an objection before the Court, the Court was to receive written notice of the intent to appear, evidence of Class membership, a statement of the objections, and the reason as well as documents or writings that the Court should consider.

A number of objections were received in reference to the permissible objections. The following is a list of the objectors whose objections were filed with the Court as well as a summary of their objections.

- **Frank Nordby:** (6 shares) Nordby raises concerns regarding the limited benefits of the 8-K disclosure statement. He also objects to the amount of attorney fees based on the purported lack of benefit to the shareholders.

- **Frank DeJulius:** (Claims to have owned shares during the Class Period but the number of shares is not indicated[2]) DeJulius is represented by local counsel Charles Peterson. DeJulius objects to the Settlement because there is "no discernible, or measurable, settlement benefit[] flowing to the benefit of the class. Specifically, the 'additional disclosure' . . . did not increase the value received by any of the class members . . . shares." (DeJulius Objection ¶ 6(a)). Additionally, DeJulius believes that the $2.6 million in attorney fees is unreasonable because Plaintiff's counsel did not confer any benefit on the Class.[3]

---

[2] Plaintiff objects to his objection because there is no proof that he was a shareholder during the relevant period or the amount of shares owned during the period.

[3] DeJulius is of the opinion that the "additional disclosure" would have been made in the ordinary course of the transaction and further that the notice sent to the Class was devoid of any information to support the contention that Plaintiffs counsel "vigorously" prosecuted the action.

- **Stuart I. MacKenzie:** (Claims to have owned shares during the Class Period but the number of shares is not indicated[4]) MacKenzie is "not impressed with the merits of the lawsuit" and questions the motives of Plaintiff's counsel by bringing the action. (MacKenzie Objection at p. 1). MacKenzie believes that the proposed legal fee/expense award is high in relationship to the relief obtained and requests that the award be reduced or withheld.

- **George M. Snyder:** (40 shares) Snyder objects to the amount of attorney fees because the Settlement was done as "an aborted effort to achieve a change in the course of events in favor of a defeated bidder for Albertson's" and that only *de minimus* value was received by the Class. (Snyder Objection at ¶ 3-4). Of note, Snyder believes that Albertson's will be paying for the fee and does not believe the fee should come at the expense of the Class.[5]

- **Larry Sommer:** (600 shares) Sommer did not receive the Settlement notice until December 7, 2006 and promptly filed with the Court an objection. Sommer objected to the amount of attorney fees and was of the opinion that the Settlement did not provide any significant benefit to the class.

---

[4] Plaintiff raises the same objection to Mr. MacKenzie's objection as was raised in reference to Mr. DeJulius' objection.
[5] However, this contention is unsupported as Supervalu will be paying the fee award.

MEMORANDUM DECISION AND ORDER- 16

## OBJECTIONS FILED WITH COUNSEL BUT <u>NOT</u> WITH THE COURT

Certain other objections were sent to Class counsel but were not properly filed with the Court.

Their objections, though improper, are summarized below:

- **Mary S. Frasier:** (100 Shares) Ms. Frasier states an intent to appear at the settlement hearing, but does not describe the nature of any objections.  (Def. Memo in Support at 6).

- **Kathleen N. Aula:**  Sent note to counsel indicating a desire to not be a participant of the Class.  Nothing in the note indicates share ownership.

- **Dorothy Rupel:**  Sent note to counsel indicating a desire to not be a participant of the Class.  Nothing in the note indicates share ownership.

- **E.L. Sullivan[6]:** (more than 190,000 shares) Affidavit states that he was not made aware of the 8-K statement and therefore was unable to consider the addition prior to voting on the sale.  Mr. Sullivan is also of the belief that the compensation received by Mr. Johnston was excessive and correspondingly devalued the company and its stock.

On December 13, 2006 the final settlement hearing was commenced.  Only two objectors were present at the hearing, counsel for Objector Frank Nordby and Objector Frank DeJulius.  However, counsel for Mr. DeJulius stated that they would rest on the written papers and no evidence would be presented by counsel.   Mr. Nordby, however, presented testimony of Professor Jesse Fried.  Prof. Fried is a law professor from the University of California, Berkeley, Boalt Hall School of Law, and the Faculty Co-director of the Berkeley Center for Law, Business and Economy, teaching in the areas of corporate law and executive compensation.  Prof. Fried

---

[6] There is no indication that Mr. Sullivan filed an objection to the Settlement.  Mr. Sullivan filed an affidavit concurrent with Mr. Nordby's objection.

has also authored numerous publications on the subject of executive compensation.   In preparation of his testimony, Prof. Fried reviewed certain documents sent to him by Nordby's counsel as well as relevant cases discussing executive compensation specifically.

The substance of Prof. Fried's testimony focused primarily on two issues.  First, Prof. Fried discussed certain documents that would hypothetically support a claim for excessive executive compensation and his opinion that Plaintiffs failed to collect enough documents to properly determine whether a viable claim on executive compensation existed.  Specifically, Prof. Fried stated that documents and testimony from depositions of the Executives, depositions of the members of the Compensation Board, minutes from the Compensation Committee as well as the substance of the discussions would be necessary to fully analyze an excessive executive compensation claim.   Second, Prof. Fried testified as to precedent from Delaware Courts regarding claims on executive compensation.  Specifically, he discussed a theory that based on Delaware case law if a merger price or payment to shareholders is diminished because of excessive executive compensation, claims on behalf of shareholders for those damages would be viewed as direct.  Specifically, Prof. Fried stated that Delaware case law has been unable to make a concrete distinction between a direct and derivative lawsuit and that in certain circumstances the courts may be willing to convert a derivative lawsuit to a direct suit in the interest of equity.  Prof. Fried argues that in circumstances such as this, when a corporation is dissolved due to a merger that this would warrant such a transmutation.  No other witnesses testified before the court regarding the appropriateness of the class action settlement.

## Summary of the Settlement:

Below is a summary of the settlement as posited by the Parties in the Notice of Class Action which was sent to all shareholders during the relevant period.

Defendants agreed to make, and did make, certain additional disclosures concerning the details of the circumstances and events leading up to the execution by Albertson's of definitive agreements relating to the Acquisition. Defendants published such Supplemental Disclosures in a Form 8-K filed with the SEC on or about May 18, 2006 to be used as additional consideration by the shareholders voting on the pending transaction.

The relevant disclosures set forth in the 8-K elaborated further on the Interested Entity proposal and the potential impact it could have had on shareholders. The purpose of this disclosure was to provide a shareholder with additional information germane to the issue of the merger and shareholder consideration that would be received, thus allowing a more informed decision when voting to approve or dissent to the Acquisition.

