# Exhibit K

| | | |
|---|---|---|
| IN RE NATIONWIDE HEALTH PROPERTIES, INC. SHAREHOLDER LITIGATION | * | IN THE |
| | * | CIRCUIT COURT |
| | * | FOR |
| | * | BALTIMORE CITY |
| | * | Part 10 |
| | * | Case No.:  24-C-11-001476 |

*     *     *     *     *     *     *     *     *     *     *     *     *

## MEMORANDUM OPINION

## I.    INTRODUCTION

This purported class action shareholder litigation arises out of a proposed stock-for-stock merger between Nationwide Health Properties, Inc. ("Nationwide"), a Maryland corporation, and Ventas, Inc. ("Ventas"), a Delaware corporation.  Plaintiffs Michael Crowley, Ron Taylor, the Haughey Family Trust, and Marcella and Stanley Rappoport each own common shares of Nationwide.  Plaintiffs, on behalf of themselves and all other Nationwide shareholders, brought this consolidated action[1] against Nationwide and the eight members of its Board of Directors[2], alleging that the directors breached their fiduciary duties to the corporation and its shareholders by arranging and agreeing to the proposed merger ("Proposed Transaction").

---

[1] The consolidated action is comprised of the following four matters filed in the Circuit Court for Baltimore City: *Michael Crowley v. Nationwide Health Properties, Inc., et al.* (Case No. 24-C-11-001476), *Ron Taylor v. Nationwide Health Properties, Inc., et al.* (Case No. 24-C-11-001563), *Haughey Family Trust v. Douglas Pasquale, et al.* (Case No. 24-C-11-001835), and *Marcella and Stanley Rappoport v. Douglas Pasquale, et al.* (Case No. 24-C-11-002186).  The parties submitted a joint request for special designation to this Court's Business and Technology division of the civil docket.  The Court granted the joint request and recaptioned the consolidated action as *In re Nationwide Health Properties, Inc. Shareholder Litigation*.

[2] The individual defendant-directors ("Individual Defendants" or "Defendant-Directors") include Douglas M. Pasquale, Robert D. Paulson, R. Bruce Andrews, David R. Banks, William K. Doyle, Richard I. Gilchrist, Dr. Jeffrey L. Rush, and Keith P. Russell.

Additionally, Plaintiffs named Ventas and its wholly-owned subsidiary, Needles Acquisition LLC ("Needles"),[3] as aiding and abetting defendants. Defendants have filed a Motion to Dismiss the Consolidated Amended Class Action Complaint pursuant to Maryland Rule 2-322(b), which is now before this Court. For the reasons that follow, the Court grants the motion and dismisses the Consolidated Amended Class Action Complaint ("Consolidated Complaint") with prejudice.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The facts set forth in this Opinion are as alleged in Plaintiffs' Consolidated Complaint and as stated in the Form S-4 Registration Statement filed by Ventas.[4]

### A. Nationwide and Merger Discussions

Nationwide is a publicly traded Maryland corporation and real estate investment trust ("REIT") that invests primarily in healthcare real estate in the United States. Prior to announcing the merger with Ventas, Nationwide's portfolio of properties totaled 667 properties and included 298 senior housing facilities, 212 skilled nursing facilities, 134 medical office

---

[3] Needles Acquisition LLC is a Delaware limited liability company and wholly owned subsidiary of Ventas. Plaintiffs contend that Needles was created specifically for the purpose of effectuating the Proposed Transaction. Following completion of the merger, Needles will merge with and into Nationwide and thereafter cease to exist.

[4] During the May 16, 2011 hearing at which the Court heard oral arguments on the motion to dismiss, Defendants asked the Court to take judicial notice of the Registration Statement, which, as argued by defense counsel, has been filed with the Securities and Exchange Commission. A court may take judicial notice of "additional facts that are either matters of common knowledge or capable of certain verification." *Faya v. Almaraz*, 329 Md. 435, 444 (1993) (citing McCormick on Evidence, §§ 329–330 (4th ed. 1992); *see also ATSI Comm c'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 98 (2d Cir. 2007) ("[A court] may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."). As both a matter of public record and a document accepted by a credible federal agency, this Court takes judicial notice of the facts contained in the April 11, 2011 Registration Statement pertaining to the Proposed Transaction. This summary of the factual background also includes factual representations from Defendants' Motion to Dismiss and Plaintiffs' Opposition thereto, but only to the extent that those facts are undisputed and consistent with the well-pleaded allegations of the Consolidated Complaint and the Registration Statement.

buildings, 12 continuing care retirement communities, seven specialty hospitals, two assets in development, and two assets held for sale.

In August 2010, Nationwide's Board of Directors (the "Board"), asked J.P. Morgan and another undisclosed financial advisor to present the Board with information on available merger opportunities.  J.P. Morgan provided the Board with a capital markets update and reviewed both market trends in the REIT industry and potential merger and acquisition activity in the healthcare REIT industry.  The second financial advisor also presented information to the Board regarding specific merger opportunities.  After reviewing these presentations, the Board indicated it was receptive to considering a merger or acquisition transaction, and the Board selected J.P. Morgan as its financial advisor.

On October 18, 2010, the Board held a meeting during which J.P. Morgan made a presentation regarding the healthcare real estate industry, specific acquisition opportunities, and various other merger and acquisition opportunities.  Following the presentation, the Board decided to focus on three large healthcare REITs—Ventas, Company A and Company B—for the bidding process.[5]  During the weeks of October 25 and November 1, 2010, J.P. Morgan contacted and met with representatives of each of the three companies.  While attending the National Association of Real Estate Investment Trusts ("NAREIT") during the week of November 14, 2010, Nationwide CEO Douglas Pasquale and representatives of J.P. Morgan met separately with the respective chief executive officers of Ventas, Company A, and Company B.

---

[5] According to the Registration Statement, Nationwide's Board directed its financial advisor "to initiate contact with a select group of large healthcare REITs with which a combination could be favorable for [Nationwide] stockholders and which were capable of executing such a transaction."  (Registration Statement Ex. A at 39 (hereinafter "Reg. Stmt")).  The Board determined that Ventas, Company A, and Company B met these criteria.  Both Ventas and Company A contemplated a possible acquisition of Nationwide, while "because of Company B's relative size," Company B only considered a "merger of equals" transaction.

In the meetings, the parties either discussed the potential acquisition of Nationwide (Ventas and Company A) or a "merger of equals" transaction (Company B).

Over the next three months,[6] Nationwide actively pursued both Company A and Ventas. Nationwide provided due diligence to both companies, and J.P. Morgan asked each company to provide the Board with a preliminary non-binding indication of the company's interest in Nationwide by December 8, 2010. Company A was first to submit a non-binding indication of interest in which it agreed to acquire all outstanding shares of Nationwide common stock in exchange for common stock in Company A. Company A expressed its interest at a fixed exchange ratio that was equivalent to $43.94 per Nationwide share, based on the closing price of Company A's stock the previous day. Days later, Ventas submitted its non-binding indication of interest at a fixed exchange ratio equivalent to $40.28 per Nationwide share, based on the closing price of Ventas common stock that day.

The Board subsequently held a special meeting on December 15, 2010, to discuss the specific terms of the two proposals. At that meeting, representatives of J.P. Morgan described the effect of each proposal on dividend payments to Nationwide shareholders, as well as the potential accretion or dilution of funds from operations and adjusted funds from operations of each company. Based on the most recent quarterly dividend payments made by each company, the Ventas proposal was expected to result in a 9% decline in pro forma dividend payments to Nationwide shareholders, while the proposal from Company A would result in a 29% increase. J.P. Morgan further noted, however, that a merger with Ventas was expected to be accretive to Ventas, whereas a merger with Company A would be dilutive to Company A. At the conclusion of the meeting, the Board determined that Nationwide should continue the due diligence process

---

[6] Company B withdrew from merger discussions in early December, indicating to J.P. Morgan that it was no longer interested in a transaction with Nationwide.

and acquisition discussions with both companies.   Meanwhile, Nationwide would encourage both companies to revise and improve upon their respective proposals.

On January 4, 2011, in response to J.P. Morgan's request for an update to its proposal, Ventas submitted a revised non-binding proposal in which it increased the fixed exchange ratio to the equivalent of $44 per share of Nationwide stock, with the exact ratio to be determined at the time of executing the definitive agreement.   The revised proposal represented a 23% premium to Nationwide shareholders, based on both companies' ten-day average share prices at that time.   Days later, on January 7, 2011, Company A responded to J.P. Morgan's request for an update with a non-binding bid that offered an exchange ratio equivalent ranging between $42.86 and $47.50 per Nationwide share.   Compared to its original bid of $43.94, the revised offer was both lower and higher than the previous offer.   On behalf of the Board, J.P. Morgan continued to seek a more definitive offer from Company A.   Meanwhile, J.P. Morgan met with the financial advisors of both companies to present to them and discuss a term sheet setting forth terms of a proposed merger agreement with Nationwide.   On January 11, 2011, Company A's advisors indicated to J.P. Morgan that Company A would narrow its range to between $44.17 and $46.95 per share.   Nevertheless, Company A refused to commit to a firm number.

On January 13, 2011, the Board held a special meeting to discuss the revised proposals from both companies.   At the meeting, the Board indicated to J.P. Morgan its desire to obtain a price of $46 per share, based on the exchange ratio at the time of execution of the definitive agreement.   The Board then directed J.P. Morgan to continue discussions with Ventas and Company A.   The following day, representatives of J.P. Morgan contacted the financial advisors of both companies to relay the Board's desire to obtain the equivalent of $46 per share based on

an exchange ratio to be set at signing.  Ventas indicated through its financial advisor that it would not agree to that ratio equivalent.  Company A again refused to narrow its exchange ratio.

On February 8, 2011, at the direction of the Board, J.P. Morgan informed Ventas and Company A that their respective proposals were still inadequate and insufficiently detailed. Nevertheless, both companies would be invited to make a presentation to the Board if they could present a proposal setting forth adequate value and a specific exchange ratio equivalent for all outstanding Nationwide shares.  Both companies accepted the invitation to make presentations to the Board on February 22, 2010, subject to the stated condition.  Prior to the meeting, on February 19, 2011, Ventas submitted a revised non-binding proposal, further refining its offer to the equivalent of $44 per share, with the exchange ratio to be determined at signing.  The value was based on the volume weighted average price of Ventas common stock over the preceding ten trading days, which, at the time, implied an exchange ratio of 0.806.