## Analysis

**A.    Certification of the Settlement Class**

While the Court has preliminarily approved the class, the Court believes it proper to enumerate again the appropriateness of certifying the Class. Solely for settlement purposes, *see Weinberger v. Kendrick*, 698 F.2d 61, 73 (2nd Cir. 1982), Plaintiffs sought certification of a class for all persons who owned common stock in Albertson's at any time during the period of

September 2, 2005, through and including June 2, 2006 ("the Class Period"). (Pl. Memo in Support of Final Approval, p. 1, Fn. 2). Idaho Rule of Civil Procedure Rule 23 governs class certification. A class must satisfy each of the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation, as well as one or more of the subsections of Rule 23(b). The burden is on the party seeking class certification to show that the requirements of Rule 23(a) and at least one subdivision of Rule 23(b) are satisfied. *Yarmolinsky v. Perpetual Am. Fed. Sav. & Loan Ass'n*, 451 A.2d 92, 94 (D.C. 1982). "Whether that burden has been met is a matter entrusted to the trial court's discretion, and its decision will not be reversed unless that discretion has been abused." *Cowan v. Youssef*, 687 A.2d 594, 602 (D.C. 1996). As discussed below, the Court finds that the Class has satisfied the burden in reference to each of these prerequisites.

### 1. Numerosity

To qualify for certification, a class must be "so numerous that joinder of all members is impracticable." I.R.C.P. 23(a)(1). The Class here is comprised of all persons who owned common stock in Albertson's at any time during the period of September 2, 2005, through and including June 2, 2006. Plaintiffs sent more than 25,000 notices to potential class members on the basis of records provided by Albertson's. (Wood Aff. ¶ 16). Corporate records identified approximately 371,000,000 shares of Albertson's stock outstanding. (Wood Aff. ¶ 16). The numerosity requirement is clearly satisfied.

## 2. Commonality

Rule 23(a)(2) requires "questions of law or fact common to the class." I.R.C.P. 23(a)(2). In the context of a putative class action lawsuit, class members are related by virtue of their common ownership of the company stock. Moreover, the complaint alleged that there were "questions of law and fact which are common to the Class and which predominate over questions affecting any individual class member (Compl. at ¶ 29), including:

> a. whether defendants have breached their fiduciary duties of undivided loyalty, independence or due care with respect to plaintiff and the other members of the Class in connection with the Acquisition;
>
> . . .
>
> c. whether the Individual Defendants are unjustly enriching themselves and other insiders or affiliates of Albertson's;

(Compl. at ¶ 29).   Therefore, the shareholder ownership combined with the nature of the complaint present common questions of fact and law. *See, e.g., In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 452 (S.D.N.Y. 2004); *Banyai v. Mazur*, 205 F.R.D. 160 163 (S.D.N.Y. 2002).  Class members here share a number of questions of law and fact relating to the fiduciary duties of the Albertson's board members, whether the defendants acted as fiduciaries, and the existence of unjust enrichment. The Class is sufficiently common to be certified.

## 3. Typicality

Under Rule 23(a)(3), the claims of class representatives must be "typical of the claims . . . of the class." I.R.C.P. 23(a)(3).   This requirement is met where the proposed class

representatives' claims "arise from [the] same course of conduct that gives rise to claims of the other class members, where the claims are based on the same legal theory, and where the class members have allegedly been injured by the same course of conduct as that which allegedly injured the proposed representatives." *In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 375 (S.D.N.Y. 2000) (citing *In re the Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2nd Cir. 1992). Here, the class representatives' claims are typical of the Class. The representatives held Albertson's stock during the relevant Class Period.

### 4. Adequacy:

The final Rule 23(a) provision requires that class representatives "fairly and adequately protect the interests of the class." I.R.C.P. 23(a)(4). Under Rule 23(a)(4), courts must consider "(i) whether the class representatives' claims conflict with those of the class and (ii) whether class counsel is qualified, experienced, and generally able to conduct the litigation." *In re Global Crossing*, 225 F.R.D. at 453 (citing *In re Oxford*, 191 F.R.D. at 376; *In re the Drexel Burnham Lambert Group*, 960 F.2d at 291).

Here, there are no discernable conflicts between the Class and its representatives. The representatives will recover in the same manner as every other Class member, and must prove identical factual and legal predicates. Furthermore, Class counsel are qualified attorneys with substantial class action experience, including shareholder derivative suits. Their prosecution of the lawsuit has secured the Settlement before the Court for consideration and final approval.

Throughout the litigation, they have shown themselves to be capable and qualified to represent the Class.

### 5. Maintainability:

In addition to finding that a class meets the requirements of Rule 23(a), the court must ascertain whether the class is maintainable under one or more of the Rule 23(b) criteria. Plaintiffs contend that the Class may be certified as a non-opt-out class under Rule 23(b)(1)(B). The Court agrees.

Rule 23 authorizes lawsuits to proceed on a non-opt out basis if they fall within certain parameters. *See* I.R.C.P. 23(b)(1)-(2); 23(c)(2)-(3). In that respect, as in many others, the rule is essentially identical to the federal rule, F.R.C.P. 23(b)(1)-(2); 23(c)(A)-(B); and the Delaware rule. If the circumstances require treatment under 23(b)(1) or (2), there is no opt out right, whereas if 23(b)(3 is the only applicable subsection, then a right to opt out must be offered. *Pope v. Intermountain Gas Co.* 103 Idaho 217, 238, 646 P.2d 988, 1009 (1982). Rule 23(b)(1)(B) provides for class certification when: "the prosecution of separate actions by or against individual members of the class would create a risk of . . . adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests . . .." I.R.C.P. 23(b)(1)(B).

The instant case presents a circumstance courts have recognized repeatedly as appropriate for treatment as a Rule 23(b)(1)(B) class: a shareholder challenge to a merger transaction is the

appropriate means of bringing such a case.  All of the shareholders benefited equally from the enhanced disclosure and it is only fair that all shareholders be bound by the settlement.

In sum, Plaintiffs have satisfied all of the prerequisites for class certification under Rule 23(a) and have demonstrated that a class may be maintained under Rule 23(b)(1)(B).  Therefore, the Class is certified for settlement purposes.