Two days later, on February 21, 2011, the chief executive officer of Company A informed Mr. Pasquale that Company A was not prepared to provide the Board with a definitive proposal—that is, Company A would not agree to a fixed offer.  Company A had previously expressed concern about the pro forma dilution to Company A that would result from a potential transaction within the exchange ratio range provided in its proposal.  Based on the share price of Company A on the last trading day prior to February 21, 2011, the ratio range was the equivalent of between $45.56 and $48.42 per Nationwide share.  Consequently, Company A did not make a presentation at the February 22, 2011 Board meeting.  Company A, through its chief executive officer and financial advisors, continued to express its interest in a potential transaction with Nationwide.  Despite Nationwide's request, Company A did not narrow, modify or confirm the proposed exchange ratio range.

On February 22, 2011, the Board held a special meeting at which representatives of Ventas made a presentation to the Board and answered questions from Nationwide's directors. Following the presentation, the Board discussed the Ventas proposal and recent developments. J.P. Morgan reviewed the financial data related to the proposal with the Board, as well as the stock price performance of both Ventas and Nationwide.  At the conclusion of the meeting, the Board made an informed decision to move toward a finalized agreement with Ventas.  The following day, Mr. Pasquale and representatives of J.P. Morgan met with Ventas officers and a representative of Centerview Partners, Ventas' financial advisor, to discuss the basis upon which Nationwide would move forward to finalize a merger agreement with Ventas, which included certain concessions from both sides.  Negotiations on the terms of the definitive merger agreement continued from February 23 to February 27, 2011, during which time representatives of both companies continued Nationwide's due diligence and reviewed Ventas' business plan, financial projections, growth estimates, and balance sheet.

On February 27, 2011, the Ventas board of directors held a special meeting to discuss the proposed merger with Nationwide. Representatives of Centerview Partners presented their financial analysis of the proposed merger and noted that while the nominal consideration of $44 per share of Nationwide common stock had not changed, the agreed-upon exchange ratio and total number of Ventas shares to be issued under the merger were lower than those cited in the proposal.  Centerview attributed the deviation to a subsequent increase in Ventas' stock price. Centerview delivered its fairness opinion to the Ventas board that the exchange ratio of 0.7866 was fair, from a financial point of view, to Ventas.  That same day, the Nationwide Board held its own special meeting to discuss the terms of the proposed merger with Ventas. Representatives of J.P. Morgan reviewed its financial analysis of the merger and delivered its

fairness opinion to the Board.  J.P. Morgan opined that the exchange ratio in the proposed merger was fair, from a financial point of view, to Nationwide shareholders.  The Board accepted the Ventas offer that same day.

On February 28, 2011, Nationwide and Ventas issued a joint press release announcing the merger.  Pursuant to the Proposed Transaction, which is valued at approximately $7.4 billion, Ventas will acquire all outstanding shares of Nationwide's common stock.  As consideration for the transaction, Nationwide shareholders will receive 0.7866 Ventas shares per Nationwide share.  A special shareholders' meeting and vote is scheduled for July 1, 2011, at which time it is expected that Nationwide shareholders will vote on the Proposed Transaction.  At this special shareholder meeting, the Board intends to recommend approval of the merger.

B.  **The Registration Statement**

On April 11, 2011, Ventas filed its Form S-4 Registration Statement ("Registration Statement") with the United States Securities and Exchange Commission.  Attached to the Registration Statement is the 79-page Agreement and Plan of Merger ("Merger Agreement"), as well as the fairness opinions of both J.P. Morgan, financial advisor to Nationwide, and Centerview Partners, financial advisor to Ventas.  The Registration Statement not only discloses the background to the merger and the terms of the agreement, but also includes the following:

- 7 pages of potential risk factors related to the merger;

- More than 10 pages explaining the comparative rights of Nationwide versus Ventas shareholders;

- 14 pages summarizing the two fairness opinions, including updated projections and analyses, in addition to 6 pages reproducing the full text of the opinions themselves; and

- More than 3 pages detailing the exact benefits accruing to Nationwide's directors and executive officers as a result of the merger.

A.  **The Consolidated Amended Complaint**

On March 7, 2011, Plaintiff Michael Crowley filed a Complaint in the Circuit Court for Baltimore City, on behalf of himself and a putative class of all public shareholders of Nationwide, against Nationwide and the Individual Defendants.  Plaintiffs also name Ventas and Needles (hereinafter, collectively referred to as "Ventas") as defendants.  Plaintiff Crowley opposed the merger and sued to halt the Proposed Transaction between Nationwide and Ventas. Three days later, on March 10, 2011, Plaintiff Ron Taylor filed a similar action in the Circuit Court for Baltimore City, challenging the same transaction.  That same month, two more shareholder lawsuits[7] were filed in the Circuit Court for Baltimore City, also opposing the Ventas merger.[8]

On April 22, 2011, in response to an Order by this Court consolidating the four pending cases in Baltimore City, Plaintiffs filed the Consolidated Amended Complaint.  In the Consolidated Amended Complaint, Plaintiffs allege that the Individual Defendants breached their fiduciary duties to Nationwide shareholders when they:

- "[S]ecured insider benefits for themselves and the [Nationwide's] management as part of an inadequate sales process;

- Adopted preclusive deal protection devices to block out competing bidders that may have offered more value to [Nationwide's] shareholders;

- Filed with the SEC a materially misleading Registration Statement that contained numerous material misstatements and omissions; and

---

[7] On March 17, 2011, Plaintiff the Haughey Family Trust filed a putative class action in the Circuit Court for Baltimore City.  On March 29, 2011, Plaintiffs Marcella and Stanley Rappoport filed a lawsuit in the Circuit Court for Baltimore City, also challenging the Proposed Transaction.

[8] Three identical putative class actions were also filed in California state court between February 28, 2011 and March 3, 2011.  Those three actions have been consolidated before Judge Gail Andler in the complex division of the Orange County Superior Court.  Defendants have moved to dismiss, or in the alternative, stay those actions while this action is pending.

> • Agreed to hand over [Nationwide] and its future prospects to Ventas for an unfair implied value of $44.00 per share when potentially superior terms were readily available from [Nationwide]."

(Consolidated Am. Compl. ¶ 58 (hereinafter, "CAC").)

Plaintiffs allege claims of aiding and abetting against all Defendants, including Nationwide and Ventas.  Plaintiffs accuse Defendants of providing, with actual knowledge of their conduct, "substantial assistance, aid, and/or encouragement to each of the other Defendants" in breaching their fiduciary duties. (CAC ¶ 99.)  Plaintiffs seek to enjoin the shareholder vote on the Proposed Transaction, and rescind and invalidate the Proposed Transaction.  Plaintiffs also seek compensatory damages and rescissory damages for losses and damages they allege to have sustained.

A. **Preliminary Motions**

This Court conducted a status conference on April 13, 2011, with all counsel of record. Thereafter, Plaintiffs filed a Motion for Expedited Discovery on April 19, 2011.  In opposition to the request for expedited discovery, Defendants filed a Motion for Protective Order Staying Discovery pursuant to Maryland Rule 2-403.[9]  After reviewing the motions and oppositions thereto, the Court denied Plaintiffs' Motion to Expedite Discovery and granted Defendants' Motion for a Protective Order on May 3, 2011,[10] thereby staying discovery pending resolution of the extant motion to dismiss.

Defendants filed their Motion to Dismiss on April 29, 2011, arguing that Plaintiffs' Complaint, in its entirety, fails to state a cognizable legal claim for which relief can be granted. The Court entertained extensive oral arguments from counsel on May 16, 2011.  Following the

---

[9] Defendants styled their motion in opposition as "Defendants' Motion for Protective Order Staying Discovery and Opposition to Plaintiffs' Motion for Expedited Discovery."

[10] Plaintiffs filed a subsequent Motion for Partial Reconsideration of the Court's Grant of the Protective Order on May 7, 2011, which this Court denied on May 10, 2011.

hearing, the Court held the motion to dismiss *sub curia* to consider the arguments presented by counsel.

## V.   STANDARD OF REVIEW

The standard of review with which a court must rule on a motion to dismiss is well-established.  In considering a motion to dismiss under Maryland Rule 2-322(b)(2)—failure to state a claim upon which relief can be granted—a trial court considers only the well-pleaded, relevant and material facts within the four-corners of the Complaint. *See Pittway Corp. v. Collins*, 409 Md. 218, 234 (2009).  The court makes no findings of fact on its own, however. *See Morris v. Osmose Wood Preserving*, 99 Md. App. 646, 658 (1991), *rev'd in part on other grounds*, 340 Md. 519 (1995).  Rather, it must assume the truth of those facts and all reasonable inferences drawn therefrom in a light most favorable to the plaintiffs. *Reichs Ford Rd. Joint Venture v. State Rds. Comm'n of the State Hwy. Admin.*, 388 Md. 500, 509 (2005); *Bobo v. State*, 346 Md. 706, 708 (1997).

Venerable case law requires that facts comprising the cause of action must be pleaded with sufficient specificity. *Bobo*, 346 Md. at 708.  The Maryland Rules expressly provide that "a pleading that sets forth a claim for relief . . . shall contain a clear statement of the facts necessary to constitute a cause of action and a demand for judgment for relief sought . . . ." Md. Rule 2-305 (LexisNexis 2011).  Bald assertions and mere conclusory charges will not suffice. *Bobo*, 346 Md. at 708–09; *see Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 121 (2007) ("Mere conclusory charges that are not factual allegations may not be considered.").  A court may, therefore, dismiss the action "if the allegations and permissible inferences, if true, would not afford relief to the plaintiff," *i.e.*, the allegations fail to state a cognizable cause of action. *Wasserman v. Kay*, 197 Md. App. 586, 607 (2011) (citations omitted); *Lubore v. RPM Assoc.*, 109 Md. App. 312,

322 (1996), *cert. denied*, 343 Md. 565 (1996) ("[The] grant of a motion to dismiss is proper if the complaint does not disclose on its face a legally sufficient cause of action.") (citation omitted).