**B.     STANDARD FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENTS:**

Idaho Rule of Civil Procedure 23(e) requires the Court to approve a dismissal or compromise of a class action after notice to the class members.  Federal and state law provides guidance on this issue.  Federal Rule of Civil Procedure 23(e) governs the settlement of class action litigation.  Courts may approve class action settlements after proponents of the settlement have distributed adequate notice of the proposed settlement and the settlement has been the subject of a fairness hearing.  F.R.C.P.  23(e)(1).  The touchstone for court approval is that the settlement be "fair, reasonable, and adequate," F.R.C.P.  23(e)(1)(C); *see Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370, 1375 (9th Cir. 1993); *In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 207 (5th Cir. 1981); *Marshall v. Holiday Magic, Inc.,* 550 F.2d 1173, 1178 (9th Cir. 1977); *Austin v. Pennsylvannia Dep't of Corrections,* 876 F.Supp. 1437, 1456 (E.D.Pa. 1995); *Pickett v. Holland America Line-Westours, Inc.,* 35 P.3d 351, 356 (Wash. 2001), and "not a product of collusion." *D'Amato v. Deutsche Bank,* 236 F.3d 78, 85 (2d Cir.2001) (citing *Joel A. v. Giuliani,* 218 F.3d 132, 138 (2d Cir.2000)); *see also Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,* 396 F.3d 96, 116 (2d Cir.2005), cert. denied, 125 S.Ct. 2277 (2005).

Courts analyze a settlement's fairness, reasonableness and adequacy with reference to both "the negotiating process leading up to settlement as well as the settlement's substantive terms." *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (N.Y. 2001) (citation omitted). The court may not engage in mere "rubber stamp approval" of the settlement, yet it must "stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir.1974); *In re Amsted Indus. Inc. Litig.*, 521 A.2d 1104, 1107 (Del. Ch. 1986); *Pickett*, 35 P.3d at 356-57.

Further, courts should be "mindful of the 'strong judicial policy in favor of settlements, particularly in the class action context.'" *Wal-Mart*, 396 F.3d at 116 (quoting *In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir.1998)); *Lomas & Nettleton Co. v. Tiger Enters.*, 99 Idaho 539, 542, 585 P.2d 949, 952 (1978). As many courts have long recognized, "[t]here are weighty justifications, such as the reduction of litigation and related expenses, for the general policy favoring the settlement of litigation." *Weinberger v. Kendrick*, 698 F.2d 61, 73 (C.A.N.Y. 1982) (citations omitted). These concerns underlie the Court's analyses of both the procedural and substantive fairness of the Settlement. However, the ultimate determination is that the settlement should be approved if it is, when taken as a whole, fair, adequate, and reasonable. *Pickett*, 35 P.3d at 356-57.

## C.   PROCEDURAL FAIRNESS: THE NEGOTIATION PROCESS

"A court reviewing a proposed settlement must pay close attention to the negotiating process, to ensure that the settlement resulted from 'arms-length negotiations and that plaintiffs'

counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests.'" *D'Amato*, 236 F.3d at 85 (quoting *Weinberger*, 698 F.2d at 74); *see also Dunk v. Ford Motor Co.*, 48 Cal. App. 4[th] 1794, 1802 (1996); *Boggess v. Hogan*, 410 F. Supp. 433, 437 (N.D. Ill 1975).   This inquiry into a settlement's procedural fairness helps to ensure that the settlement is not the product of collusion. Evidence of arms-length negotiation between experienced counsel that have engaged in meaningful discovery may give rise to a presumption of fairness. *Wal-Mart*, 396 F.3d at 117 (citation omitted).

In considering the Settlement, multiple factors indicate an arm's length negotiation. From the moment that Plaintiff sent his first demand letter to the Board expressing his initial concerns over a possible sale of Albertson's, to the present, Class counsel has vigorously represented the Settlement Class.  To that end, Class counsel in the Action successfully obtained a remand of the Action back to this Court following the removal by Defendants to Federal Court; moved for and obtained expedited discovery; participated in numerous meet and confer sessions; prepared and briefed motion to address and resolve discovery disputes; and prepared for and argued various court hearings.  Class counsel's motion for expedited proceedings also served to accelerate the consideration and resolution of the dispute.  Conversely, Defendants vigorously and zealously opposed Class counsel's challenge to the Acquisition at each stage of the proceedings.  Both sides have ardently advocated for their respective positions demonstrating an arm's length negotiation.

Next, the Court is satisfied that Class counsel is more than experienced and has the ability to bring this Action.   Class counsel has a nationwide reputation for handling shareholder derivative litigation, various class actions, and complex litigation.   Plaintiff's lead counsel was responsible for organizing the suit and coordinated plaintiff's counsel.   Third, extensive discovery occurred here.   Class counsel requested and documented over 700,000 pages of written discovery as detailed above.   The bulk of the discovery related to the valuation of the company in relation to the sale of Albertson's and briefly addressed issues of executive compensation.   The Court finds that the discovery conducted by Plaintiff's counsel was sufficient to evaluate and effectively represent the Class's interests.

In light of the substantial evidence that settlement negotiations were conducted at arms-length without any hint of collusion, the Court credits the Settlement with a presumption of fairness.   Accordingly, the propriety of this presumption is supported by the fairness of the Settlement terms.

### D.   NOTICE

Proponents of a settlement must provide reasonable notice to the settlement class in such a manner as the court directs.  I.R.C.P. 23(e); *see also* F.R.C.P. 23(e).   Such notice must comply with due process and Rule 23.   *See Wal-Mart*, 396 F.3d at 113.   While there are "no rigid rules" to be applied, "the settlement notice must 'fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings.'"   *Id.* at 114 (quoting *Weinberger*, 698 F.2d at 70).

"It is widely recognized that for the due process standard to be met it is not necessary that every class member receive actual notice, so long as class counsel acted reasonably in selecting means likely to inform persons affected." *In re Prudential Sec. Inc. Ltd. P'Ships Litig.*, 164 F.R.D. 362, 368 (S.D.N.Y.1996) (citations omitted). In the context of the non-opt-out class here, "Rule 23 requires only such unspecified 'appropriate notice' as 'the court may direct.'" *In re Global Crossing*, 225 F.R.D. at 448 (quoting F.R.C.P. 23(c)(2)(A)).

In this instance, the form and method of notice approved by the Court's preliminary approval order were effectuated by Class counsel. Notice was sent to over 25,000 Albertson's shareholders of record, published in national and business newspapers, and published on both the Albertson's and SEC websites. These efforts were sufficient to alert prospective Class members to the terms of the proposed Settlement and their ability to object to the Settlement. Notice procedures such as these have been found to be more than adequate in similar cases. *See, e.g., In re Worldcom, Inc. ERISA Litig.*, No. 02 Civ. 4816(DLC), 2004 WL 2338151, at *3 (S.D.N.Y. Oct. 14, 2004); *In re Global Crossing*, 225 F.R.D. at 448-50. The Court finds that the notice procedures and the content of the notice were adequate.

**E.      Substantive Fairness: The Settlement Terms**

In evaluating the fairness, reasonableness, and adequacy of a settlement, the court must consider the "substantive terms of the settlement compared to the likely result of a trial." *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir.1983) (citations omitted). In order to make this evaluation, courts have consistently employed the *Grinnell* factors, which are as follow:

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through the trial;

(7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery;

(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Wal-Mart*, 396 F.3d at 117 (quoting *Grinnell*, 495 F.2d at 463); *Girsh v. Jepson*, 521 F.2d 153, 157 (3rd Cir. 1975). When appropriate, the Court will combine multiple Grinnell factors to more efficiently appraise the Settlement.