On the other hand, dismissal is improper when the facts, if proven, would entitle the plaintiff to relief. *See Morris v. Osmose Wood Preserving*, 340 Md. 519, 531 (1995).  When moving to dismiss, a defendant is asserting that even if the allegations of the complaint are taken as true, the plaintiff is not entitled to relief as a matter of law.  *Lubore*, 109 Md. App. at 322.

## VI.  ANALYSIS

In their Motion to Dismiss, Defendants argue that Plaintiffs' shopworn allegations are devoid of merit, and the class action itself is nothing more than commonplace deal litigation that inevitably follows "every sale of every company in the United States." (Defs.' Mem. Supp. Mot. Dismiss 1 (citations omitted).)[11] First, Defendants assert that Plaintiffs have failed to state a claim for any breach of fiduciary duty because the Individual Defendants' actions are protected under the business judgment rule.  Thus, Defendants oppose Plaintiffs' contention that the director-defendants owed, let alone breached, any common law duties of candor and maximization of value to Nationwide shareholders pursuant to the Maryland Court of Appeals' decision in *Shenker v. Laureate Education, Inc.*, 411 Md. 317 (2009).  Second, Defendants argue that Plaintiffs have failed to allege sufficient facts to rebut the presumption of good faith, loyalty, and due care under the business judgment rule.  Third, Defendants contend that Plaintiffs failed to demonstrate any breach of the duty of candor.  Although the Consolidated Complaint

---

[11] Indeed, Defendants cite to cases where courts have observed a "cookie cutter"-like flavor to complaints filed in similar securities litigation.  *See Pipefitters Local No. 636 Defined Benefit Plan v. Oakley, Inc.*, 180 Cal. App. 4th 1542, 1547 n.1 (2010) (noting the practice of filing complaints in securities litigation that "copied identically-worded paragraphs from previous complaints that plaintiff's counsel had filed against other corporations"); *Cherwek v. Aspect Med. Sys, Inc.*, C.A. No. 4989-VCS, 12:15–18 (Del. Ch. May 25, 2010) (Settlement Hrg.) ("[T]here is a sort of pattern here, where what we have done is every single time a company is sold, with no apparent entrenchment motives, there is a suit brought.").  This Court will resist the urge, however tempting, to comment on this apparent trend in securities litigation.

alleges certain omissions in the Registration Statement, Plaintiffs have failed to explain how these omissions are material to the Proposed Transaction.   Finally, Defendants argue that Plaintiffs' aiding and abetting claims are merely conclusory and lack any factual support.

A.  **Applicability of *Shenker v. Laureate Education, Inc.***

Before this Court addresses the Plaintiffs' specific allegations of breach, the Court must first determine what fiduciary duties were owed to Nationwide's shareholders.   Defendants argue that apart from the fiduciary duties enumerated under Section 2-405.1(a) of the Corporations and Associations Article of the Maryland Code, the director-defendants owed no other fiduciary duties under common law to the shareholders of Nationwide.   By contrast, Plaintiffs argue that the Court of Appeals' decision in *Shenker* requires the corporate directors to endeavor to maximize the value of the transaction to the company's shareholders, 411 Md. at 341, consistent with Delaware law.   *See Revlon v. MacAndrews & Forbes Holding, Inc.*, 506 A.2d 173, 182 (Del. 1986) (requiring directors to secure the "best" price for stockholders following a decision to sell the company or once sale of the company becomes inevitable).

In *Shenker*, the Maryland Court of Appeals reversed in part the dismissal of shareholder claims against directors of a Maryland corporation.   In that case, Laureate Education, Inc., a company in the business of licensing educational technology overseas and acquiring management interests in foreign colleges and universities, was acquired by a group of company directors and private investors in a cash-out merger. The plaintiff shareholders objected to the transaction and filed a consolidated direct shareholder complaint, alleging *inter alia* that Laureate's directors breached their fiduciary duties to the company's shareholders by failing to obtain the best price for their stock.   The trial court dismissed the action with prejudice, on the ground that the plaintiff shareholders failed to allege a cognizable duty.   On appeal the Court of

Special Appeals affirmed the trial court, concluding that the suit was an impermissible direct shareholder suit.  The Court of Appeals reversed the dismissal of the fiduciary claims[12] and held that "in a cash-out merger transaction where the decision to sell the corporation already has been made, shareholders may pursue direct claims against directors for breach of their fiduciary duties of candor and maximization of shareholder value." *Shenker*, 411 Md. at 342.  In so holding, the Court of Appeals stated that the fiduciary duties of candor and maximization of shareholder value are common law duties "not encompassed or superseded by § 2-405.1(a)." *Id.* at 341. Further, these duties are triggered once a management decision is made to sell the corporation. *Id.* at 338 ("When directors undertake to negotiate a price that shareholders will receive in the context of a cash-out merger transaction, . . . they assume a different role than solely 'managing the business and affairs of the corporation.  Duties concerning the management of the corporation's affairs change after the decision is made to sell the corporation.").

While Plaintiffs are correct in noting that *Shenker* recognizes additional fiduciary duties apart from the statutory duties of § 2-405.1(a), Plaintiffs' heavy reliance on *Shenker* is misplaced.  Plaintiffs argue that the Court of Appeals never intended to limit strictly the holding in *Shenker* to cash-out transactions.  Whilst the Court of Appeals never addressed stock-for-stock mergers in *Shenker*, Plaintiffs maintain that *Shenker* applies to the Proposed Transaction because it not only impacts the same value received for one's property as with a cash-out merger, but also reflects a change-of-control that warrants imposing the common law duty to maximize shareholder value.

---

[12] The complaint also included allegations of civil conspiracy and aiding and abetting the defendants' breach of their fiduciary duties.  The Court of Appeals affirmed the dismissal of shareholders' claims against investors for civil conspiracy and aiding and abetting. *Shenker*, 411 Md. at 353–54.

### 1. *Cash-out mergers versus stock-for-stock mergers*

At first blush, the Court finds this argument facially indefensible in light of the clear language of the Court's opinion in *Shenker*. Writing for the Court of Appeals, Judge Harrell repeatedly placed *Shenker's* holding in the express context of a cash-out merger no less than *ten times*. The Court of Appeals could not have been any clearer. Further, there can be no doubt from *Shenker* that the Court intentionally distinguished a cash-out merger from traditional stock-for-stock mergers by noting specifically noting the difference between the two types of transactions in the following footnote:

> Generally, in a cash-out (or freeze-out) merger transaction, the majority shareholder (or shareholders) of the target company seeks to gain ownership of remaining shares in the target company. This is accomplished by incorporating an acquiring company to purchase for cash the shares of the target company. Due to the majority's controlling position in the target company, it may force any minority shareholders to surrender their shares and accept the cash payment, effectively eliminating their interest in the target company (and leaving them with no subsequent interest in the acquiring company). Such a cash-out merger stands in contrast to a traditional merger, in which shareholders of the target company trade in their shares in exchange for shares in the acquiring company."

*Id.* at 327 n.3.

This Court has found no support in *Shenker*, or in any of the other authorities cited by Plaintiffs, to impose the duty to maximize shareholder value outside of a "cash-out" or change of control situation—that is, a change of control merger that effectively eliminates the shareholders' interests in the target company. Further, as one prominent legal treatise on Maryland corporation law observes: "[I]t is clear that *Shenker v. Laureate Education, Inc.*, in its own words, applies only to a very narrow set of circumstances—namely, a cash-out merger when the decision to sell the corporation has already been made." James J. Hanks, Jr., Maryland Corporation Law § 6.6(b) (2010 Supplement) (footnotes omitted).

The Court of Appeals' finding of an enhanced fiduciary duty of maximizing shareholder value in *Shenker* aligned Maryland corporation law with similar rulings by the Delaware courts in the context of cash-out mergers. *See Shenker*, 411 Md. at 340 ("Our conclusion . . . is consistent with the Delaware Supreme Court's holding in *Revlon*.   In that case, the Delaware Supreme Court held that, where it is clear that the board has determined that the corporation is for sale or sale is a foregone conclusion, the duty of the directors 'changed from the preservation of [the corporation] as a corporate entity to the maximization of the company's value at a sale for the stockholders' benefit.'").

Indeed, Maryland courts have historically found Delaware law in matters involving business law highly persuasive.  *See Kramer v. Liberty Prop. Trust*, 408 Md. 1, 24–25 (2009) ("Due to the similarity of [Maryland and Delaware statutes concerning indemnification of officers and directors defending legal proceedings,] and because the Delaware courts have gained a reputation for their expertise in matters of corporate law, we deem decisions of the Delaware Supreme Court and Court of Chancery to be highly persuasive [on the issue.]").   The Delaware Court of Chancery's expertise in matters pertaining to corporate acquisition and mergers[13] is highly respected by courts all over the country.  *See, e.g., Teamsters Local Nos. 175 & 505 Pension Trust Fund v. IBP, Inc.*, 123 F. Supp. 2d 514, 519 (D.S.D. 2000) ("[T]he Delaware chancery court . . . has earned a reputation for its 'expertise concerning corporate governance.'").

---

[13] The Delaware State Courts' website provides the following description regarding the jurisdiction of the Delaware Court of Chancery:  "In today's practice, the litigation in the Court of Chancery consists largely of corporate matters, trusts, estates, and other fiduciary matters, disputes involving the purchase and sale of land, questions of title to real estate, and commercial and contractual matters in general."  Delaware State Courts, Delaware Court of Chancery, Jurisdiction, http://courts.delaware.gov/Chancery/jurisdiction.stm.

Delaware courts have declined to treat cash-out mergers and stock-for-stock mergers synonymously to trigger heightened *Revlon* duties absent a change-of-control.  *See Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1290 (Del. 1994) (finding no "sale or change in control" when "control of both [companies] remains in a large, fluid, changeable and changing market."); *County of York Employees Ret. Plan v. Merrill Lynch & Co.*, C.A. 4066-VCN, 2008 Del. Ch. LEXIS 162, *17–18 (Del. Ch. Oct. 28, 2008) ("Under Delaware law the stock-for-stock merger between Merrill and BAC is not subject to heightened scrutiny.   Instead, it will be evaluated subject to the deferential business judgment rule.   Our business judgment rule presumes that a board acts with care and loyalty.").   The Delaware Supreme Court has found value maximization appropriate "[w]henever the board is deciding whether to approve a proposed 'all shares' tender offer that is to be followed by a cash-out merger . . . [which] constitutes a final-stage transaction for all shareholders." *McMullin v. Beran*, 765 A.2d 910, 918 (Del. 2000); *Hudson v. Prime Retail, Inc.*, No. 24-C-03-5806, 2004 Md. Cir. Ct. LEXIS 26, *37 (Md. Cir. Ct. Apr. 1, 2004).   Other courts have similarly declined to impose the duty to maximize shareholder value outside of cash-out mergers.  *See, e.g.*, *Stender v. Cardwell*, No. 07-cv-02503-REB-MJW, 2010 U.S. Dist. LEXIS 52395, at *12-14 (D. Colo. May 12, 2010) (declining to apply *Shenker* out of the purely cash-out context, when the instant merger provided shareholders with the option of either cashing out their shares, trading them in for shares in the post-merger organization, or some combination of the two).