## 1. Complexity, Expense and Likely Duration of the Litigation

What has already proven to be a complex, long, and expensive litigation seems unlikely to prove any less so if the parties were to continue on to trial. The settlement came on the eve of what would likely have been a highly contentious hearing seeking to enjoin the sale of Albertson's to SuperValu. Since the commencement of this lawsuit, the parties have engaged in considerable discovery, vigorously contested motion practice, and intensive settlement

MEMORANDUM DECISION AND ORDER- 29

negotiations. Plaintiffs have every reason to expect Defendants' continued disputation of the underlying claims and their assertion of every available defense leading up to trial and, if necessary, at trial. Were a trial necessary, the difficult factual issues present in this case would likely necessitate a further costly and lengthy courtroom battle.

Conversely, the Settlement under consideration "would grant relief to all class members without subjecting them to the risks, complexity, duration and expense of continuing litigation." *In re Global Crossing*, 225 F.R.D. at 456-57; *see also Maley v. Del Global Techs. Corp.*, 186 F.Supp.2d 358, 362 (S.D.N.Y.2002) (approving settlement that resulted "in a substantial and tangible present recovery, without the attendant risk and delay of trial"). After careful consideration of the circumstances of this litigation, the Court finds that a trial would likely be long, complex, and costly. This factor favors the Settlement.

### 2. Reaction of the Class to the Settlement

The exceptionally low number of objections submitted by the Class also weighs in favor of the Settlement. The reaction of the class is commonly gauged with reference to the extent of objection to the settlement. Courts have noted that "the lack of objections may well evidence the fairness of the Settlement." *In re Am. Bank Note Holographics*, 127 F.Supp.2d 418, 425 (S.D.N.Y.2001); *see also In re PaineWebber Ltd. P'ships Litig.*, 171 F .R.D. 104, 126 (S.D.N.Y.1997) ("A favorable reception by the Class constitutes 'strong evidence' of the fairness of a proposed settlement and supports judicial approval.") (quoting *Grinnell*, 495 F.2d at 462).

Here, the Settlement administrator published a summary notice in a national newspaper and mailed notice to approximately 25,000 Class members.  In response, the Court received only five objections, and only one directed at the nature of the Settlement of the Class.  The lion's share of the objections dealt directly with the amount of attorney's fees to be received by Class counsel.  The relative lack of dissent here compares favorably with settlements previously approved. See, e.g., *D'Amato*, 236 F.3d at 86-87 (eighteen objectors out of 27,883 notices); *Hicks v. Stanley*, No. 01 Civ. 10071(RJH), 2005 WL 2757792, at *6 (S.D.N.Y. Oct. 24, 2005) (three objectors out of approximately 100,000 potential members of the class); *In re WorldCom, Inc. Sec. Litig.*, 388 F.Supp.2d 319, 337-338 (S.D.N.Y.2005) (seven objectors out of 4,000,000 potential class members and 830,000 claimants).

### 3. Stage of Proceedings and Amount of Discovery Completed

Consideration of the third Grinnell factor also supports the Settlement. Courts have approved settlements at all stages of the proceedings.  The relevant inquiry for this factor is whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement. The parties need not "have engaged in extensive discovery" as long as "they have engaged in sufficient investigation of the facts to enable the Court to 'intelligently make . . . an appraisal' of the settlement." *In re Austrian & German Holocaust Litig.*, 80 F.Supp.2d 164, 176 (S.D.N.Y.2000) (quoting *Plummer v. Chemical Bank*, 668 F.2d 654, 660 (2d Cir.1982)); *see also Maley*, 186 F.Supp.2d at 363; *In re Am. Bank Note Holographics*, 127 F.Supp.2d at 425-26.

Here, the parties had engaged in extensive factual investigation prior to the time of the Settlement Agreement. As noted above, Plaintiffs successfully defeated Defendant's motion to remove the present action to Federal Court. Further, both parties were prepared to argue the motion seeking an injunction of the sale when the Settlement Agreement was reached at the eleventh hour. Multiple hearings have been conducted in an effort to secure the present settlement. All parties engaged in thorough briefing of their claims to support their positions in all hearings before this Court. Finally, as detailed above, Plaintiff secured the production of over 700,000 documents related to the transaction which included PowerPoint presentations made to the Board by Company management, its advisors, and agents that analyzed and summarized the proposed Acquisition. Further, Plaintiff had served deposition notices on key participants in the transaction, including Albertson's CEO, Larry Johnston, and other important financial analysts who reviewed the transaction. All of these efforts are indicia that the parties did not arrive at the Settlement hastily or without ample preparation and understanding of the discovery.

## 4. Risks of Class Prevailing (Establishing Liability and Damages, and of Maintaining the Class through Trial)

One of the Court's central inquiries when appraising a settlement is the likelihood that the class would prevail at trial in the face of the risks presented by further litigation. An analysis of all the relevant risks in this litigation also favors the Settlement.

MEMORANDUM DECISION AND ORDER-32

Grinnell factors four through six specifically advise courts to consider the risks of establishing liability and damages, and of maintaining the class through trial. *Grinnell*, 495 F.2d at 463. These inquiries require courts to consider legal theories and factual situations without the benefit of a fully developed record, thus courts must heed the Supreme Court's admonition not to "decide the merits of the case or resolve unsettled legal questions." *Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n. 14 (1981). Rather, "the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement." *In re Global Crossing*, 225 F.R.D. at 459 (citing *In re Holocaust Litig* ., 80 F.Supp.2d at 177).

Plaintiffs face a number of risks in establishing liability here. Perhaps most notably, the rigid requirements necessary to halt a merger or sale.  In order to halt a merger/sale of a company, Plaintiffs must show: (1) a reasonable probability of success on the merits; (2) that they will suffer irreparable injury absent the injunction and (3) that the harm to the plaintiffs without an injunction outweighs the harm that the injunction will visit upon the defendants. *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 179 (Del. 1986).

*Revlon* emphasizes that the board must perform its fiduciary duties in the service of a specific objective: maximizing the sale price of the enterprise.  Although the *Revlon* doctrine imposes enhanced judicial scrutiny of certain transactions involving a sale of control, it does not eliminate the requirement that plaintiffs plead sufficient facts to support the underlying claims for a breach of fiduciary duties in conducting the sale. *Revlon*, 506 A.2d at 182-83.

However, a court applying enhanced judicial scrutiny should be deciding whether the directors made a reasonable decision, not a perfect decision. If a board selected one of several

reasonable alternatives, a court should not second guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the boards' determination. Thus, courts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness. *Paramount Communications Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 (Del. 1994).