It is well-recognized that cash-out mergers and stock-for-stock mergers are different types of transactions.   Despite the Court of Appeals' clear explanation of how cash-out mergers differ in nature and consequence from stock-for-stock transactions, not to mention similar

conclusions by other courts and legal scholars[14] alike, Plaintiffs would have this Court find that the Proposed Transaction adversely affects only the personal property interests of Nationwide's shareholders.  As such, the Plaintiffs contend that the Individual Defendants owed Nationwide shareholders a direct duty to maximize the value received for their stock, thus affording them the right to bring a direct action for breach of that duty.

The Court of Appeals previously clarified that the scope of § 2-405.1(a) covers only those fiduciary duties "that involve the management of the business and affairs of the corporation, matters in which the corporation has an interest . . . ." *Shenker*, 411 Md. at 337. Where shareholders have a personal interest in the matter, however, common law recognizes additional duties of candor and maximization of the consideration offered for the shares. *Id.* at 337.  These non-managerial duties stem from the director's general duties of care, loyalty, and good faith due to his fiduciary relationship with the corporation and its shareholders. *Id.* at 337. In their Consolidated Complaint, Plaintiffs assert that the director-defendants negotiated the consideration that Nationwide shareholders would receive as "payment" for their stock.  At that moment, the Individual Defendants stepped away from their managerial roles, and their actions directly affected the shareholders' personal interests. *See Llewellyn v. Queen City Dairy, Inc.*,

---

[14] Regarding the difference between cash-out mergers and stock-for-stock mergers, law professor Lawrence Hamermesh wrote:

> The two types of transactions actually are quite distinct. * * * [In cash-out mergers,] [p]ayment of a premium to the target corporation's shareholders is a vehicle for sharing merger gains with target shareholders, who, as a result of the cash-out merger, would have no further equity claim to such gains, and therefore would not otherwise share in them.  The case for a stock-for-stock merger, however, is starkly different.  In such a transaction, shareholders of both constituent corporations remain shareholders in the continuing combined enterprise. Thus, both groups—acquirer shareholders and target shareholders—are able to participate pro rata in gains arising out of the merger.  Therefore, a premium to the target's shareholders cannot be justified, as in a cash acquisition, on the premise that it is the only way to permit those shareholders to share in the gains arising from the merger.

Lawrence A. Hamermesh, *Premiums in Stock-for-Stock Mergers and Some Consequences in the Law of Director Fiduciary Duties*, 152 U. Pa. L. Rev. 881, 883–84 (2003).

187 Md. 49, 61 (1946) ("[A] share of stock is personal property of the holder and as to such personal property the corporation has no equitable interest at all, but is a stranger.  No right accrues to [the corporation] if a shareholder in a sale thereof is cheated through misrepresentation and fraud.  The right of action is in the shareholder.").

While Plaintiffs' effort to articulate a shareholder's general interest in receiving consideration for his stock is laudable, this Court finds that the Individual Defendants' actions, in furtherance of arranging and finalizing a corporate merger are managerial in nature.  It would appear that Plaintiffs are directing the Court to focus solely on the consideration to be "paid" to Nationwide's shareholders.   In so doing, Plaintiffs ignore two critical, and obvious, aspects of the merger.   First, Plaintiffs overlook the fact that consideration must be paid in every acquisition merger.  Moreover, the reality is that premiums are usually paid in stock-for-stock mergers by the acquiring company.  Lawrence A. Hamermesh, *Premiums in Stock-for-Stock Mergers and Some Consequences in the Law of Director Fiduciary Duties*, 152 U. Pa. L. Rev. 881, 886 (2003).   Plaintiffs' reasoning—that payment for stock shifts the focus from "ownership" to the "value received for one's property"—would require courts to impose the duty of maximization of value in every merger, which is contrary to venerable case law.  This Court refuses to adopt such a broad view.  Second, Plaintiffs take no notice of the shareholders' transferred stock interest in Ventas post-merger.  Indeed, Nationwide shareholders will share in the ownership of the combined company and, therefore, in Ventas' future gains.  To that end, Plaintiffs have not alleged, nor can they allege, that Nationwide shareholders will be left "with no subsequent interest in the acquiring company." *See Shenker*, 411 Md. at 327 n.3.

2.  *Change-of-Control*

Due to the fundamental differences between cash-out and stock-for-stock transactions, this Court's analysis turns on whether the Proposed Transaction involves a "change of control." Plaintiffs further justify applying *Shenker* to this transaction by arguing that the Proposed Transaction, even in the context of an all-stock transfer, constitutes a "change of control" given the following:

- Ventas shareholders will own approximately 65% of the combined company, whereas former Nationwide shareholders will own 35%;

- Existing Ventas board members and senior management will comprise the majority of the board and senior management of the company, while former Nationwide members will occupy only three of the 13 seats on the Ventas board;

- Debra A. Cafaro, current Chairman and CEO of Ventas, will continue to serve the combined company in this capacity;

- Ventas is the acquirer in this transaction, for accounting purposes;

- Ventas will continue to maintain its corporate headquarters in Chicago, Illinois;

- The Registration Statement "admits that the Proposed Transaction" is a change of control for the purposes of certain employment agreements," including Mr. Pasquale's contract.

(CAC ¶ 57.)

Plaintiffs are correct to note that courts in Delaware have recognized a change-of-control in certain stock-for-stock transactions. *See Paramount Commc'ns Inc. v. QVC Network, Inc.*, 637 A.2d 34, 46–47 (Del. 1994) (explaining that a stock-for-stock merger can reflect a change in control when the acquirer is a private company); *La. Mun. Police Employees' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1179 n.6 (Del. Ch. 2007). At the same time, however, the Delaware Supreme Court has held that where "control of both [companies] remains in a large, fluid, changeable and changing market," then directors are not obligated to obtain the highest available

consideration for shareholders. *Arnold*, 620 A.2d at 1289–90; *see Paramount*, 637 A.2d at 46–47 ("[W]here . . . shares of both constituent corporations are widely held, corporate control can be expected to remain unaffected by a stock for stock merger."). In other words, there is no change-of-control. *In re Nat'l City Corp. S'holders Litig.*, C.A. No. 4123-CC, 2009 Del. Ch. LEXIS 137, at *9 (Del. Ch. July 31, 2009) ("After the [stock-for-stock] merger, control of the combined entity remained in a 'large, fluid, changeable and changing market.' Thus, . . . [the] board would be entitled to the protections of the business judgment rule . . . .") (internal citation omitted), *aff'd*, 998 A.2d 851 (Del. 2010). Maryland corporation law reflects the same principle:

> A sale of the business for cash—whether through merger, sale of assets or otherwise—will always result in a change of control. Conversely, a stock-for-stock merger will not be a change of control so long as there is no single stockholder or affiliated group of stockholders who did not have effective voting control of the target *before* the transaction buy who will hold a majority of the voting power of the combined company *after* the transaction.

Hanks, Maryland Corporation Law § 6.6(b) (footnotes omitted).

Plaintiffs cannot avail themselves of the Delaware authorities in light of the facts alleged in the Consolidated Complaint. Plaintiffs articulate six reasons to find a "change-in-control." For example, Plaintiffs note the respective ownership percentages of both companies' shareholders (in Ventas) after the merger. Again, Plaintiffs conveniently overlook two obvious facts. First, every merger deal, especially those not involving a merger of equals, must result in disproportionate ownership percentages in the combined company. Second, as observed by defense counsel during oral arguments, Nationwide's shareholders become Ventas shareholders after the merger. The Consolidated Complaint contains no support—no facts alleged or reasonably drawn inferences—to suggest that the shareholders of both companies were anything but a disaggregated body of public investors.

Plaintiffs also note that after the merger, the majority of the board of directors and senior management of the combined company will be Ventas directors and senior management. This argument is misguided and erroneously focused on the board of directors, who are elected into their positions. Change-of-control does not refer to management, but to ownership by shareholders. Courts have indicated, however, that the phrase "change-of-control" can change in legal significance depending on the context for the phrase. *See generally Crawford*, 918 A.2d at 1172 (acknowledging that the words "change-of-control" may change in legal significance depending on the context).

Finally, Plaintiffs maintain that Nationwide's own employee documents provide for the vesting of certain employee benefits in change-of-control situations. Plaintiffs cite to the substantial benefits that Defendant Pasquale stands to receive as a result of the Proposed Transaction. Defendants respond that Mr. Pasquale's employment contract with Nationwide specifically defined "change-of-control" as a contractual term. As a result of the merger with Ventas, Mr. Pasquale will forfeit his position as chief executive officer. It makes sense, therefore, that the transaction creates a personal change-of-control situation for him.

Nevertheless, Plaintiffs have not sufficiently pleaded facts supporting their "change-of-control" argument. Thus, the Court will dismiss the allegation that the Individual Defendants owed the shareholders a duty to maximize shareholder value. Assuming *arguendo* that this Court were to find applicable in this case such a duty, Plaintiffs cannot circumvent the governing standard for director conduct: reasonableness under § 2-405.1(a)(3). *See* Md. Code Ann., Corps. & Ass'ns § 2-405.1(a)(3) (LexisNexis 2011). Section 2-405.1(f) further provides that "[a]n act of a director relating to or affecting an acquisition or a potential acquisition of control of a corporation may not be subject to a higher duty or greater scrutiny than is applied to any other

act of a director." *Id.* § 2-405.1(f).   The Court finds this statutory language necessarily encompasses the common law duty of maximizing shareholder value.   *See Jasinover v. Rouse*, No. 13-C-04-59594, 2004 MDBT 12, *24–25 (Md. Cir. Ct. Nov. 4, 2004) ("[W]hether because of a *Revlon* obligation or not, the directors' actions will be governed by the standard of Section 2-405.1(a)." (quoting Hanks, Maryland Corporation Law § 6.6(b) (2003 Supplement)));[15]   In other words, a director's actions in the context of a merger does not incur heightened judicial scrutiny.