Beyond that, the Plaintiff would then have been required to show that the Board acted outside their fiduciary duties to the company and shareholders. The business judgment rule presumes that directors of a corporation have complied with their fiduciary duties to reasonably inform themselves of all relevant[7], material information and have acted with the requisite care in making the business decision.[8] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) overruled on other grounds by, *Brehm v. Eisner*, 746 A.2d 244, 251 (Del. 2000); 46 A.L.R.4[th] 887 (Westlaw 2006). Under Delaware law, "a breach of fiduciary duty analysis in the context of a merger begins with the rebuttable presumption that that a company's board of directors has acted with care, loyalty, and in 'good faith.'" *In re IXC Commc'ns, Inc. S'holders Litig.*, Nos. 17324, 17334, 1999 WL 1009174, at *4 (Del. Ch. Oct. 27, 1999); *In re CompuCom Sys., Inc. S'holders Litig.*, 2005 WL 2481325, at *5 (Del. Ch. Sept. 29, 2005).[9] Important to a board's duty to inform

---

[7] A board of directors must be reasonably informed of material facts available to them but does not require that they be informed of every fact. *Brehm*, 746 A.2d at 259.

[8] Initially the business judgment rule required a showing of both (1) the directors being disinterested and independent; and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. However, the court subsequently changed the "and" to read "or." *See Brehm*, 746 A.2d at 253.

[9] "In this way, the business judgment rule serves to promote the role of the board, and not the court, as the ultimate manager of the business and affairs of the corporation." *In re CompuCom Sys.*, 2005 WL 2481325, at *5; *see also* Del. Code Ann. Tit. 8, § 141(a) ("The business and affairs of every corporation . . . shall be managed by or under the direction of a board of directors.").

themselves is the reliance on an expert advising the Board.[10]  *See In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1000-01 (Del. Ch. 2005); *Brehm*, 746 A.2d at 251; 46 A.L.R.4th 887.  When making a corporate decision, it is permissible for a Board to consider potential liabilities of a position and counter those effects.  *See Id.* at 253.  Where a shareholder pleads wrongdoing by a corporate board, their allegations must create a reasonable doubt that the board's decisions were outside the outer limits of the business judgment rule.  *Id.* at 258; *Aronson*, 473 A.2d at 812.  Specifically, Courts should not engage in "20/20 hindsight to second guess a board's decision, except 'in rare cases [where] a transaction may be so egregious on its face that the board approval cannot meet the test of business judgment.'"  *Brehm*, 746 A.2d at 260; *see also In re Toys "R" Us*, 877 A.2d at 1000-01;[11] 46 A.L.R.4th 887.  As such, a complaint second guessing the business decisions of a board must likely plead that corporate directors were guilty of misconduct, fraud, or collusion in their actions.  46 A.L.R.4th 887.  But again, that standard is tempered because "[i]f the board selected one of several reasonable alternatives, a court should not second-guess that choice even though it might have decided otherwise . . . .  Thus, courts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness."  *Paramount Commc'ns, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 45 (Del. 1994).  As such, the

---

[10] One of the questions addressed by the *Brehm* Court was whether the Disney directors would be "fully protected" by their reliance on an expert in making a determination of the severance package. *Brehm*, 746 A.2d at 261.
[11] *In re Toys "R" Us* highlights that board actions further those of the shareholders when they undertake "reasonable efforts" to perform the obligations to the shareholders and that perfection is not required. *In re Toys "R" Us*, 877 A.2d at 1000-01. Additionally, the case illustrates that one of the benchmarks of breaching this duty is to "tilt the playing field towards a particular bidder for reasons unrelated to the stockholders' ability to get top dollar." *Id.*

road for bringing a shareholder derivative suit is surely an uphill battle, however while the burden is high, it is not insurmountable. *See Brehm*, 746 A.2d at 267.

Because of the low threshold of the business judgment rule, there is little need to intricately dissect the facts in this instance. That is, there is nothing pled to suggest that the Defendant's actions were uninformed, without due care, or without the best interests of the corporation and its' shareholders in mind. Moreover, the facts do not suggest that there was anything closely resembling fraud or misrepresentations. Much to the contrary, the papers suggest that many outside sources and experts were consulted and that the Defendants were acting in an informed manner, seeking to maximize the value of the company. For example, the Acquisition was the product of a lengthy process that consumed nearly a year and involved over 37 meetings of the board or (separately) the independent members of the board. There were three financial advisors and two law firms from whom the directors sought advice and guidance. (Batcheler Aff., Ex. E, at 48). To further bolster the claim that the ultimate decisions made by the Board in relationship to the Acquisition were fair is the conclusions made by Class counsel ultimately determining that their theory of liability was not viable. (Rozwood Aff. II at ¶¶ 18-20; Morris Aff. At ¶¶ 4, 10-11). As such, there does not appear to be any breach by the Defendants of the business judgment rule and moreover, this Court would not scrutinize their decisions based on a present ability to review the past. In sum, the risks of prevailing at trial were surely a gargantuan task and one which Class counsel recognized.

Finally, it is important to note that the Court cannot discount the risk of maintaining the class through trial. The Court certified the Class only after a settlement was reached without

opposition by the defendants.  It could be anticipated that had the settlement not occurred, the Defendants would oppose class certification vigorously.  As such, even the process of class certification would have subjected Plaintiffs to considerably more risk than the unopposed certification that was ordered for purposes of the Settlement.

### 5. Ability of Defendants to Withstand a Greater Judgment

The ability of Defendants to pay a greater judgment does not militate against the Settlement.  This factor typically weighs in favor of settlement where a greater judgment would put the defendant at risk of bankruptcy or other severe economic hardship.  *See, e.g., In re Warner Comms. Sec. Litig.*, 618 F.Supp. 735, 746 (S.D.N.Y.1985).  Here, SuperValu, the parent company of the now subsidiary Albertson's, remains a solvent, highly capitalized company, with significant assets.  Neither party contends that Defendants are incapable of withstanding a monetary judgment.  However, "the fact that a defendant is able to pay more than it offers in settlement does not, standing alone, indicate that the settlement is unreasonable or inadequate." *In re Painewebber*, 171 F.R.D. at 129; see also D'Amato, 236 F .3d at 86; *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 477-78 (S.D.N.Y.1998).  It is also important to note that here the remedy sought by Class counsel involved only equitable relief in the form of an injunction and ultimately in additional disclosures made the shareholders.  Class counsel considered potential direct monetary claims but made a calculated decision to forgo the pursuit of any claims because the value and potential risk were incompatible.  Moreover, this factor must

be weighed in conjunction with all of the *Grinnell* factors, most notably the risk of the class prevailing and the reasonableness of the settlement fund.