This finding is consistent with the views adopted by other courts—namely, that the standard requires directors to act reasonably in obtaining the maximum value for shareholders. *See In re Toys "R" Us S'holder Litig.*, 877 A.2d 975, 1001 (Del. Ch. 2005) ("[A court must] examine whether the directors have undertaken reasonable efforts to fulfill their obligations to secure the best available price, and not to determine whether the directors have performed flawlessly."); *In re the MONY Group, Inc. S'holder Litig.*, 852 A.2d 9, 22 (Del. Ch. 2004) ("At the root of a judicial inquiry into whether a board met its *Revlon* duties is whether the board acted reasonably."); *see also In re Answers Corp. S'holders Litig.*, C.A. No. 6170-VCN, 2011 Del. Ch. LEXIS 57, *10–11 (Del. Ch. 2011) (Because directors need only make a reasonable decision, not a perfect decision, "directors are generally free to select the path to value maximization, so long as they choose a reasonable route to get there"); *In re Terra Indus., Inc.*

---

[15] The 2010 supplement to the Maryland Corporation Law treatise provides:

> The directors have substantial latitude in determining how to perform their duties. Even in a change of control, it may be reasonable for a board to enter into an agreement after arm's-length negotiations with only one bidder, rather than "shopping" the company if the board, in good faith and with a reasonable basis, especially if supported by independent advice, concludes that the process is likely to yield for the stockholders the best value reasonably available. Indeed a board may favor one bidder over another in various respects if it can be shown that the stockholders' interests would be advanced. However, in a change of control, any process that does not involve some demonstrable market check, even post agreement, may be difficult to uphold.

Hanks, Maryland Corporation Law § 6.6(b) (footnotes omitted).

*S'holder Litig.*, No. 24-C-10-001302, 2010 Md. Cir. Ct. LEXIS 9, *25–26 (Md. Cir. Ct. July 14, 2010).

As further explained below, Plaintiffs have failed to demonstrate that the Nationwide Board in fact acted unreasonably in approving the Proposed Transaction, i.e., failed to obtain the highest value reasonably available. *See Paramount*, 637 A.2d at 44 ("In the sale of control context, the directors must focus on one primary objective—to secure the transaction offering the best value reasonably available for the stockholders—and they must exercise their fiduciary duties to further that end."). Rather, the Court finds that the Board's decision to secure the only definitive offer presented to it at the time was reasonable under the circumstances.

Directors need not engage in a heated bidding contest to secure the best value reasonable available to shareholders. *See Barkan v. Amsted Industries, Inc.*, 567 A.2d 1279, 1286 (Del. 1989) ("*Revlon* does not demand that every change in the control of a . . . be preceded by a heated bidding contest."). Where the target company is presented with a choice—a firm, but lower, offer from one bidder and a higher, but speculative, offer from another bidder—the target company may justifiably take the lower offer. *See In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 499 (Del. Ch. 2010). Plaintiffs rely on the Registration Statement to support their allegation that the Board failed to maximize shareholder value in choosing Ventas over Company A. Plaintiffs' reliance on the Registration Statement fails because the Registration Statement clearly indicates, and Plaintiffs admit, that at no point during the entire span of the merger discussions did Company A commit to a definitive offer. Furthermore, there is no evidence—nothing that can be gleaned from the Board's discussions with its advisors, its negotiations with both Ventas and Company A, and its repeated attempts to solicit a definitive offer from Company A—to suggest that Company A would have tendered a definitive, superior offer but for the announcement of

24

the Proposed Transaction.   Plaintiffs have not demonstrated to this Court that an offer by Company A is forthcoming.  For these reasons, the Court dismisses Plaintiffs' claim of breach of the fiduciary duty to maximize shareholder value.

### G.  **Breach of Fiduciary Duties and the Business Judgment Rule**

Plaintiffs assert that Nationwide and the Individual Defendants breached their duties of care, loyalty, good faith, and fair dealing toward Nationwide's public shareholders.  They allege that the Individual Defendants approved a marginally beneficial merger transaction through an unfair process and for unfair consideration.   In doing so, Plaintiffs argue that the Individual Defendants will reap a windfall of benefits from the deal at the expense of Nationwide's shareholders.   Additionally, the terms of proposed merger further exacerbate the director-defendants' breach of the duty of care by "locking-up" the transaction and precluding Nationwide from considering potentially superior acquisition proposals from other companies.

#### 1.  *Maryland Business Judgment Rule*

In Maryland, as in most states, shareholders hold the ownership interests of a corporation.  It is the directors, however, who are charged with the significant responsibility of managing the corporation's affairs for the benefit of its owners.  Consequently, "[s]hareholders are not ordinarily permitted to interfere in the management of the company . . . ." *Werbowsky v. Collomb*, 362 Md. 581, 599 (2001).  Similarly, with limited exception, courts generally will not second-guess the management decisions of the directors of a corporation. *Tackney v. U.S. Naval Acad. Alumni Ass'n*, 408 Md. 700, 712 (2009); *Mountain Manor Realty, Inc. v. Buccheri*, 55 Md. App. 185,193–94 (1983).

The Corporations and Associations Article of the Maryland Code sets forth a corporate director's standard of care as follows:

> A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves: (1) In good faith; (2) In a manner he reasonably believes to be in the best interests of the corporation; and (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

Md. Code Ann., Corps. & Ass'ns § 2-405.1(a).

In fact, it is well-established by statute and venerable case law that disinterested directors are presumed to have conformed to this standard of care when performing their managerial duties. *See Id*. § 2-405.1(e) ("An act of a director of a corporation is presumed to satisfy the standards of [care under § 2-405.1(a)] . . . ."); *Wittman v. Crooke*, 120 Md. App. 369, 376 (1998) ("Under the business judgment rule, there is a presumption that directors of a corporation acted in good faith and in the best interest of the corporation."). Thus, the business judgment rule shields corporate directors from liability for such conduct, notwithstanding a demonstration that they acted fraudulently, in self-interest, or with gross negligence. Md. Code Ann., Corps. & Ass'ns § 2-405.1(c); Md. Code Ann., Cts & Jud. Proc. § 5-417; *Barkan*, 567 A.2d at 1286 ("[T]here is no single blueprint that a board must follow to fulfill its duties. * * * Rather, a board's actions must be evaluated in light of relevant circumstances to determine if they were undertaken with due diligence and in good faith.  If no breach of duty is found, the board's actions are entitled to the protections of the business judgment rule.").

Clearly, the Board owed fiduciary duties of care, loyalty and good faith to Nationwide's shareholders in recommending the merger with Ventas.  Thus, to prevail on their challenge of the merger, Plaintiffs bear "the burden of rebutting the business judgment rule by introducing evidence of director self-interest or self-dealing, or that the directors lacked good faith or failed to exercise due care." *Parnes v. Bally Entm't Corp.*, C.A. No. 15192, 2001 Del. Ch. LEXIS 34, *29 (Del. Ch. 2001) (citations omitted).  Nowhere in the Consolidated Complaint do Plaintiffs

allege specific acts of fraud by the Individual Defendants.  Moreover, the facts contained in the Consolidated Amended Complaint fail to raise even a specter of such an allegation.  Plaintiffs do, however, claim that the director-defendants acted in their own self-interest at the expense of Nationwide shareholders, and that, as a result of this self-dealing, the shareholders were denied the possibility of receiving substantially superior consideration for their shares.  Because these allegations imply both self-dealing and negligence, this Court now turns to examine whether the Individual Defendants breached their duties of loyalty and care under § 2-405.1(a).

### 2.  Duty of Loyalty

Plaintiffs allege that the Individual Defendants acted in their own self-interest in structuring the proposed merger with Ventas, claiming that "Ventas bought the support of certain Board members and senior executives by promising them the ability to participate as owners of the [combined company] going forward." (CAC ¶ 59.)  Plaintiffs also add that once the Proposed Transaction is approved, the Individual Defendants will reap a "windfall of accelerated vesting of restricted stock, accelerated stock options, and significant change in control payments." (*Id.*) Plaintiffs state that certain Nationwide officers,[16] Mr. Pasquale in particular, will be permitted to exercise stock options and take advantage of vested stock units shortly after the merger's execution. (*See* CAC ¶¶ 60–63.)  If Mr. Pasquale resigns during the period six-months prior to and three years following the closing, he would be entitled to severance pay in addition to his vested stock options, vested restricted stock units, and any vested performance shares. (*Id.*) Moreover, Plaintiffs note that these types of consequential benefits are not available to Nationwide's common shareholders.

---

[16] In addition to Mr. Pasquale, Plaintiffs have identified two other Nationwide executive officers who also stand to receive vested and exercisable stock options, performance shares, and change-in-control benefits:  Abdo H. Khoury and Donald D. Bradley.  Neither individual is a member of the Board.

Under the business judgment rule, corporate directors are presumed to have "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Werbowsky*, 362 Md. at 608–09; *see also Fort Howard Corp. S'holders Litig.*, C.A. No. 9991, 1988 Del. Ch. LEXIS 110, at *41 (Del. Ch. Aug. 8, 1988) (stating that a board "may favor one [buyer] over another if in good faith and advisedly it believes shareholder interests would be thereby advanced"). To rebut the presumption of loyalty, the Complaint must contain well-pleaded facts that, if proven true, would demonstrate that a majority of the Board, stood to receive "personal financial benefit from [the transaction] in the sense of self-dealing . . . ." *Werbowsky*, 362 Md. at 609; *see also In re GM (Hughes) S'holder Litig.*, No. C.A. 20269, 2005 Del. Ch. LEXIS 65. at *31 (Del. Ch. May 4, 2005) (a plaintiff must provide sufficient evidence to "allow the Court to infer that the interest was of a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties without being influenced by her overriding personal interest" (quoting *In re GM Class H S'holder Litig.*, 734 A.2d 611, 617–18 (Del. Ch. 1999))). The allegations must establish a link between the vested material benefit and the board's decision to approve the merger transaction. Absent this showing, "the allegations of pecuniary self interest are merely conclusory . . . ." *Hughes*, 2005 Del. Ch. LEXIS at *32 (citing *Solomon v. Armstrong*, 747 A.2d 1098, 1126 (Del. Ch. 1999)).