### 6. Range of Reasonableness of the Settlement

The last two *Grinnell* factors consider the settlement's range of reasonableness "in light of the best possible recovery" and compared to a "possible recovery in light of all the attendant risks of litigation." *Grinnell*, 495 F.2d at 463. Though courts are encouraged to consider the best possible recovery, the range of reasonableness inquiry is tightly bound to the risks of litigation, which have been developed in greater detail above. As such, the following discussion must be tempered by the Court's earlier finding that continued litigation would proceed with a high degree of risk.

Following intense discussions and the production of a substantial number of documents, the parties reached a class wide settlement that provided meaningful consideration to the shareholders. One of the significant complaints of the Class was that the value of the deal for the shareholders was minimal and that the disclosure in the proxy had not fully disclosed the nature of the board's deliberation. The enhanced disclosure that resulted from the Settlement ensured: (1) that shareholders were more fully informed of the various detailed differences between the potential transactions contemplated by the Board; and (2) that the market, including other potential purchasers of Albertson's, would have additional information that would either generate a new superior transaction or confirm that no such transaction was anxiously waiting to replace the current offer.

The concept of disclosure is a foundation principle for the functioning of the U.S. securities markets and systems of corporate governance. *Uni-Marts, Inc. v. Stein*, 1996 WL 466961, at *6 (Del. Ch. 1996) (disclosure "protects the integrity of the process through which shareholders exercise their corporate governance rights and responsibilities"). Thus, when the adequacy of disclosure is at issue then corrective or improved disclosure can be a substantial remedy. *See Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051, 1151-52 (Del. Ch. 1987) (concluding that the harm to shareholders resulting from inadequate disclosure was irreparable and thus, in lieu of money damages, imposed a preliminary injunction until the disclosure deficiencies were cured by appropriate supplemental disclosure); *In re CompuCom Sys.*, 2005 WL 2481325, at *10 (Del. Ch. 2005) (concluding that a proxy supplement issued after the plaintiff's first amended complaint cured any alleged inadequate disclosures). A settlement that includes enhanced disclosure allows shareholders to "feel more secure and informed when casting their votes." *In re Golden State Bancorp Inc. S'holders Litig.*, 2000 WL 62964, at *2 (Del. Ch. 2000).

Here, the Settlement produced an additional disclosure that further detailed the economic terms of competing proposals and the effect of the competing offer on the Albertson's executives and financial advisor's compensation. These additional disclosures were made in an effort to better inform the shareholders regarding the underlying history of the offer and whether or not to approve the Acquisition. That is, it aided them in making a more objective determination of the entire Acquisition thus assisting the shareholders to "feel more secure and informed when casting their votes. *Id.*

After carefully considering the *Grinnell* factors, most of which weigh in favor of the Settlement, the Court must still consider other important issues that bear significantly on the appropriateness of the settlement and specifically, issues raised by Objector Frank Nordby, which will be addressed below.

## F.   ADDITIONAL CONSIDERATIONS

One of the overarching concerns of Objector Frank Nordby is the inability to opt-out of the class action if a shareholder so desires.  Perhaps one of the most notable differences between rules 23(b)(1) and 23(b)(3) notice is classes certified under Rule 23(b)(1) and (2) are generally binding on all class members with no option of opting out[12] and notice is completely discretionary with the trial court.  *Bolton v. Murray Envelope Corp.,* 553 F.2d 881, 883 (5th Cir.1977); *Robinson v. Union Carbide Corp.,* 544 F.2d 1258, 1260 (5th Cir.1977); *Dove v. Kinnear,* 79 Wn.2d 755, 766, 489 P.2d 898 (1971).   Whereas classes certified under Rule 23(b)(3) require the option to litigate separately and the best practicable notice of their rights to all class members. *Phillips Petroleum v. Shutts,* 472 U.S. 797, 812, 105 S.Ct. 2965, ___ (1985).

As such, problems of due process can surface under class actions certified under rule 23(b)(1) and (2) because the judgment is binding on all class members even though they may not necessarily receive notice or the option of opting out.  Under a rule 23(b)(1) and (2) class action, "due process requires only that the class members be adequately represented.  The trial court

---

[12] *But see Penson v. Terminal Transport Co., Inc.,* 634 F.2d 989, 993 (5th Cir.1981) (finding that a trial court has discretion to allow opt outs under a CR 23(b)(2) certification).

may in its discretion in a class action certified under Rule 23(b)(2) direct that notice be given under Rule 23(d)." *EEOC v. General Tel. Co. of Northwest, Inc.,* 599 F.2d 322, 334 (9th Cir.1979) *affirmed* 446 U.S. 318, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). In such cases under rule 23(b)(1) and (2), class members must rely on the class representatives to vigorously advocate for their interests. The central question under due process in rule 23(b)(1) and (2) actions is whether the class representation was adequate and fair. *Wetzel v. Liberty Mutual Ins. Co.,* 508 F.2d 239, 256-57 (3rd Cir.1975). Due in large part to this key distinction, the importance of the adequate representation becomes that much more vital to the analysis on whether the settlement is fair, adequate, and reasonable.

Included as part of the Settlement is a Release and more specifically a release of all direct monetary claims. The specific language of the release states as follows:

> "Released Claims" means all claims of plaintiff and all class members, including Unknown Claims, against Defendants' Released Persons, which have been or could have been asserted in the Action or otherwise in this or any other court of tribunal including, without limitation, claims arising under state or federal law, doctrine or principle of any kind, including the federal securities laws, whether directly, derivatively, representatively, or in any other capacity, which arise now or hereafter out of, or relate in any way to, the acts, facts, or events alleged or referred to in the Action, including, without limitation, the Acquisition, any discussions and negotiations leading up to the Acquisition, the preparation and approval of the proxy statements relating to the Acquisition, or any other disclosures relating to the Acquisition, or which arise now or hereafter out of, or relate in any way to, any other proposed or actual transaction involving the sale or other disposition of all or any part of the business of Albertson's, or any fiduciary duty or disclosure obligations of any of the Defendants or other persons to be released with respect to any of the foregoing or the Settlement (whether or not such claim could have been asserted in the Action). Notwithstanding anything to the contrary in the Agreement, however, nothing herein is intended to waive or limit any statutory appraisal rights that any member of the Settlement Class may have.

The subject of the release posed severe consternation to all parties and the Court in making a determination of the remaining rights of any party. Objector Nordby was concerned with the language of the Release for two reasons. First, it would extinguish any additional claim brought by Nordby, including the suit which is already filed with the Court as mentioned above. Second, Nordby states that the Release is unconstitutional in that it prohibits a shareholder from bringing a direct claim against the board.