While it is true that once Nationwide shareholders approve the merger, Defendant Pasquale will be "out of a job," there is nothing in the Complaint to indicate that Mr. Pasquale's termination benefits would cause him to favor Ventas over the interests of Nationwide's shareholders. In fact, the source of these benefits is the defendant's employment contract with Nationwide. Thus, Mr. Pasquale would have received these benefits regardless of which

company ultimately became Nationwide's acquisition partner.   Furthermore, courts have repeatedly held that the accelerated vesting of stock options, by itself, does not create a conflict of interest. *See Ryan v. Lyondell Chem. Co.*, C.A. No. 3176-VCN, 2008 Del. Ch. LEXIS 105, *41 (Del. Ch. July 28, 2008) ("The vesting of stock options in connection with a merger does not create a per se impermissible interest in the transaction."), *rev'd on other grounds*, 970 A.2d 235 (Del. 2009) (granting summary judgment in favor of the directors); *Globis Partners, L.P. v. Plumtree Software, Inc.*, C.A. No. 1577-VCP, 2007 Del. Ch. LEXIS 169, at *29 (Del. Ch. Nov. 30, 2007) ("[A]ccelerated vesting of options does not create a conflict of interest because the interests of the shareholders and directors are aligned in obtaining the highest price."); *Krim v. ProNet, Inc.*, 744 A.2d 523, 528 (Del. Ch. 1999) (granting a motion to dismiss and holding that the vesting of stock options does not state a claim for breach of the duty of loyalty);

Plaintiffs note the substantial gains that the Individual Defendants stand to gain through the Proposed Transaction and surmise that "it is entirely conceivable that the Board, in their desire to vest their restricted stock units as quickly as possible, could throw the common shareholders under the proverbial bus" and "rationally decide to cash out at the $44 per share transaction price rather than risk the immediate vesting of their units by holding out for a better deal." (Pls.' Opp. 34–35.) First, Mr. Pasquale is the only member of the Board whose post-merger interests include vested stock options, restricted stock units, performance shares, and change-in-control benefits.   The remaining Board members have restricted stock unit interests only.   Plaintiffs have not shown that these interests influenced a majority of the Board in favor of approving the transaction.   Plaintiffs have pled no facts in the Consolidated Complaint that support a contrary view. Second, where directors are confronted with two rational courses of action, their choice of one that later turns out to have been less advantageous to the corporation

than the other does not constitute a breach of good faith. *See Cummings v. United Artists Theatre Circuit, Inc.*, 237 Md. 1, 15 (1964) (upheld a board's decision to decline to call a special meeting in order to accept an advantageous offer that might have been lost by delay). Moreover, Plaintiffs admit in the Consolidated Complaint that there were no other definitive bids submitted at the time the Board decided to pursue the Ventas proposal. Despite repeated efforts by the Board to solicit a definitive proposal from Company A, the Board was unsuccessful. Finally, Plaintiffs' accusation of vested stock-driven director self-dealing contradicts common sense reasoning that the vesting of these incentive awards would encourage directors to seek the best price for their stock.

Claims based solely on conjecture are not legally cognizable. Plaintiffs have offered no factual support in the Consolidated Complaint to sustain their allegation that the Board acted in self-interest to approve prematurely the Ventas merger in order to reap a windfall of vested stock benefits. Plaintiffs list a number of stock benefits that will vest with shareholder approval of the Ventas merger. Plaintiffs have not, however, alleged how those benefits create an impermissible conflict of interest, when the vesting of those benefits are a matter of the director-defendants' employment contracts and would devolve regardless of the identity of Nationwide's merger partner. Likewise, Plaintiffs failed to indicate that the Board intentionally or knowingly cut short their dealings with Company A in order to avail themselves of the benefits of the Ventas merger. As such, this Court finds that Plaintiffs have not satisfied their burden to rebut the presumption of the business judgment rule and state a claim for breach of the duty of loyalty.

### 3. Duty of Care

Plaintiffs have alleged claims against Defendants for breach of the duty of care. These claims, which the Court notes are inextricably intertwined with Plaintiffs' value-maximization

30

charges, are two-fold.  First, Plaintiffs assert that the Individual Defendants breached their duties of care when they agreed to the merger with Ventas for "unfair" and "grossly inadequate" consideration.  Second, Plaintiffs accuse the Board of breaching their fiduciary duties by including numerous "deal protection" provisions in the Merger Agreement that effectively prevent Nationwide from receiving and investigating any competing, and potentially superior, proposals.  The Court addresses both claims in turn and, for reasons that follow, finds that Plaintiffs have failed to articulate cognizable claims for which relief can be granted.

To survive a motion to dismiss, the Complaint must allege facts that, if proven true, would tend to show that the Individual Defendants acted with gross negligence. *Parish v. Md. & Va. Milk Produces Ass'n*, 250 Md. 24, 75 (1968), *aff'd on reh'g*, 261 Md. 618, *cert. denied*, 404 U.S. 940 (1971); *Billman v. State Deposit Ins. Fund Corp.*, 88 Md. App. 79, 108 (1991), *cert. denied*, 325 Md. 94 (1991); *see also Marriott Corp. v. Chesapeake & Potomac Tel. Co.*, 124 Md. App. 463, 478 (1998) ("Gross negligence is: An intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life and property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them.").  Thus, Plaintiffs must show that the facts alleged in the Complaint support the finding that the Individual Defendants acted intentionally or with utter disregard to the interests of Nationwide's shareholders in negotiating and approving the deal with Ventas.

### a.   Unfair price: inadequate consideration

Plaintiffs argue that the Board prematurely terminated merger discussions with Company A, a competing bidder willing to offer potentially superior terms to the Ventas proposal. Plaintiffs complain that the Proposed Transaction's final exchange ratio of 0.7866, which implied a value of $44.00 per share of Nationwide common stock, significantly undervalued the

company, given its strong financial performance[17] in recent years. Furthermore, Plaintiffs aver that the $44 consideration clearly falls below the Board's $46.00 per share target equivalent, which the Board expressed to both companies. Plaintiffs suggest that the Board's decision to accept the lower consideration in the Proposed Transaction constitutes gross negligence, especially when a superior offer was available for the Board's consideration.

It is undisputed that the $44.00 per share consideration represents a 15% premium over the closing share price of Nationwide's common stock on February 25, 2011.[18] While Company A may have provided the Board with an exchange ratio range equivalent of between $44.17 and $46.95 per Nationwide share, Company A never presented the Board with a definitive offer. Further, Plaintiffs readily acknowledge that a transaction with Company A was expected to be dilutive to Company A's shareholders. Defendants argue that Company A was, therefore, likely to, and did in fact, reduce the upper end of the consideration range. Thus, given all of the Board's attempts to solicit a definitive proposal from Company A, and said company's unwillingness to commit to a firm offer, it was reasonable for the Board to accept a marginally lower offer in the face of the risk associated with Company A's reluctance to submit a definitive offer.

The Court finds that Plaintiffs' "inadequate consideration" claims are merely conclusory and insufficient to rebut the presumption of due care under the business judgment rule. *See*

---

[17] Regarding the intrinsic value of Nationwide's stock, Plaintiffs point out that:

> Nationwide's total revenue went from $209.55 million in 2006 to $390.51 million in 2009. For the first three quarters of 2010, Nationwide reported total revenue of $325.49 million with a combined net income of $108.45 million. In addition, shares of Nationwide traded as recently as October 2010 over $41 per share . . . . Moreover, as of February 22, 2011, one securities analyst had a price target of $45.00 on Nationwide.

(CAC ¶ 84.) Plaintiffs also state that Nationwide reported "very strong financial results for the fourth quarter and full year 2010." (*Id.* ¶ 33 (quoting statements by Defendant Pasquale issued on February 28, 2011).)

[18] February 25, 2011 was the last trading day before Nationwide and Ventas announced the proposed merger.

32

*Wittman*, 120 Md. App. at 378 (stating that the argument that a corporation "could have gotten a better deal" is "really not a cause of action").  Boards are justified in accepting a lower, but firm, offer over one that is higher but more speculative.  *See Cogent*, 7 A.3d at 499 (finding that the absence of a firm offer from a competing bidder presented the target company with a risk serious enough to justify taking a somewhat lower, but firm offer); *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 594–97 (Del Ch. 2010) (approving a 5.5% premium and finding that the board could reject a nominally higher, but more uncertain, topping bid from a rival).

The well-pleaded facts before this Court demonstrate that the Ventas proposal was the only definitive offer on the table.  In arriving at the final terms of the Proposed Transaction, the Board participated in numerous meetings with Nationwide management, hired a financial advisor to assist with the process, which included presentations on the market and various proposals, and engaged in extensive negotiations with three different companies.  Moreover, after Company B withdrew from negotiations, the Board continued to provide due diligence and seek optimal proposals from the two remaining companies, Ventas and Company A.  Even when Ventas submitted its final revised proposal, the Board continued to seek a definitive offer from Company A.  Only when Company A failed to comply with these repeated requests by the requested date, did the Board proceed to move forward with Ventas.  Accordingly, Plaintiffs have failed to, nor can they, demonstrate that the Board was grossly negligent in pursuing the only firm offer in its hands.  Moreover, this Court notes that the Proposed Transaction with Ventas guarantees a 15% premium for Nationwide shareholders.

### b.  Unfair process: deal protection devices

Plaintiffs also object to the process undertaken by the Board to secure the merger with Ventas.  Plaintiffs assert that the Individual Defendants further breached their fiduciary duties by

agreeing to unfair terms that effectively "lock-up" the transaction for Ventas and preclude other potential acquirers from submitting competing bids. The allegedly unfair "deal protection devices" include:

    i.   A "no shop" provision that bars Nationwide from soliciting or negotiating with potential third party acquirers;

    ii.   An "information rights" provision that requires Nationwide to disclose fully to Ventas all unsolicited acquisition proposals from third parties within 24 hours of their receipt;

    iii.   A "matching rights" provision that affords Ventas the right to match any competing proposal within three business days of receiving the relevant information; and

    iv.   A "termination fee" provision that requires Nationwide to pay Ventas $175 million, approximately 2.4% of the total transaction value, in the event that Nationwide receives and accepts a superior offer from another acquirer.