### 1.    Nature of Nordby's Claim

During the course of the Settlement Approval hearing, Objector Nordby argued that a claim for excess executive compensation can be a direct claim and because the Release prohibits all direct monetary claims that the Release is overbroad and unconstitutional due to the inability for a Class member to opt-out of the present Settlement. In aid of his assertions, Prof. Fried was presented to the Court to testify as to the manner in which excess executive compensation claims are brought in Delaware and likely trends of the Delaware Courts. Specifically, Prof. Fried discussed in-depth both *Parnes v. Bally Entertainment Corporation*, 722 A.2d 1243 (Del. Sup. 1999) and *Kramer v. Western Pacific Industries, Inc.*, 546 A.2d 348 (Del. Sup. 1988), as supporting their assertion that the line between a direct and derivative suit was a "fuzzy" one and that Delaware courts appear to be willing to take a seemingly derivative claim and construe it as a direct claim, especially in the context of a sale/merger where the former corporation in no longer in existence, as has happened here. Specifically, Nordby argues that *Parnes* establishes

that if a merger price or payment to shareholders is diminished because of excessive executive compensation, claims on behalf of the shareholders for those damages are direct. *Parnes*, 722 A.2d at 1247; *see also, Dieterich v. Harrer*, 857 A.2d 1017, 1029 (Del. Ch. 2004); *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 973 (Del. Ch. 2000).

In *Parnes*, the CEO of the defendant corporation exerted substantial control over the merger negotiations, informing potential acquirers that a suitable merger offer would necessarily require payments to the CEO of money and corporate assets. There the Court stated that in order to assert a direct attack on a merger the shareholder would be required to "challenge the validity of the merger itself, which is usually done by charging the directors with breaches of fiduciary duty." *Parnes*, 722 A.2d at 1245. In the *Parnes* case the court found that the allegations were in fact attacking the merger itself and specifically the collusive actions by the CEO and therefore the claim could properly be maintained as a direct action.

In *Kramer*, the Delaware court found to be derivative a stockholder's challenge to transactions that occurred immediately preceding a merger. Specifically the stockholders challenged the decision by the board to grant management stock options and golden parachutes. In an effort to maintain a direct suit the stockholders argued that their share of the proceeds from the merger were reduced by the resources used to pay for the options and golden parachutes. However, the Delaware court disagreed with the argument stating that to support a direct action the stockholder must allege an injury other than that suffered by the corporation. *Kramer*, 546 A.2d at 352. Ultimately the court held that the claim of mismanagement of corporate assets was a derivative claim. *Id.*

In this instance, the facts here are inapposite with those of *Parnes*. That is, in *Parnes* a director was seeking to influence the merger by requiring a suitable offer to include illegal payments of money and assets to him. Specifically, the director's illegal demands precluded potentially higher offers from other would be suitors. *See Parnes*, 722 A.2d at 1246. Nothing in the record indicates that Mr. Johnston, as the CEO of Albertson's engaged in any divisive tactics to boost his golden parachute at the expense of a more profitable offer. Rather Nordby concedes that there were no improprieties in relationship with the present Acquisition. That is, Mr. Johnston did not engage in any illegal activity by choosing one alternative over another because he stood to benefit financially from one as opposed to another. And like *Kramer*, the facts here are highly comparable, that is, here any alleged direct attack made by Nordby related to purported excess executive compensation which as stated in *Kramer* would be classified as a derivative suit. What has occurred here is an allegation of excess executive compensation to Mr. Johnston which was triggered by the merger. But again, as was reiterated in *Kramer*, if there is no attack on the validity of the merger itself then a derivative claim results. *Kramer*, 546 A.2d at 352.

Moreover, both Defendant and Class counsel rebut the assertion made by Nordby through the use of *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031 (Del. Sup. 2004). Counsel argues that the present state of the law in Delaware is that a claim for excess executive compensation is a derivative claim and there is no indication that the Delaware Supreme Court is willing to deviate from that position.

In *Tooley*, the stockholders brought a purported direct class action seeking monetary damages for the alleged breach of fiduciary duties of the Board which purportedly harmed the cash value of the stock. The Court of Chancery dismissed the action on the ground that the claims were derivative in nature and not direct and the stockholders lost standing once they tendered their shares in connection with the merger. The Delaware Supreme Court after reviewing prior case law that confused the direct/derivative dichotomy, set forth a clear rule to assist a court in making such a determination. The Court held:

> [A] court should look to the nature of the wrong and to whom the relief should go. The stockholder's claimed direct injury must be independent of any alleged injury to the corporation. The stockholders must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.

*Tooley*, 845 A.2d at 1039. In issuing its decision, the Delaware court took special care to affirm the outcome in prior cases, including that of *Parnes*, and *Kramer*. As the Court discussed the confusing nature of the direct and derivative claims, the court did not discuss the ability to convert one to another in special circumstances, rather, the Court carefully considered and declared a plain and simple rule. As such, the current state of the law regarding direct and derivative claims is that as stated in *Tooley*, and nothing more can be inferred therefrom. The fact remains that it is unsupported hyperbole to argue that a Court will be willing to transmute a derivative claim to a direct claim and, at the present time, is a position that this Court is unwilling to indulge in.

### 2.     The Status of Nordby's Derivative Suit

Objector Nordby also argues that any derivative claim would be a "dead duck" due to

Albertson's inexistence and a dismissal of the *Nordby* suit would be required. *See Kramer*, 546

A.2d at 354-55; *Lewis v. Anderson*, 453 A.2d 474 (Del. Ch. 1982), *order aff'd* 477 A.2d 1040

(Del. Sup. 1984).  Specifically, Nordby argues that similar to the result in *Kramer* he too would

lose standing to pursue the post-merger claims against the Defendants because he no longer

holds stock in the corporation.  In a derivative suit, the shareholder sues on behalf of the

corporation for harm done to the corporation. *Kramer*, 546 A.2d at 351.  Accordingly, any

damages recovered would rightly be paid to the corporation and not the shareholders bringing the

action.  However, the law is clear that to have standing to maintain a shareholder derivative suit,

a plaintiff must be a shareholder at the time the suit was initiated and must remain a shareholder

throughout the litigation. *Lewis v. Anderson*, 477 A.2d 1040, 1046 (Del. 1984).  Nevertheless,

the Delaware courts have noted two exceptions to the requirement that only current shareholders

may maintain a derivative action: (i) if the merger itself is the subject of a claim of fraud, being

perpetrated merely to deprive shareholders of the standing to bring a derivative action; or (ii) if

the merger is in reality merely a reorganization which does not affect plaintiff's ownership in the

business enterprise. *Lewis*, 477 A.2d at 1046 n. 10; *see also Bokat v. Getty Oil Co.*, 262 A.2d

246, 249 (1970); *Schreiber v. Carney*, 447 A.2d 17, 21-22 (1982); *Kramer*, 546 A.2d at 354.