Defendants present several compelling arguments to justify these provisions in the Proposed Transaction. First, given Company A's failure to make a firm offer, the Board did nothing more than preserve the premium deal with Ventas by including these terms. Moreover, the deal protection devices included in the merger agreement are standard provisions that are well within the directors' discretion. Second, the merger agreement contains a fiduciary out provision that permits the Board to consider a potentially superior offer. Finally, until shareholders vote to approve the Proposed Transaction, Company A remains free to make a definitive, competing bid for Nationwide. In other words, Nationwide is not precluded from entertaining another potentially superior offer.

A board of directors may "act decisively to preserve the one definite offer it had on the table." *Cogent*, 7 A.3d at 498. Furthermore, the Court notes that various methods used to "lock up" an attractive deal are considered standard measures. *See Answers*, 2011 Del. Ch. LEXIS at *18 (finding no breach of fiduciary duty where the merger agreement contained the following

deal protection measures: a 4.4% termination fee; a no solicitation clause, a "no-talk" provision limiting the board's ability to discuss alternative proposals with unsolicited bidders; a matching rights provision, and a force-the-vote requirement); *Cogent*, 7 A.3d at 502 (denying plaintiff shareholders' request to preliminarily enjoin the corporate merger and finding that the no-shop and matching rights provisions, the 3% termination fee, the top-up option, and other provisions were not so defensive, individual and cumulatively, as to preclude a superior proposal); *In re 3Com S'holders Litig.*, C.A. No. 5067-CC, 2009 Del. Ch. LEXIS 215, at *25 (Del. Ch. Dec. 18, 2009) (upholding matching rights provisions and noting that such provisions have been "repeatedly upheld" by other courts; *In re IXC Commc'ns, Inc. S'holders Litig.*, C.A. Nos. 17324, 17334, 1999 Del. Ch. LEXIS 210, at *29 (Del. Ch. Oct. 27, 1999) (upholding a "no shop" provision).

Given the well-established case law affirming the use of deal protection provisions absent "director interest or other breaches of fiduciary duty," *see State of Wis. Inv. Bd. v. Bartlett*, C.A. No. 17727, 2000 Del. Ch. LEXIS 42, at *30 (Del. Ch. Feb. 24, 2000) (citation omitted), this Court finds Plaintiffs' allegation that the inclusion of such deal protection measures constitutes a breach of the Board's fiduciary duties wholly without merit. Therefore, the Court, as a matter of law, dismisses the claim with prejudice.

D. **Breach of Duty of Candor**

Both Maryland and Delaware law provide that in addition to fulfilling fiduciary duties of good faith, loyalty and care when presented with merger proposals, the directors of a corporation are also "obliged to disclose with entire candor all material information concerning the merger." See *McMullin*, 765 A.2d at 917; *Parish*, 250 Md. at 74 ("It is clear that officers and directors of a corporation stand in a sufficiently confidential relation to the corporation's stockholders to

impose a duty upon them to reveal all facts material to the corporate transactions."); *Bartlett*, 2000 Del. Ch. LEXIS at \*23 ("The 'duty of disclosure' arises as a subset of a director's fiduciary responsibilities of care, loyalty, and 'good faith.'" (citing *Malone v. Brincat*, 722 A.2d 5, 11 (Del. 1998))).   Thus, to survive a motion to dismiss for breach of the duty of disclosure, Plaintiffs "must provide some basis for a court to infer that the alleged violations were material." *Malpiede v. Townson*, 780 A.2d 1075, 1086–87 (Del. 2001).   The Complaint must specifically identify the misstatements or omissions, state why the facts or omissions are "material," and how the disclosure violation caused injury.   *Id*. at 1087.

> 1.   The materiality standard

The law does not require that directors disclose all available information merely because investors might find it helpful. *Skeen v. Jo-Ann Stores*, Inc. 750 A.2d 1170, 1174 (Del. 2000) ("Omitted facts are not material simply because they might be helpful.").   Rather, it is well-established that an omitted fact is considered material only "if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449) (1976)); *Zirn v. VLI Corp.*, 621 A.2d 773, 778–79 (Del. 1993); *Hudson*, 2004 Md. Cir. Ct. LEXIS at \*38–39 (quoting *Malpiede*, 780 A.2d at 1086).   "Material facts include those which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities," such as any fact which "might affect the value of the corporation's stock . . . ." *SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997).

Materiality is typically a mixed question of law and fact.   *See Matrix Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318 (2011).   While courts are generally reluctant to dismiss a

complaint on the ground that the alleged misstatements or omissions are not material, courts may do so when "reasonable minds cannot differ on the question." *See TSC Industries*, 426 U.S. at 450. In the context of a merger, information can be speculative and tenuous. Consequently, "the materiality standard may be difficult to apply." *Mayhew*, 121 F.3d at 52 (noting further that materiality will depend "upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity") (citations omitted); *see also Abrons v. Maree*, 911 A.2d 805, 813 & n.18 (Del. 2006) (observing that materiality claims relating to non-disclosure of long-term projections and the synergies that may affect those projections "have not met with success in the past"); *In re Siliconix Inc. S'holders Litig.*, C.A. No. 18700, 2001 Del. Ch. LEXIS 83, *48 (Del. Ch. 2001) ("[A]ny projections about the proposed, combined entity would be speculative, especially because of the difficulties asserted with projecting both the timing and success of any synergies that may result. Accordingly, [plaintiff] has not provided a basis, even preliminarily, for finding a disclosure violation."). Nevertheless, courts have required that the Complaint contain more than unsupported conclusions and speculation. *Skeen*, 750 A.2d at 1173.

### 2. Alleged material omissions in the Registration Statement

Defendants argue that Plaintiffs' claims serve no other purpose than to nitpick at the disclosures in the Registration Statement by alleging several "material" omissions. Defendants object to the sufficiency of the allegations on two grounds: first, Plaintiffs fail to articulate how the alleged omissions are material; and second, the details Plaintiffs seek are trivial and do not significantly alter the "total mix" of information available to the reasonable shareholder. Plaintiffs allege that the Registration Statement "omits and/or misrepresents" certain material information including:

- Nationwide's sales process that resulted in the Proposed Transaction;

- Any potential conflicts of interest concerning J.P. Morgan;

- Details concerning J.P. Morgan's fairness opinion, including data and inputs underlying its financial valuation analyses;

- Similar details concerning Centerview Partners' fairness opinion; and

- Material forecast information concerning both Nationwide and Ventas.

(*See* CAC ¶¶ 72–81.)  For reasons that follow, this Court finds that Plaintiffs have failed to state a cognizable claim for breach of the duty of candor, and the Court will dismiss Plaintiffs' disclosure claims accordingly.

Defendants filed with the SEC a 133-page Registration Statement detailing: the background of the merger; the exact terms of the agreement and its effects on Nationwide stock; the companies' respective reasons for the merger; the recommendations of both boards of directors; the exact benefits accruing to certain directors and executive officers as a result of the merger; the risk factors relating to the merger; the opinions of both companies' financial advisors; and litigation related to the merger.  Defendants also included a cautionary statement[19] regarding the inherent uncertainty of forward-looking statements contained within the document. In their reasons for recommending the merger, the Board disclosed a host of factors supporting its decision.   Among these factors was the following excerpt concerning "Strategic Alternatives":

> After reviewing possible alternatives to the proposed merger with Ventas, including continuing to operate [Nationwide] as an independent company or seeking a business combination with Company A or Company B or another company, and after consultation with [Nationwide's] financial

---

[19] The Registration Statement lists 23 factors beyond the control of both companies that may impact the future results of the merger. The Statement warns, "Due to these risks and uncertainties, there can be no assurances that the results anticipated by the forecasts or other forward-looking statements of Ventas or [Nationwide] will occur, that their respective judgments or assumptions will prove correct, or that unforeseen developments will not occur." (Reg. Stmt at 24.)

advisor, the [Nationwide] board of directors believes that it is unlikely that another party would have the ability to meet or exceed the economic and other terms being offered by Ventas and took into account the belief by [Nationwide] that an offer by another company on terms economically comparable to Ventas' offer would probably have been dilutive, and therefore reduced the value of any consideration in the form of stock to be paid to [Nationwide] stockholders.

(Reg. Stmt at 49.)

Against this information backdrop, Plaintiffs must affirmatively demonstrate "a substantial likelihood" that, under the circumstances, "the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus.*, 426 U.S. at 449. Put another way, the omitted fact is considered material if "there is a substantial likelihood that a reasonable investor would consider it important in deciding how to vote." *Arnold*, 650 A.2d at 1277.

Rather than engage in a factual analysis of whether a reasonable investor would have found the alleged omissions important in deciding how to vote, which would be inappropriate on a motion to dismiss, the Court finds cause to dismiss Plaintiffs disclosure claims as a matter of law. Facially, the Complaint fails to state how any of the alleged omissions are material.[20] Plaintiffs have identified specific information they argue should have been included in the Registration Statement. Plaintiffs have made no attempt, in the Complaint or elsewhere, to explain how this information would have altered the "total mix" of information made available. At oral argument, plaintiffs' counsel offered no authorities in support of their materiality argument. While the Court may forego further discussion in light of this pleading deficiency for

---

[20] With regard to Defendants' alleged failure to disclose adequate information related to any potential conflict of interest concerning J.P. Morgan, Plaintiffs state, "[I]t is critical to know any facts that might suggest that the financial advisors are conflicted, including the extent of any contingent fee arrangements and previous or current work for any party." (CAC ¶ 73.)

a motion to dismiss, the Court will nevertheless briefly address each alleged category of omissions.

To the extent that the Court finds that Defendants have already disclosed the sought-after information, the Court will dismiss those claims.   Plaintiffs complain that the Registration Statement omits details concerning J.P. Morgan's prior work with Nationwide and Ventas, as well as any compensation related thereto.   The Court finds, however, that the Registration Statement discloses this precise information,[21] except for the specific compensation due to J.P. Morgan.   Defendants represent, however, that the Registration Statement is currently only preliminary and that the final Statement made available to shareholders prior to the special vote will contain this information.