Both of the *Lewis* exceptions are inapplicable to this case.  Nordby does not contend that the

merger was fraudulent, perpetrated merely to deprive shareholders of its claim against the

defendants; nor does Nordby contend that Albertson's had only been reorganized.  The facts

clearly cannot support such a conclusion. As such, Nordby would lose his ability to bring a derivative action on behalf of Albertson's.

However, much like a shareholder may bring a derivative action on behalf of the corporation, a shareholder who seeks redress for a now defunct corporation due to a merger is not high and dry without a cause of action. Rather, the shareholder may pursue a double derivative action. *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993). A double derivative action is an action by a shareholder of one corporation to redress a wrong allegedly done to another corporation in which shares are owned by the first corporation. *Batchelder v. Kawamoto*, 147 F.3d 915, 917 n.1 (9th Cir. 1998). In other words, "[t]he shareholder is, in essence, maintaining a derivative action on behalf of the subsidiary, since the holding or parent company has derivative rights to the cause of action possessed by the subsidiary." *Id.* Accountability of the subsidiary corporation's board is still preserved and now flows through the parent company. Of course a plaintiff must still satisfy the test for demand futility for the subsidiary's board as well as for the parent's board. *Rales*, 634 A.2d at 934.

Here, Nordby has filed a derivative action seeking redress for the excessive compensation paid to Mr. Johnston. While Nordby no longer has standing to sue derivatively on behalf of Albertson's due to the merger, he does have standing to bring the suit as a double derivative because the Albertson's stock was converted to SuperValu stock. Thus, assuming Nordby maintained his SuperValu stock, he would continue to have standing to bring the double derivative suit.

It is also important to note that extensive discussion occurred regarding the Release language and whether Class counsel and Defendants viewed it to preclude a derivative suit, such as that already filed by Nordby. Counsel was in agreement that while the Release did preclude any and all direct monetary claims, the Release was in no way intended to prohibit a shareholder from bringing a derivative suit that arises from the Acquisition. In reviewing the Release language, the Court finds that it should be interpreted as follows: Any shareholder class action of shareholder direct claim alleging excessive compensation arising out of or relating to (i) the transaction itself or (ii) any agreements entered into in connection with the transaction are barred by the release. However, shareholder derivative claims alleging excessive compensation independent of the sale are not released. Over lengthy discussion, both Class counsel and Defendants agreed to this interpretation.

## 3.    Unconstitutionality

As is discussed above, the Court does not find any direct action to be available to Nordby or any other class member in relation to the Acquisition. As such, the concern over the constitutionality of the Release is a non-issue. Because the only remaining claims available to Nordby are derivative in nature and those have been specifically carved out of the Release, the Court need not further elaborate on the issue.

### 4. Adequate Investigation of Excess Executive Compensation Claim

The final argument asserted by Objector Nordby is that Class counsel failed to adequately investigate the alleged excess executive compensation. The documentary review, analysis and opinions of Prof. Fried constitute the sole evidence of record regarding Plaintiff's treatment of excessive executive compensation claims. However, as the Court noted above, Class counsel is highly experienced in bringing both class actions and derivative claims. During the course of the hearing, Class counsel stated that they considered the claims for excess executive compensation and felt that the potential reward versus the high risk in bringing the suit was disproportionate and that counsel made a calculated decision to forgo the direct claim for excess compensation. While it may be true that Class counsel did not fully pursue, obtain or consider all documents necessary to fully analyze such a claim, the experience of counsel, indicates that the risk of pursuing the action was not worth the cost of attaining all necessary documents. Based on the documents, it appears that counsel reviewed the documents available and made a calculated decision to not pursue the excess compensation claim. The Court is unwilling to second guess, in hindsight, the actions of counsel in making litigation decisions. Furthermore, the Court does not believe that the issue warrants denying Settlement approval.

### G. MOTION TO INTERVENE

In August of 2006, Nordby filed a motion to intervene in the action. During the hearing, the Court stated that it would reserve ruling on that motion which would follow the final settlement hearing. While the motion to intervene played no role in the consideration of the

present motion it is tangentially related.  Nordby brings his Motion to Intervene, first, as an

intervention as a matter of right and, alternatively, as a request for permissive intervention.

Intervention as a matter of right is provided for under Rule of Civil Procedure 24(a), which

states:

> Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the state of Idaho confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

I.R.C.P. 24(a).  Because the Class Action has been approved, the need to discuss the Nordby's

request to intervene is now moot.


### CONCLUSION:

As such, based on the Courts review of the *Grinnell* factors, most of which favor the

Settlement, and the other relevant concerns raised by Counsel, the Court finds that Class Counsel

adequately represents the Class and the substantive terms of the Settlement are fair, reasonable,

and adequate.  Moreover, Objector Nordby is not precluded from pursuing the derivative action

previously filed with the Court.  While the suit cannot be pursued on behalf of Albertson's

directly, Nordby can secure the same rights by way of a double derivative action.  Thus, for the

foregoing reasons, Plaintiff's Motion for Final Approval of Settlement is granted.  However, the

Court will reserve judgment on attorney's fees and expenses and a separate decision and order

will follow.

**ORDER:**

IT IS HEREBY ORDERED that Plaintiff's Motion for Final Approval of the Settlement is GRANTED in accordance with the findings as set forth above. Additionally, Objector Nordby's Motion to Intervene is DENIED. Finally, the Court will, however, reserve judgment on the attorney's fees and expenses.

DATED this 23 day of January 2007.

Darla Williamson,
District Court Judge

MEMORANDUM DECISION AND ORDER- 51

I certify that a true and correct copy hereof was this date mailed to each of the following:

Philip Gordon
Bruce Bistline
GORDON LAW OFFICES, CHTD
623 West Hays Street
Boise, ID 83702

Robert S. Walker
John M. Newman, Jr.
JONES DAY
901 Lakeside Ave.
Cleveland, OH 44114

Marc M. Umeda
S. Benjamin Rozwood
ROBBINS, UMEDA, & FINK, LLP
610 West Ash Street, Suite 1800
San Diego, CA 92101

Richard H. Greener
Thomas A. Banducci
GREENER, BANDUCCI, SHOEMAKER
950 W. Bannock, Suite 900
Boise ID 83702

J. Walter Sinclair
Mark S. Geston
STOEL RIVES, LLP
101 S. Capitol Blvd., Suite 1900
Boise ID 83702

Charles F. Peterson
LAW OFFICES OF CHARLES F.
PETERSON
913 West River Street, Suite 420
Boise, ID 83702

Dated: _____

Signed: _____
          Janine Korsen,
          Deputy Court Clerk

MEMORANDUM DECISION AND ORDER- 52