Regardless, additional information would not have added materially to the shareholders' benefit.  *See David P. Simonetti Rollover IRA v. Margolis*, C.A. No. 3694-VCN, 2008 Del. Ch. LEXIS 78, at *21 (Del. Ch. June 27, 2008) (concluding that "little . . . could have [been] added for the shareholders' benefit" when the proxy statement "notes that [the seller's advisor] and its affiliates had acted as joint bookrunner in connection with a convertible notes offering by [the seller], acted as a counterparty in connection with the related bond hedge and warrant transactions entered into by [the seller], provided certain cash management services to [the seller], and acted as a participant in a credit facility of [the seller]"); *see also Rosan v. Chicago Milwaukee Corp.*, No. 1056, 1994 Del. Ch. LEXIS 7, *7 (Del. Ch. Jan. 19, 1994) (denying the

---

[21] The Registration Statement discloses that:

    (i)  J.P. Morgan executed open market purchases by Nationwide of certain of its outstanding debt securities in May 2010;

    (ii)  J.P. Morgan's commercial banking affiliate is an agent bank and a lender under outstanding credit facilities of both Nationwide and Ventas;

    (iii)  J.P. Morgan provides treasury and cash management services to each of Nationwide and Ventas;

    (iv)  J.P. Morgan's asset management affiliate provides asset and wealth management services to Nationwide; and

    (v)  J.P. Morgan and its affiliates trade in Nationwide or Ventas securities.

(Reg. Stmt at 64.)

award of legal fees based on changes made in a preliminary prospectus because "[p]reliminary statements are sent to the SEC for comments and are not meant to be final statements").

With regard to J.P. Morgan's fairness opinion, Plaintiffs seek a level of disclosure that exceeds what courts have previously held as sufficient under the *TSC* materiality standard. Plaintiffs argue that J.P. Morgan's description "fails to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions." (CAC ¶ 74.) Plaintiffs state, "Without this information, one cannot replicate the analyses, or confirm the valuations, or evaluate the fairness opinion." (*Id.*)   Additionally, Plaintiffs argue that the Registration Statement omits material details concerning J.P. Morgan's analyses supporting its fairness opinion.

The law requires directors to make a full and fair disclosure of "all material information within the board's control when it seeks shareholder action." *Shell Petroleum, Inc. v. Smith*, 606 A.2d 112, 114 (Del. 1992). Nevertheless, directors need not disclose everything under the sun. The Board need not, for example, disclose consistent and redundant facts or disclose insignificant details and reasonable assumptions. *Abrons*, 911 A.2d at 813.   Speculative information, as the Court previously noted, is not material. *Siliconix*, 2001 Del. Ch. LEXIS at *48.  Likewise, the duty of candor does not require directors to disclose so much information as to enable shareholders to "make an independent determination of fair value."   *In re Staples S'holders Litig.*, 792 A.2d 934, 954 (Del. Ch. 2001) (citing *Skeen*, 750 A.2d at 1174).  Rather, shareholders are entitled to a "fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on the merger or tender rely." *Globis Partners*, 2007 Del. Ch. LEXIS at *39.

The Registration Statement contains detailed disclosures concerning J.P. Morgan's work. Furthermore, the fairness opinion included in the Registration Statement adequately summarizes the various analyses J.P. Morgan performed and the many factors considered in reaching its fairness opinion.  The Court notes that the entire summary, distinguished from the full text of the opinion, exceeds eight pages.   Plaintiffs nonetheless assert that this summary, along the appended opinion in full, is inadequate.  In seeking additional data, support for conclusions, and any underlying assumptions, Plaintiffs attempt to decipher the roadmap used by J.P. Morgan in order to navigate their own route to reach the same destination.  The Court finds no authority supporting this approach.  Plaintiffs are not entitled to the additional information they seek; such details underlying J.P. Morgan's work need not be disclosed.  *See Merrill Lynch*, 2008 Del. Ch. LEXIS at *42 ("Delaware courts have repeatedly held that a board need not disclose specific details of the analysis underlying a financial advisor's opinion."); *Abbey v. E.W. Scripps Co.*, C.A. No. 13397, 1995 Del. Ch. LEXIS 94, *11 (Del. Ch. Aug. 9, 1995) (stating that the work and consideration upon which an investment banker bases its opinion is considered part of its "professional work in preparation for reaching and expressing its professional opinion," and, therefore, rarely material); *In re Dataproducts Corp. S'holders Litig.*, C.A. No. 11164, 1991 Del. Ch. LEXIS 149, *23 (Del. Ch. Aug. 22, 1991) (stating that Delaware law does not automatically mandate "disclosure of the detailed facts and specific analyses underlying a financial advisor's valuation methodology").

Plaintiffs allege similar deficiencies concerning Centerview Partners' fairness opinion. This Court need not address the substance of the alleged omissions for several reasons because Plaintiffs' claim fails as a matter of law.  First, there can be no dispute that Centerview Partners, as Ventas' financial advisor, did not owe a duty of candor to Nationwide shareholders because a

42

company owes no duty to persons with whom it has no fiduciary relationship.  In the context a merger, an acquiring company owes no duty to the shareholders of the target company, absent a special relationship. *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 551 (D. Del. 2002).  Second, Plaintiffs cannot deny that the Centerview opinion was prepared for the benefit of Ventas' shareholders.  Plaintiffs have offered no explanation of why Nationwide shareholders would find this information material.  Lastly, Plaintiffs have not established, by fact or inference, that Nationwide had possession or control of the omitted facts concerning the Centerview opinion.  Therefore, Plaintiffs' claim is dismissed as a matter of law.

By the same reasoning, Plaintiffs' claims concerning "certain Nationwide and Ventas Financial Information" also fail as a matter of law.  Plaintiffs assert that the Registration Statement fails to disclose assumptions and components of Ventas' cash flow analysis in Ventas' forecast.  Plaintiffs fail to explain not only how this information is material, but also that the information was either known to Nationwide's Board or in its possession at the time.  Plaintiffs also contend that the Registration Statement fails to include both the components of Nationwide's cash flows and the assumptions made in the Nationwide forecast.  In light of the Court's determination that the Registration Statement provides a fair summary of the analyses performed for Nationwide, no further disclosure would be material.  *See 3Com*, 2009 Del. Ch. LEXIS 215, at *8 ("Plaintiffs' . . . complaint asserting that management should have provided cash flow measures and EBIT or EBITA estimates from which cash flows could be derived does not state a colorable claim."); *MacMillan v. Intercargo Corp.*, 1999 Del. Ch. LEXIS 95, at *18 (Del. Ch. May 3, 1999).

Finally, the Court turns to address Plaintiffs' disclosure claims concerning the "process" that led to the Proposed Transaction.  Plaintiffs allege eight specific omissions concerning the

"seriously flawed" process that resulted in the Board's approval of the Proposed Transaction.  It is clear to the Court that these eight are primarily concerned with the Board's decision to foreclose a possible merger with Company A.  Plaintiffs make no attempt to disguise their inquiry into "why" "the Board determined that the Proposed Transaction was preferable to continuing to pursue a transaction with Company A that may have offered substantially superior consideration for Nationwide's shareholders." (CAC ¶ 72(h).)  Courts in Delaware and in Maryland have determined that such "why" questions are generally not material.  *See In re Lukens, Inc. S'holders Litig.*, 757 A.2d 720, 736 (Del. Ch. 1999); *Jasinover*, 2004 MDBT at *30.  Plaintiffs offer no explanation or reason why any of this information is material.  As such, Plaintiffs claims are merely conclusory.

Notwithstanding the pleading deficiency, Plaintiffs' claims fail for another reason.  Directors are not obligated to disclose information where the board "has not received a firm offer or has declined to continue negotiations with a potential acquirer because it has not received an offer worth pursuing . . . ."  *Simonetti*, 2008 Del. Ch. LEXIS at *25.  The Nationwide Board never received a definitive offer, or other sign of firm commitment, from Company A.  The Board believed it unlikely that Company A would have matched or exceeded the terms offered by Ventas and stated as much in the Registration Statement. (*See* Reg. Stmt at 49.)  The Court finds, therefore, that the Board's reasons for discontinuing merger discussions with Company A are not material, and Plaintiffs' claims fail as a matter of law.

To the extent that Plaintiffs have alleged process-related omissions that are neither "why" questions nor directly related to the Board's decision regarding Company A, the law does not require over-disclosure—that is, disclosure of "so much information as to enable [shareholders] to replicate the directors' efforts." *Hudson*, 2004 Md. Cir. Ct. LEXIS at *39.  By the same token,

directors need not disclose a "play-by-play description of every consideration or action taken." *See Cogent*, 7 A.3d at 511–12. Notwithstanding Plaintiffs' pleading deficiencies, this Court has already determined that Defendants' 133-page preliminary Registration Statement contained more than adequate information concerning the Proposed Transaction.   Inasmuch as shareholders will receive the finalized Statement prior to voting on the merger, this Court does not find that the additional information sought by Plaintiffs would significantly alter the "total mix" of information available to shareholders.   Accordingly, this Court dismisses Plaintiffs' disclosure claims with prejudice.

## VI.  CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss the Consolidated Amended Complaint is hereby granted with prejudice.


May 27, 2011                                              _____
Date                                                            Stuart R. Berger
                                                                   Judge, Circuit Court for Baltimore City

| | | |
|---|---|---|
| **IN RE NATIONWIDE HEALTH PROPERTIES, INC. SHAREHOLDER LITIGATION** | * | **IN THE** |
| | * | **CIRCUIT COURT** |
| | * | FOR |
| | * | BALTIMORE CITY |
| | * | Part 10 |
| | * | Case No.:  24-C-11-001476 |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## ORDER

Upon consideration of Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint, the Plaintiffs' Opposition filed thereto, and the Reply Memorandum in Further Support of Defendant's Motion to Dismiss, it is this **27th** day of May, 2011, by the Circuit Court for Baltimore City, hereby **ORDERED** that:

1. The Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint be, and the same is, hereby **GRANTED**; and it is further **ORDERED** that:

2. The Consolidated Amended Class Action Complaint be, and the same is, hereby **DISMISSED WITH PREJUDICE**; and it is further **ORDERED** that:

3. All costs associated with these proceedings shall be assessed against the Plaintiffs.

 

_____
Stuart R. Berger
Judge, Circuit Court for Baltimore City

1