| | | |
|---|---|---|
| IN RE CONSTELLATION ENERGY | * | IN THE |
| GROUP, INCORPORATED | | |
| SHAREHOLDER LITIGATION | * | CIRCUIT COURT |
| | * | FOR |
| | * | BALTIMORE CITY |
| | * | Case No.: 24-C-11-003015 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CONSTELLATION DEFENDANTS' MOTION TO DISMISS

Defendants Mayo A. Shattuck, III, Yves C. de Balmann, Ann C. Berzin, James T. Brady, James R. Curtiss, Freeman A. Hrabowski, III, Nancy Lampton, Robert J. Lawless, John L. Skolds, and Michael D. Sullivan (collectively, the "Individual Defendants"), and Constellation Energy Group, Inc. ("Constellation," and, with the Individual Defendants, the "Constellation Defendants"), respectfully submit this motion to dismiss the Consolidated Amended Class Action Complaint with prejudice for failure to state a claim upon which relief can be granted pursuant to Md. Rule 2-322(b)(2). The grounds for this motion are set forth fully in the accompanying memorandum in support. A proposed Order is attached.

The Constellation Defendants incorporate by reference the motion to dismiss filed this day by Defendants Exelon Corporation and Bolt Acquisition Corporation (collectively, the "Exelon Defendants").

DATED: July 28, 2011

                     _____ /BDS

James D. Mathias
David Clarke, Jr.
Benjamin D. Schuman
DLA Piper LLP (US)
6225 Smith Avenue
Baltimore, Maryland 21209-3600
(410) 580-4208 (Telephone No.)

(410) 580-3208  (Facsimile No.)
james.mathias@dlapiper.com
david.clarke@dlapiper.com
ben.schuman@dlapiper.com

James P. Gillespie*
Brant W. Bishop*
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005-5793
(202) 879-5190 (Telephone No.)
(202) 879-5200 (Facsimile No.)
james.gillespie@kirkland.com
brant.bishop@kirkland.com

*Attorneys for Defendants Constellation Energy
Group, Inc., Mayo A. Shattuck, III, Yves C.
de Balmann, Ann C. Berzin, James T. Brady,
James R. Curtiss, Freeman A. Hrabowski, III,
Nancy Lampton, Robert J. Lawless, John L.
Skolds, and Michael D. Sullivan*

*admitted *pro hac vice*

| | | |
|---|---|---|
| IN RE CONSTELLATION ENERGY | * | IN THE |
| GROUP, INCORPORATED | | |
| SHAREHOLDER LITIGATION | * | CIRCUIT COURT |
| | * | FOR |
| | * | BALTIMORE CITY |
| | * | Case No.: 24-C-11-003015 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM IN SUPPORT OF THE
## CONSTELLATION DEFENDANTS' MOTION TO DISMISS

James D. Mathias
David Clarke, Jr.
Benjamin D. Schuman
DLA Piper LLP (US)
6225 Smith Avenue
Baltimore, Maryland 21209-3600
(410) 580-4208 (Telephone No.)
(410) 580-3208 (Facsimile No.)
james.mathias@dlapiper.com
david.clarke@dlapiper.com
ben.schuman@dlapiper.com

James P. Gillespie, P.C.*
Brant W. Bishop, P.C.*
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005-5793
(202) 879-5190 (Telephone No.)
(202) 879-5200 (Facsimile No.)
james.gillespie@kirkland.com
brant.bishop@kirkland.com

*Attorneys for Defendants Constellation Energy
Group, Inc., Mayo A. Shattuck, III, Yves C.
de Balmann, Ann C. Berzin, James T. Brady,
James R. Curtiss, Freeman A. Hrabowski, III,
Nancy Lampton, Robert J. Lawless, John L.
Skolds, and Michael D. Sullivan*

*admitted pro hac vice

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

FACTUAL BACKGROUND ................................................................................................... 4
    *A.*    *Constellation's Recent Strategic Transactions* ................................................. 4
    *B.*    *Constellation and Exelon Discuss a Potential Merger* .................................... 5
    *C.*    *The Terms of the Proposed Merger* ................................................................ 8
    *D.*    *The Joint Proxy Statement* ............................................................................. 9
    *E.*    *The Allegations in the Complaint* .................................................................. 10

LEGAL STANDARD ........................................................................................................... 11

ARGUMENT ........................................................................................................................ 11

I.    PLAINTIFFS' ATTACKS ON THE DIRECTORS' DECISION TO ENTER INTO THE
      PROPOSED TRANSACTION ARE INSUFFICIENT TO OVERCOME THE
      PROTECTIONS OF THE BUSINESS JUDGMENT RULE ........................................... 11

    *A.*    *The Directors Are Protected by the Business Judgment Rule* ...................... 11
    *B.*    *To Overcome the Protections of the Business Judgment Rule, Plaintiffs Must Establish*
        *Fraud, Self-Dealing, or Unconscionable Conduct* ...................................... 14
    *C.*    *Plaintiffs' Conclusory Allegations That Directors Lack Independence or Are Not*
        *Disinterested Are Insufficient* ...................................................................... 16
    *D.*    *Plaintiffs' Attacks on the "Fairness" of the Deal Are Insufficient* .............. 19

II.   THE DIRECTORS EXERCISED REASONABLE BUSINESS JUDGMENT IN
      APPROVING DEAL PROTECTION TERMS ............................................................... 20

    *A.*    *The "No Solicitation" Provision Is Appropriate* ......................................... 21
    *B.*    *The "Matching Right" Provision Is Appropriate* ......................................... 24
    *C.*    *The Termination Fee Is Appropriate* ............................................................ 24

III.  THE DISCLOSURE CLAIMS FAIL ............................................................................. 26

    *A.*    *Plaintiffs' Claims Regarding the Financial Advisors' Opinions Fail* .......... 27
    *B.*    *Plaintiffs' Claims About the Opinions of Exelon's Financial Advisors Are Meritless.* 30
    *C.*    *The Joint Proxy Statement Sufficiently Discloses the Sales Process* ............ 31
    *D.*    *Plaintiffs' Claims Relating to Financial Projections Fail* ............................ 34

IV.  MARYLAND LAW PROHIBITS PLAINTIFFS' CLAIMS FROM BEING RAISED AS
      A DIRECT ACTION ...................................................................................................... 35

V.   THE DERIVATIVE CLAIMS MUST BE DISMISSED BECAUSE PLAINTIFFS
      FAILED TO MAKE DEMAND .................................................................................... 37

    *A.*    *Derivative Actions Are "Extraordinary"* ..................................................... 37
    *B.*    *The Futility Exception Is "Very Limited"* ..................................................... 38
    *C.*    *Plaintiffs Fail to Plead Any Particular Facts to Satisfy the Futility Exception* ........... 39

VI.  PLAINTIFFS' COUNT FOR AIDING AND ABETTING SHOULD BE DISMISSED .. 40

CONCLUSION .................................................................................................................... 41

## TABLE OF AUTHORITIES

<u>Cases</u>

*Abbey v. E.W. Scripps Co.*, Civ. A. No. 13397, 1995 WL 478957 (Del. Ch. Aug. 9, 1995)........29

*Abrons v. Maree*, 911 A.2d 805 (Del. Ch. 2006)...............................................................35

*Andrews v. Hollerbach*, 2006 WL 6160393 (Md. Cir. Ct. Aug. 3, 2006)..........................39

*Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270 (Del. 1994)........................13, 14

*Basic, Inc. v. Levinson*, 485 U.S. 224 (1988)..................................................................26

*Benak v. Alliance Capital Mgmt. L.P.*, 2005 WL 1285652 (D.N.J. May 23, 2005)......................39

*Bender v. Schwartz*, 172 Md. App. 648 (2007)...........................................................37, 38

*Black v. Fox Hills N. Cmty. Ass'n*, 90 Md. App. 75 (1992)...............................................15

*Bobo v. State*, 346 Md. 706 (1997).................................................................................11

*Campbell v. Cushwa*, 133 Md. App. 519 (2000)...............................................................11

*Caston v. Hoaglin*, 2009 WL 3078214 (S.D. Ohio Sept. 23, 2009)..................................39

*Cherwek v. Aspect Med. Sys., Inc.*, Civ. A. No. 4989-VCS (Del. Ch. May 25, 2010).....................1

*City of St. Clair Shores Gen. Emps. Ret. Sys. v. Inland W. Retail Real Estate Trust, Inc.*,
635 F. Supp. 2d 783 (N.D. Ill. 2009)......................................................................36, 39

*County of York Employees Ret. Plan v. Merrill Lynch & Co.*, C.A. No. 4066-VCN,
2008 WL 4824053 (Del. Ch. Oct. 28, 2008)......................................................13, 14, 29

*Danielewicz v. Arnold*, 137 Md. App. 601 (2001)..........................3, 15, 20, 36, 39

*Devereux v. Berger*, 264 Md. 20 (1971)...................................................................12, 15

*Energy Partners, Ltd. v. Stone Energy Corp.*, 2006 WL 2947483 (Del. Ch. 2006)..............23, 24

*Faya v. Almaraz*, 329 Md. 435 (1993).........................................................................4, 11

*Felker v. Anderson*, 2005 WL 602974 (W.D. Mo. Feb. 11, 2005).....................................39

*Figueiredo-Torres v. Nickel*, 321 Md. 642 (1991)...........................................................11

*Globis Partners, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024
(Del. Ch. Nov. 30, 2007)...........................................................28, 29, 32, 34

*Golden Cycle, LLC v. Allan,* No. Civ. A. 16301, 1998 WL 892631 (Del. Ch. Dec. 10, 1998) .... 25

*Goodwin v. Live Entm't,* No. 15765, 1999 WL 64265 (Del. Ch. Jan. 25, 1999) ............................ 25

*Hudson v. Prime Retail, Inc.,* No. 24-C-03-5806, 2004 WL 1982383
    (Md. Cir. Ct. Apr. 1, 2004) ........................................................ 16, 17, 18, 26, 31, 32, 34

*In re 3Com S'holders Litig.,* No. Civ. A. 5067-CC, 2009 WL 5173804
    (Del. Ch. Dec. 18, 2009) .......................................... 21, 25, 27, 28, 29, 32, 34, 35

*In re AllianceBernstein Mut. Fund Excessive Fee Litig.,* 2005 WL 2677753
    (S.D.N.Y. Oct. 19, 2005) ........................................................................................ 39

*In re American Mut. Funds Fee Litig.,* 2005 WL 3989803 (C.D. Cal. Dec. 16, 2005) ............... 39

*In re Answers Corp. S'holders Litig.,* 2011 WL 1366780 (Del. Ch. April 11, 2011) .................. 26

*In re Best Lock Corp. S'holder Litig.,* 845 A.2d 1057 (Del. Ch. 2001) .................................. 28, 33

*In re CheckFree Corp. S'holders Litig.,* 2007 WL 3262188 (Del. Ch. Nov. 1, 2007) ............. 28, 34

*In re CNL Hotels & Resorts, Inc. Sec. Litig.,* 2005 WL 2219283 (M.D. Fla. Sept. 13, 2005) ..... 39

*In re Cogent, Inc. S'holder Litig.,* 7 A.3d 487 (Del. Ch. 2010) ............................. 21, 24, 31, 32, 34

*In re CompuCom Sys., Inc. Stockholders Litig.,* No. Civ. A 499-N, 2005 WL 2481325
    (Del. Ch. Sept. 29, 2005) ........................................................................................ 19

*In re Dataproducts Corp. S'holders Litig.,* 1991 WL 165301 (Del. Ch. Aug. 22, 1991) ....... 33, 35

*In re Davis Selected Mut. Funds Litig.,* 2005 WL 2509732 (S.D.N.Y. Oct. 11, 2005) ............... 39

*In re Dreyfus Mut. Funds Fee Litig.,* 428 F. Supp. 2d 342 (W.D. Pa. 2005) .............................. 39

*In re Encore Computer Corp. S'holders Litig.,* No. 16044, 2000 WL 823373
    (Del. Ch. June 16, 2000) ........................................................................................ 17

*In re Franklin Mut. Funds Fee Litig.,* 388 F. Supp. 2d 451 (D.N.J. 2005) .............................. 39

*In re Infosonics Corp. Derivative Litig.,* 2007 WL 2572276 (S.D. Cal. Sept. 4, 2007) ............... 39

*In re IXC Commc'n, Inc. S'holders Litig.,* Nos. Civ. A. 17324 & 17334, 1999 WL 1009174
    (Del. Ch. Oct. 27, 1999) ........................................................................................ 21

*In re JCC Holding Co., Inc.,* 843 A.2d 713 (Del. Ch. 2003) .................................................. 28, 33

*In re J.P. Stevens & Co., Inc. S'holders Litig.,* 542 A.2d 770 (Del. Ch. 1988) ...................... 21, 25

*In re Key Energy Servs., Inc. Derivative Litig.,* 2006 WL 5979882 (W.D. Tex. July 10, 2006) .. 39

*In re Lear Corp. S'holder Litig.*, 926 A.2d 94 (Del. Ch. 2007)......................................................24

*In re Lukens Inc. S'holders Litig.*, 757 A.2d 720 (Del. Ch. 1999)..........................................21, 22

*In re Merrill Lynch Focus Twenty Fund Inv. Co. Act Litig.*, 218 F.R.D. 377
(E.D.N.Y. 2003)......................................................................................................................38, 39

*In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d 233 (S.D.N.Y. 2006)...........39

*In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d 873 (D. Md. 2005)...............................................39

*In re Nationwide Health Properties, Inc. Shareholder Litigation*, No. 24-C-11-001476
(Balt. City Cir. Ct. May 27, 2011).......................................................................................*passim*

*In re Netsmart Technologies, Inc. S'holders Litig.*, 924 A.2d 171 (Del. Ch. 2007).....................33

*In re Oppenheimer Funds Fees Litig.*, 419 F. Supp. 2d 593 (S.D.N.Y. 2006)..............................39

*In re Pennaco Energy, Inc.*, 787 A.2d 691 (Del. Ch. 2001)..................................................24, 25

*In re Siliconix S'holders Litig.*, 2001 WL 716787 (Del. Ch. June 21, 2001)................................34

*In re Staples S'holders Litig.*, 792 A.2d 934 (Del. Ch. 2001).....................................................27

*In re Terra Indus., Inc. S'holder Litig.*, No. 24-C-10-001302, 2010 WL 5412283
(Md. Cir. Ct. July 14, 2010)...............................................................................................25, 26

*In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975 (Del. Ch. 2005).........................22, 24, 30

*In re Vitalink Commc'n Corp. S'holders Litig.*, Civ. A. No. 12085, 1991 WL 238816
(Del. Ch. Nov. 8, 1991).........................................................................................................22

*Jasinover v. Rouse Co.*, No. 13-C-04-59594, 2004 WL 3135516
(Md. Cir. Ct. Nov. 4, 2004).....................................................................................21, 25, 32, 34

*Jolly Roger Fund LP v. Sizeler Prop. Investors, Inc.*, 2005 WL 2989343
(D. Md. Nov. 3, 2005).............................................................................................................39

*Kahn v. Caporella*, 1994 WL 89016 (Del. Ch. Mar. 10, 1994).....................................................30

*Kamen v. Kemper Fin. Svcs., Inc.*, 500 U.S. 90 (1991)..............................................................38

*La. Municipal Police Employees' Retirement System v. Crawford*, 918 A.2d 1172
(Del. Ch. 2007).......................................................................................................................33

*Lyondell Chem. Co. v. Ryan*, 970 A.2d 235 (Del. 2009)...............................................................23

*Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001)......................................................................40

*Marriott Corp. v. Chesapeake & Potomac Tel. Co.*, 124 Md. App. 463 (1998) ......................... 20

*McIntyre v. Guild, Inc.*, 105 Md. App. 332 (1995) ........................................................................ 11

*McMillan v. Intercargo Corp.*, 768 A.2d 492 (Del. Ch. 2000) .............................. 21, 22, 25

*McMullin v. Beran*, 765 A.2d 910 (Del. 2000) ............................................................................ 13

*Moonlight Inv., Ltd. v. John*, 192 S.W.3d 890 (Tex. App. 2006) ...................................... 39

*NAACP v. Golding*, 342 Md. 663 (1996) ..................................................................................... 15

*Orman v. Cullman*, 794 A.2d 5 (Del. Ch. 2002) ....................................................................... 17

*Parish v. Maryland & Virginia Milk Producers Ass'n*, 250 Md. 24 (1968) ....................... 19

*Patterson v. Patterson*, No. 03-C-05-005429, 2006 WL 990998 (Md. Cir. Ct. 2006) ................. 36

*Repairman's Serv. Corp. v. Nat'l Intergroup, Inc.*, 1985 WL 11540
(Del. Ch. Mar. 15, 1985) ............................................................................................... 32, 34

*Revlon v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986) ................... 13

*Safety-Kleen Corp. v. Laidlaw Enviro. Servs., Inc.*, 1999 WL 601039 (N.D. Ill. 1998) .............. 23

*Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133 (2d Cir. 2004) .......................................... 39

*Sekuk Global Enters. Profit Sharing Plan v. Kevenides*, 2004 WL 1982508
(Md. Cir. Ct. May 25, 2004) ......................................................................................... 39

*Sharrow v. State Farm Mutual*, 306 Md. 754 (1986) .............................................................. 11

*Shenker v. Laureate Education, Inc.*, 411 Md. 317 (2009) ...................... 3, 12-14, 16, 36

*Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170 (Del. 2000) ..................................................... 27

*State of Wis. Inv. Bd. v. Bartlett*, No. C.A. 17727, 2000 WL 238026 (Del. Ch. Feb. 24, 2000) ...16

*Sullivan v. Easco Corp.*, 656 F. Supp. 531 (D. Md. 1987) ............................................. 18-19

*Swope v. Quadra Realty Trust, Inc.*, 2009 WL 2349955 (N.Y. Sup. Ct. July 16, 2009) .............. 39

*Washtenaw County Employees' Ret. Sys. v. Wells Real Estate Inv. Trust, Inc.*, 2008 WL 2302679
(N.D. Ga. Mar. 31, 2008) ............................................................................................. 39

*Werbowsky v. Collomb*, 362 Md. 581 (2001) ......................... 16, 17, 18, 35, 37, 38, 39, 40

*Wittman v. Crooke*, 120 Md. App. 369 (1998) .............................. 3, 15, 16, 18, 20, 37

## Statutes

Md. Code Ann., Corps. & Ass'ns § 2-405.1 ....................................................................11-12, 35

Md. Code Ann., Corps. & Ass'ns § 2-419 .....................................................................................18

This litigation underscores what has become an unfortunate truism in American business: Whenever a significant corporate transaction is announced, there will be a lawsuit – often many duplicative lawsuits. This practice recently led then-Vice Chancellor (now Chancellor) Leo E. Strine Jr. of the Delaware Court of Chancery to remark: "[T]here is a sort of pattern here, where what we have done is every single time a company is sold, with no apparent entrenchment motives, there is a suit brought." *Cherwek v. Aspect Med. Sys., Inc.*, Civ. A. No. 4989-VCS, 12:15-18 (May 25, 2010).

The proposed $7.8 billion merger between Constellation Energy Group and Exelon Corporation quickly prompted a dozen reflexive lawsuits – the first two filed within hours of the deal being announced. And plaintiffs unleashed this avalanche of litigation against Constellation and its Board even though Constellation's Board of Directors has repeatedly demonstrated over the last few years that it is independent and committed to maximizing stockholder value; even though this merger offers Constellation's stockholders a premium of more than 24 percent over the price at which their stock was trading before the price was affected by market reports of a potential deal; and even though the transaction will not occur unless the owners of a majority of Constellation's shares vote for it.

The original complaints followed a standard form, with "unfair price" and "unfair process" allegations spun as legal conclusions of breaches of fiduciary duties, but without any facts to support these claims. On June 27, 2011, Exelon and Constellation filed a joint disclosure document (the "Joint Proxy Statement") with the Securities and Exchange Commission that is almost two hundred single-spaced pages in length and that exhaustively describes Constellation and Exelon, the background to the proposed transaction, and the analysis performed by Constellation's financial advisors that underlies their opinions that the proposed transaction is

fair to Constellation's shareholders from a financial point of view. Plaintiffs then filed their Consolidated Amended Class Action Complaint (the "Complaint" or "Compl.") on July 14, 2011. Yet, that pleading does nothing to correct the original complaints' deficiencies. And, while the Complaint adds criticisms of the disclosures contained in the Joint Proxy Statement, those challenges are deficient as a matter of law.

This Court recently dealt with a very similar set of circumstances in *In re Nationwide Health Properties, Inc. Shareholder Litigation*, No. 24-C-11-001476 (May 27, 2011) (Berger, J.) ("*NHP*") (opinion attached as Exhibit A). In *NHP*, as here, the challenged transaction was a stock-for-stock merger in which shareholders of the target company received shares in the acquiring corporation. In *NHP*, as here, the shareholders voted on whether they wished to accept the proposed exchange or not.

Nonetheless, within two weeks of the announcement, without even waiting for the parties to the transaction to file the requisite disclosure document with the SEC, many of the same law firms challenging the Constellation transaction filed challenges to the NHP transaction. Accordingly, it should hardly be surprising that plaintiffs in *NHP*, like Plaintiffs here, failed to allege *any* facts to support the claims of wrongdoing they recited by rote against Defendants.

After the parties to the transaction filed a proxy with the SEC, plaintiffs in *NHP*, like Plaintiffs here, filed an amended and consolidated pleading. That pleading, like the Complaint here, continued to attack the price and process as "unfair" but remained bereft of particular facts to support that naked assertion. The final pleading in *NHP*, like the Complaint here, added complaints about the disclosures made by Defendants, but a review of those claims revealed that Plaintiffs had identified no ***material*** omissions.

Judge Berger dismissed the plaintiffs' complaint in *NHP* with prejudice, relying on well

2

established precedent from both Maryland and Delaware. First, Judge Berger held that the applicable standard of judicial review for a stock-for-stock merger is the business judgment rule. In so ruling, Judge Berger rejected the plaintiffs' argument that a stock-for-stock merger should be governed by the common law standard of judicial review that the Court of Appeals articulated for cash mergers in *Shenker v. Laureate Education, Inc.*, 411 Md. 317 (2009). Second, relying on cases such as *Wittman v. Crooke*, 120 Md. App. 369, 376 (1998), and *Danielewicz v. Arnold*, 137 Md. App. 601, 638-39 (2001), Judge Berger noted that the protections of the business judgment rule can only be rebutted by specific, well-pleaded facts demonstrating gross negligence or a breach of the duty of loyalty and held that the plaintiffs' conclusory allegations of wrongdoing in *NHP* were insufficient. Finally, Judge Berger held that there were no material omissions in the disclosure document filed with the SEC.

Lead plaintiffs' counsel here has conceded in a prior filing that the common law duties articulated by the Court of Appeals in *Shenker* do not apply when directors approve a stock-for-stock merger like the transaction in this case, *see* Pls. Argentino & Gordon's Reply in Further Support of Their Amended Motion for Appointment of Co-Lead Counsel [Doc. No. 26/1] at 2-3 & n.2, and therefore concede that the applicable standard of judicial review in this case is the business judgment rule. As in *NHP*, the Complaint here fails to plead specific facts sufficient to overcome the business judgment rule's presumption that the Exelon deal offers Constellation shareholders a fair price on fair terms. *See* Sections I and II of Argument.

Recognizing that their challenges to the substance of the proposed transaction cannot survive a motion to dismiss, Plaintiffs also attempt to plead a violation of the duty of candor by quibbling about alleged omissions in Constellation's 198-page Joint Proxy Statement. As Judge Berger explained in *NHP*, however, in order for a disclosure claim of this sort to survive a

motion to dismiss, Plaintiffs must show that the allegedly omitted information would *materially* alter the *total mix* of information available to Constellation shareholders. As in *NHP*, this is a standard that the allegations in the Complaint cannot satisfy. *See* Section III of Argument.

What is more, while the Court need not reach these issues to dismiss, the Complaint is defective for several additional reasons. By statute, Plaintiffs lack standing to assert their claims in a direct action. *See* Section IV of Argument. To the extent Plaintiffs purport to bring their claims derivatively on behalf of Constellation, the Complaint is subject to dismissal because of Plaintiffs' unexcused failure to make a pre-suit demand on Constellation's Board of Directors. *See* Section V of Argument. Finally, Plaintiffs have failed to state a claim against Constellation for aiding and abetting. *See* Section VI of Argument.

Accordingly, the Court should dismiss Plaintiffs' entire Complaint with prejudice.

## FACTUAL BACKGROUND[1]

### A.  Constellation's Recent Strategic Transactions

Constellation is well informed about the opportunities for strategic transactions and how potential strategic counterparties value Constellation's business. (Ex. B at 48.) Over the past six years, Constellation has entered into three major strategic transactions. (*Id.*) Additionally, over the past few years, Constellation evaluated other potential transactions involving many possible counterparties, including, but not limited to, Exelon. (*Id.*) In one strategic transaction – the proposed acquisition by MidAmerican Energy Holdings Company in October 2008 –

---

[1]     This statement of facts is taken from the Complaint and the Joint Proxy Statement, which is attached as Exhibit B. This Court may take judicial notice of the Joint Proxy Statement because it is essential to Plaintiffs' claims and because it has been filed publicly with the SEC. *See NHP* at 2 n.4 (taking judicial notice of the Nationwide registration statement because it was "both a matter of public record and a document accepted by a credible federal agency"); *Faya v. Almaraz*, 329 Md. 435, 444 (1993) (a court may take judicial notice of "additional facts that are either matters of common knowledge or capable of certain verification").

4

Constellation terminated the agreement to pursue an alternative transaction, which it consummated. (*Id.*)

The senior management teams and Boards of each of Constellation and Exelon actively monitor and assess developments in the energy industry and are generally aware of the business activities of other major energy companies, including each other. (*Id.* at 47.) Executives from each of Constellation and Exelon periodically interact with each other at industry gatherings and as part of various energy industry organizations. (*Id.*) As a result, they see and speak with each other several times each year, each of Constellation and Exelon is generally familiar with the other company's business and operations, and on at least two occasions prior to the commencement of the October 2010 discussions that led to this deal the senior executives that initiated this merger had informal conversations regarding a possible transaction between Constellation and Exelon. (*Id.*)

### B.    Constellation and Exelon Discuss a Potential Merger

In October 2010, Mayo A. Shattuck, III ("Shattuck"), Chairman of the Board, President, and Chief Executive Officer of Constellation began conversations with Christopher M. Crane ("Crane"), President and Chief Operating Officer of Exelon, and John W. Rowe ("Rowe"), Chairman and CEO of Exelon, regarding the possibility of a merger of Exelon and Constellation. (Compl. ¶ 52-53.) Around October 25, 2010, the parties agreed to evaluate a possible transaction. (*Id.* ¶ 53.) Beginning in late October 2010, senior management of Constellation retained outside professional advisors to assist it and provide advice on the proposed merger. (*Id.* ¶ 55.) Shattuck and Rowe continued to discuss an acquisition in November. (*Id.* ¶ 57.) Shattuck also apprised some directors of his discussions with Exelon during this time.

On December 17, 2010, at Constellation's first regularly scheduled board meeting since discussions began, Shattuck reported to the full Board on his Exelon discussions and internal

analysis of a potential transaction. (*Id.* ¶ 59.) Discussions between the companies continued in January, with the parties executing confidentiality and joint defense agreements. (*Id.* ¶ 60; Ex. B at 50.)

On January 20, 2011, senior management and Morgan Stanley presented to the Board what they considered the preliminary strategic benefits and financial information related to a possible Exelon transaction. (Ex. B. at 51.) At a January 21, 2011 Board meeting, the Board asked a subgroup of four Constellation directors, (Robert J. Lawless, Ann C. Berzin, James T. Brady and Yves C. de Balmann, each a named defendant) to review in more detail with management a possible transaction with Exelon. (*Id.*)

In early February, the subgroup met with senior management, Morgan Stanley and Kirkland & Ellis LLP ("Kirkland"), Constellation's outside legal adviser, and concluded that a transaction could have significant benefits for Constellation and its stockholders and merited further analysis. (*Id.* at 52-53.) On February 16, 2011, the subgroup updated the other four independent directors (all directors other than Shattuck) on its analysis, preliminary views and the direction they had provided to management. (*Id.* at 53.) The Board met again in late February with Constellation's advisors and authorized continued discussions and negotiations. (*Id.*)

Throughout March and April 2011, the parties continued discussion of, among other things, the respective companies' consideration of the possible transaction, due diligence, proposed terms, regulatory approvals, risks, and management and governance of a combined company. (*Id.* at 53-56.) From mid-March through late April, Morgan Stanley met and spoke with Barclays Capital Inc., Exelon's financial advisor, numerous times to discuss unresolved items. (*Id.* at 54-56.)

On March 17, 2011, the Constellation Board met with its advisors and discussed the current status of the discussions, as well as risks of the deal. (*Id.* at 54.) The Board decided to have a larger group of Constellation senior management engage in a more extensive exchange of non-public information with Exelon to further define the terms of a possible transaction and explore whether mutually acceptable terms could be reached. (*Id.*) From mid-March to mid-April, the parties exchanged drafts of a merger agreement. (*Id.* at 55-58.)

In mid to late April, the parties' financial advisors discussed a potential exchange ratio and exchanged offers. (*Id.* at 58.) On April 18, 2011, Shattuck and Crane agreed to present to their Board's an exchange ratio of 0.930 shares of Exelon common stock for each share of Constellation common stock. (Compl. ¶ 67.)

On April 18, 2011, the Constellation Board met with its advisors. (Ex. B at 58.) Rowe and Crane attended a portion of the meeting and presented their views on the possible transaction and the opportunities they believed it presented. (*Id.* at 58-59.) The Board received presentations by senior management, Morgan Stanley and Kirkland, and discussed the likelihood and desirability of alternative merger partners and the actions that had been taken over the recent past to consider any other possible strategic transactions. (*Id.* at 59.) Senior management and Morgan Stanley described their understanding of the opportunities for alternative strategic transactions, based on their general market knowledge and prior discussions and selected informal conversations with potential merger partners and other potentially interested parties, as well as the benefits of a transaction with Exelon relative to alternative business combination transactions. (*Id.*) The directors concluded that the terms of the proposed transaction presented a strong value proposition to the Constellation shareholders and instructed management and the

advisors to work towards finalizing the deal. (*Id.*) Over the next week, the parties continued to negotiate final terms. (*Id.* at 59-60.)

On April 26, 2011, following presentations by senior management, Morgan Stanley and Kirkland, the Board (without advisors or management present) considered and discussed the various presentations made and the benefits and risks of the proposed transaction. (*Id.* at 61.) The Board then expressed its preliminary support for the merger and that it expected to approve it once the definitive merger agreement was finalized, and subject to receipt of fairness opinions from the financial advisors. (*Id.*)

On April 26-27, 2011, Constellation and Exelon finalized the merger agreement, which the Exelon Board unanimously approved on April 27, 2011. (*Id.*) Later on April 27, 2011, Morgan Stanley and Goldman Sachs provided the Constellation Board their respective oral opinions (subsequently confirmed in writing) that the exchange ratio was fair, from a financial point of view, to Constellation shareholders. (*Id.* at 63.) The Constellation Board then unanimously approved the merger agreement. (*Id.*) On April 28, 2011, Constellation and Exelon executed the merger agreement and issued a joint press release announcing it. (*Id.*)

## C.   The Terms of the Proposed Merger

Upon completion of the merger, Bolt Acquisition Corporation[2] will merge with and into Constellation. (Ex. B at 9.) Constellation will be the surviving corporation and a wholly owned subsidiary of Exelon. (*Id.*) Each outstanding share of Constellation common stock (other than shares owned by Constellation, Exelon or Bolt, which shares will be cancelled) will be converted

---

[2]   Bolt Acquisition Corporation ("Bolt") is a direct wholly owned subsidiary of Exelon that was formed to effect the merger of Bolt with and into Constellation. Bolt has engaged in no business activities to date and has no material assets or liabilities of any kind, other than those incident to its formation and those incurred in connection with the merger. Bolt was incorporated in Maryland in April 2011. (Ex. B at 33.)

into the right to receive 0.930 shares of Exelon common stock, with cash to be paid in lieu of fractional shares. (*Id.* at 10.) Exelon shareholders will continue to own their existing shares of Exelon common stock. (*Id.*)

The exchange ratio represents a 12.5% premium over the closing price of Constellation common stock as of April 27, 2011, the last trading day prior to the execution of the merger agreement; a 20.6% premium over the 30-day average closing price of Constellation common stock as of April 27, 2011; and, most notably, a 24.6% premium over the 30-day average closing price of Constellation common stock as of April 6, 2011, the last date prior to the first public reports of a possible transaction between Constellation and Exelon – *i.e.*, the unaffected stock price. (*Id.* at 104-105.) Based on the current number of shares of Exelon common stock and Constellation common stock outstanding existing Exelon shareholders would own approximately 78% of the common stock of Exelon and former Constellation stockholders would own approximately 22% of the common stock of Exelon upon completion of the merger. (*Id.* at 10.)

The Merger Agreement contains standard deal protections, including a no-solicitation clause, a matching-rights provision and termination fees, as well as a fiduciary out that allows Constellation to consider and accept alternative offers. (*Id.* at 151-53.)

### D.    The Joint Proxy Statement

On June 27, 2011, Constellation and Exelon filed with the SEC a 198-page Joint Proxy Statement regarding the proposed merger. (Ex. B.) The background to the merger and the terms of the agreement are extensively disclosed. Also attached are the 79-page Agreement and Plan of Merger ("Merger Agreement"), the fairness opinions of both companies' financial advisors, and the analyses underlying those opinions. The Joint Proxy Statement and related attachments include, among other things:

- Seven (7) pages of potential risk factors related to the merger (*id.* at 24-30);

- Sixteen (16) pages explaining the background of the merger *(id.* at 47-63);

- Forty-seven (47) pages summarizing the fairness opinions of both companies' advisors, including updated projections and analyses *(id.* at 72-102, 110-126); along with 14 pages reproducing the full text of both companies' advisors' fairness opinions *(id.* at Annex B-F); and

- Six (6) pages detailing the exact benefits accruing to Constellation's directors and executive officers as a result of the merger *(id.* at 127-133).

Constellation shareholders have all of this information available to them so they can decide whether to accept or reject the merger. During the remaining time prior to that vote, other potential counterparties are free to submit to Constellation an alternative proposal.

### E.    The Allegations in the Complaint

The Complaint asserts both a direct and derivative claim for relief against each of the Constellation directors, alleging that they breached fiduciary duties owed to Plaintiffs and Constellation. (Compl. ¶¶ 136-140, 145-149.) Specifically, the Complaint alleges that the Constellation Directors "have initiated a process to sell Constellation that undervalues the Company and vests them with benefits that are not shared equally by Constellation's public shareholders," "failed to sufficiently inform themselves of Constellation's value, or disregarded the true value of the Company, in an effort to benefit themselves," and "failed to disclose material information concerning the Proposed Acquisition" to allow shareholders to make an informed decision regarding the transaction. *(Id.* ¶ 139.) The Complaint also asserts a claim against both Constellation and Exelon alleging that they aided and abetted the alleged breaches of fiduciary duty by the Individual Defendants *(Id.* ¶¶ 141-144.) The Complaint demands, *inter alia*, a preliminary and permanent injunction of the proposed merger, as well an accounting and damages to the Company, Plaintiffs and the Class. *(Id.* at 51-52.)

10

## LEGAL STANDARD

A complaint that fails to articulate a legally sufficient cause of action should be dismissed. *See Campbell v. Cushwa*, 133 Md. App. 519, 534 (2000).  When reviewing a motion to dismiss, the Court must take as true all well-pleaded facts as alleged in the complaint and all reasonable inferences that may be drawn from the complaint, but mere conclusory charges that are not supported by allegations of facts need not be considered.  *Bobo v. State*, 346 Md. 706, 708-09 (1997); *McIntyre v. Guild, Inc.*, 105 Md. App. 332, 342-43 (1995).  The Court may also consider any matter for which judicial notice is proper, including the contents of the Joint Proxy Statement filed with the SEC.  *See Faya v. Almaraz*, 329 Md. 435, 444-46 (1993); *NHP* at 2 n.4; *see also supra* note 1.  Finally, "any ambiguity or uncertainty in the allegations bearing on whether the complaint states a cause of action must be construed against the pleader." *Figueiredo-Torres v. Nickel*, 321 Md. 642, 647 (1991) (quoting *Sharrow v. State Farm Mutual*, 306 Md. 754, 786-69 (1986)).

## ARGUMENT

I.  **PLAINTIFFS' ATTACKS ON THE DIRECTORS' DECISION TO ENTER INTO THE PROPOSED TRANSACTION ARE INSUFFICIENT TO OVERCOME THE PROTECTIONS OF THE BUSINESS JUDGMENT RULE**

A.  **The Directors Are Protected by the Business Judgment Rule**

When considering a transaction like the proposed merger here, a director's duties are defined by Section 2-405.1 of the Corporations and Associations Article of the Annotated Code of Maryland:

> A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves: (1) [i]n good faith; (2) [i]n a manner he reasonably believes to be in the best interests of the corporation; and (3) [w]ith the care that an ordinarily prudent person in a like position would use under similar circumstances.

Md. Code Ann., Corps. & Ass'ns § 2-405.1(a); *see also NHP* at 25-26.  Under this same statute, Maryland has codified the "business judgment rule," which creates a ***presumption*** that directors have complied with these duties.  *Id.* § 2-405.1(e) ("An act of a director of a corporation is presumed to satisfy the standards of subsection (a) of this section.").  Under the business judgment rule, "it is not [the Court's] function to attempt to substitute its judgment for that of the persons who are lawfully in control of a corporation's affairs." *Devereux v. Berger*, 264 Md. 20, 32 (1971).

Plaintiffs allege that the Individual Defendants have a "duty to search [for] and secure the best value reasonably available under the circumstances for the Company and its stockholders." (Compl. ¶ 34(d).)  Plaintiffs further allege that, because the Individual Defendants have "initiated a process to sell Constellation," they have "heightened fiduciary responsibilities," and the Court should exercise "enhanced scrutiny." (Compl. ¶ 36.)  In so arguing, Plaintiffs attempt to invoke the common law duties and heightened standard of review articulated by the Court of Appeals for cash mergers in *Shenker*.  But lead plaintiffs' counsel already conceded that a similar attempt was properly rejected in *NHP*.

In any event, Plaintiffs' attempt must fail because this case does not involve a cash merger in which the stockholders of the acquired corporation are being cashed out, but rather a stock-for-stock merger in which the stockholders of the acquired corporation will continue as full equity participants in the combined company.  As this Court held in *NHP*, this difference is critical.  The plaintiffs in *NHP* argued that the directors possessed, and breached, a duty to maximize the value of the transaction to the company's shareholders.  The plaintiffs' argument was based on the Court of Appeals' opinion in *Shenker*, which held that, in the "***context of a cash-out merger***," "the common law imposes on . . . directors duties to maximize shareholder

12

value and make full disclosure of all material facts concerning the merger to shareholders," 411 Md. at 338-39 (emphasis added), similar to Delaware's so-called *Revlon* duties. *See Revlon v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986). The plaintiffs in *NHP* argued that the duties described in *Shenker* should be extended to stock-for-stock transactions, or that the definition of "change of control" (which arguably would trigger *Shenker* duties) should be expanded to include a transaction like the one between NHP and Ventas.

The Court flatly rejected this argument, finding it "facially indefensible in light of the clear language of the Court's opinion in *Shenker*." *NHP* at 15. The Court noted that Judge Harrell, writing for the Court of Appeals in *Shenker*, "repeatedly placed *Shenker*'s holding in the express context of a cash-out merger no less than *ten times*." *Id.* (emphasis in original). The Court relied in particular on a footnote from *Shenker* in which the Court of Appeals distinguished between a cash-out merger (like the transaction in *Shenker*) and a stock-for-stock merger (like the transactions in *NHP* and here). *Id.* (quoting *Shenker*, 411 Md. at 327 n.3). The Court ultimately held that Maryland law imposes no duty on directors to maximize shareholder value when negotiating a stock-for-stock transaction, explaining that plaintiffs' argument to the contrary "would require courts to impose the duty of maximization of value in every merger, which is contrary to venerable case law." *Id.* at 19.

In addition to relying on the plain language of *Shenker*, the Court noted that its decision was consistent with that of Delaware courts, which have also "declined to treat cash-out mergers and stock-for-stock mergers synonymously to trigger heightened *Revlon* duties absent a change-of-control." *Id.* at 17 (citing *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1290 (Del. 1994); *Cnty. of York Emps. Ret. Plan v. Merrill Lynch & Co.*, C.A. No. 4066-VCN, 2008 WL 4824053, at *5 (Del. Ch. Oct. 28, 2008); *McMullin v. Beran*, 765 A.2d 910, 918 (Del. 2000)).

The Court likewise rejected plaintiffs' argument that the NHP/Ventas transaction represented a "change of control" that would trigger a duty to maximize shareholder value. Instead, the Court held, "where 'control of both [companies] remains in a large, fluid, changeable and changing market,' then directors are not obligated to obtain the highest available consideration for shareholders." *NHP* at 20-21 (quoting *Arnold*, 650 A.2d at 1289-90). In *NHP*, as in this case, the entity would be owned both before and after the transaction by a fluid aggregation of unaffiliated shareholders, and therefore no change of control would occur.

Significantly, Plaintiffs' counsel, in their briefs regarding appointment of lead counsel, conceded that *NHP* was rightly decided and that the Court correctly held that *Shenker* duties do not apply to stock-for-stock transactions. *See* Pls. Argentino & Gordon's Reply in Further Support of Their Amended Motion for Appointment of Co-Lead Counsel at 2-3 & n.2; *see also id.* at 3 ("Nor are any sale of control issues present here – both before and after the merger, control of Constellation Energy will rest with a diffuse set of public stockholders.").

Plaintiffs' allegations of "heightened fiduciary responsibilities" and "enhanced scrutiny" (Compl. ¶ 36.), are equally misplaced. The Court in *NHP* noted that Delaware law holds that stock-for-stock mergers are not "subject to heightened scrutiny," but rather are "evaluated subject to the deferential business judgment rule." *NHP* at 17 (quoting *Cnty. of York*, 2008 WL 4824053, at *5). Thus, the correct standard of judicial review in the instant case is the business judgment rule. And, as discussed below, Plaintiffs have not alleged facts to overcome the protections of the business judgment rule.

**B.     To Overcome the Protections of the Business Judgment Rule, Plaintiffs Must Establish Fraud, Self-Dealing, or Unconscionable Conduct**

Under the business judgment rule, "courts generally will not interfere with the internal management of a corporation" and instead will defer to the decision made by the corporation's

14

duly elected directors unless there has been a showing of "fraud, self-dealing or unconscionable conduct." *Wittman*, 120 Md. App. at 376 (citations and quotations omitted).[3] As the Court of Special Appeals has emphasized:

> "[I]f the corporate directors' conduct is authorized, **a showing must be made of fraud, self-dealing or unconscionable conduct to justify judicial review**. This presents an issue of law rather than of fact . . . [D]irectors of a corporation . . . are not expected to be incapable of error. All that is required is that persons in such positions act reasonably and in good faith in carrying out their duties . . . ."

*Id.* at 376 (quoting *Black v. Fox Hills N. Cmty. Ass'n*, 90 Md. App. 75, 82 (1992)) (emphasis added).

The presumption of the business judgment rule applies to stock-for-stock mergers just as it would any other director-approved transaction. *See NHP* at 19 (finding directors' actions in arranging and finalizing a stock-for-stock merger to be "managerial in nature" and therefore subject to the business judgment rule). In *Danielewicz v. Arnold*, 137 Md. App. 601 (2001), for example, a company issued shares of its stock to a shareholder and received from that shareholder shares in another company. The plaintiff, another shareholder, challenged the sale and purchase transaction as unfair to the company because it undervalued the company's shares. *Id.* at 610-11. Applying the business judgment rule to the plaintiff's challenge to the fairness of the exchange ratio, the court rejected the plaintiff's challenge, noting that there were only "bald and conclusory allegations" that the exchange ratio was inequitable. Consequently, the court held that there was no legal basis to "disturb the well-settled business judgment doctrine, as it

---

[3] *See also NHP* at 26; *NAACP v. Golding*, 342 Md. 663, 673 (1996) (stating that courts will not review decisions by directors "absent a showing that the officers acted fraudulently or in bad faith"); *Devereux*, 264 Md. at 31-32 ("[C]onduct of the corporation's affairs is placed in the hands of the board of directors and if the majority of the board properly exercises its business judgment, the directors are not ordinarily liable.") (citations and quotations omitted).

15

relates to a corporation's directors and the decisions they make in such capacity." *Id.* at 638; *see also Wittman*, 120 Md. App. at 376 (applying business judgment rule to challenge to stock-for-stock merger); *accord Wis. Inv. Bd. v. Bartlett*, No. C.A. 17727, 2000 WL 238026, at *4 (Del. Ch. Feb. 24, 2000) ("In the context of a merger, a breach of fiduciary duty analysis begins with the rebuttable presumption that a board of directors acted with care, loyalty, and in 'good faith.' Unless this presumption is sufficiently rebutted . . . the Court must defer to the discretion of the board and acknowledge that their decisions are entitled to the protection of the business judgment rule.").[4]

## C. Plaintiffs' Conclusory Allegations That Directors Lack Independence or Are Not Disinterested Are Insufficient

As an initial matter, Plaintiffs attempt to state claims against the directors with boilerplate assertions that they are dominated and controlled by Shattuck (Constellation's Chairman and CEO) or that they are advancing their own personal interests to the detriment of the interests of the stockholders. But to state such a claim, Plaintiffs must allege "particularized facts" supporting a conclusion that a majority of the directors lacked independence or "appear[ed] on both sides of a transaction [or] expect[ed] to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Werbowsky v. Collomb*, 362 Md. 581, 609 (2001) (citation omitted); *see also Hudson v. Prime Retail, Inc.*, No. 24-C-03-5806, 2004 WL 1982383, at *11-12 (Md. Cir. Ct. Apr. 1, 2004) (Plaintiffs must "allege particularized facts" to support any assertion that a

---

[4] Maryland courts find Delaware's well-developed body of law on corporate governance "highly persuasive." *NHP* at 16; *Shenker*, 411 Md. at 338 n.14 (quoting *Werbowsky v. Collomb*, 362 Md. 581, 618 (2001)).

16

director is dominated and controlled by another); *NHP* at 28 (quoting *Werbowsky*).[5]

Here, Plaintiffs have made no attempt whatsoever to allege particularized facts supporting a conclusion that the directors are dominated and controlled by Shattuck. The Complaint includes a formulaic assertion that the directors are "beholden to, and controlled and dominated by defendant Shattuck" (Compl. ¶ 134) but otherwise does not even address the subject. Indeed, *no* Individual Defendant other than Shattuck is even mentioned by name outside of the section identifying the parties.

More generally, Plaintiffs have failed to allege any facts showing that a majority of the directors have a material interest in the transaction. In order for a director to be materially "interested," the potential benefit must be significant enough "'in the context of the director's economic circumstances, as to have made it improbable that the director could perform [the director's] fiduciary duties.'" *Hudson*, 2004 WL 198283, at *12 (quoting *Orman v. Cullman*, 794 A.2d 5, 23 & n.44 (Del. Ch. 2002)). The Complaint asserts that the directors have acted in such a way that "vests them with benefits that are not shared equally by Constellation's public shareholders" (Compl. ¶ 139) but falls far short of pleading specific facts that demonstrate materiality under the test articulated in *Orman* and *Hudson*.

Plaintiffs' only allegations in this regard are that, if the proposed transaction is consummated, Shattuck will become the executive chairman of the combined company, and the new 16-member board will include four directors from Constellation. (*Id.* ¶ 85.) Plaintiffs make no attempt to explain why such benefits create a material conflict of interest. Given that

---

[5] *Accord In re Encore Computer Corp. S'holders Litig.*, No. 16044, 2000 WL 823373, at *5 (Del. Ch. June 16, 2000) (granting motion to dismiss and holding that "[t]o rebut that presumption [of the business judgment rule] the plaintiffs may allege facts sufficient to plead a cognizable claim for a breach of duty of loyalty, more specifically, that the defendants were materially interested in the transaction or failed to act independently on behalf of the corporation").

Shattuck already is the head of a major public company, even as to him the allegations are insufficient. Even if Shattuck were deemed to have a conflict of interest, however, solely for the sake of argument, Plaintiffs have still failed to plead that a *majority* of Constellation's Board was conflicted. *See, e.g.*, Md. Code Ann., Corps. & Ass'ns § 2-419(a)-(b)(1)(i) (providing that, even if a director is interested, if a majority of disinterested directors approve a transaction, the transaction is not voidable); *Werbowsky*, 362 Md. at 608-09 (explaining that even if directors are interested, if the transaction is approved by a majority of disinterested directors, the business judgment rule applies).

As for the fact that four Constellation directors will sit on the board of the successor entity (which, of course, means that a *majority* of Constellation's current directors will *lose* their jobs), the Court of Special Appeals already has considered and squarely rejected the argument that "the opportunity for a position on the board of directors of the new corporation is sufficient to cause the kind of conflict of interest that cannot be ratified by the shareholders." *Wittman*, 120 Md. App. at 375. In *Wittman*, the plaintiff alleged that "during the negotiations between BGE and PEPCO, appellees made the decision to trade a majority of the share price premium that BGE then enjoyed over PEPCO, in order to obtain more control over the new corporation." *Id.* at 374. The plaintiff argued that the "substantial benefit" the directors received from "'entrenching'" themselves "on the board of the new corporation" constituted a disabling conflict of interest. *Id.* at 374-75. Applying the business judgment rule, the court rejected this argument, concluding that the "alleged hope of better employment opportunities does not constitute the kind of interest covered." *Id.* at 375 (citation omitted). Absent evidence of bad faith – which is equally absent here – the plaintiff was "unable to overcome" the presumption of the business judgment rule. *Id.* at 376; *see also Sullivan v. Easco Corp.*, 656 F. Supp. 531, 535 (D. Md. 1987)

18

(applying Maryland law, finding that option of employment contracts did not create conflict of interest).

In sum, Plaintiffs have not pleaded adequately that any director, let alone a majority of directors, suffered from a material conflict of interest. As such, the Court should not hesitate to reject Plaintiffs' breach of the duty of loyalty claim. *See generally In re CompuCom Sys., Inc. Stockholders Litig.*, No. Civ. A 499-N, 2005 WL 2481325, at \*10 (Del. Ch. Sept. 29, 2005) (granting motion to dismiss where no facts demonstrated interest or lack of independence of directors and concluding "the plaintiff does not adequately allege that the merger was anything other than an arms-length transaction").

### D.    Plaintiffs' Attacks on the "Fairness" of the Deal Are Insufficient

Plaintiffs also attack the "fairness" of the proposed transaction.  This approach is also unavailing to overcome the protections of the business judgment rule. *See Parish v. Md. & Va. Milk Producers Ass'n*, 250 Md. 24, 74 (1968); *NHP* at 31.  As the court in *Parish* succinctly stated:

> It is well established that courts generally will not interfere with the internal management of a corporation at the request of a minority stockholder or a member.    The conduct of the corporation's affairs are placed in the hands of the board of directors and if the majority of the board properly exercises its business judgment, the directors are not ordinarily liable.    This sound general rule, however, is subject to the important exception that directors will be held liable if they permit the funds of the corporation or the corporate property to be lost or wasted by their gross or culpable negligence.

250 Md. at 74. Significantly, "gross or culpable negligence" is not merely the absence of care, but requires a plaintiff to plead specific facts showing "[a]n intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any

19

effort to avoid them." *Marriott Corp. v. Chesapeake & Potomac Tel. Co.*, 124 Md. App. 463, 478 (1998) (citation and internal quotations omitted).

Here, Plaintiffs fail to plead any facts showing even mere negligence, let alone "reckless disregard." Plaintiffs' conclusory claims of an allegedly inadequate sales process and allegedly unfair sales price simply are not sufficient to rebut the presumption of due care under the business judgment rule. As the Court of Special Appeals stressed in *Wittman*, a hindsight attack on a proposed transaction is not a viable method of rebutting the presumption of due care:

> *[The stockholder] argues that [the corporation] could have gotten a better deal. But that is really not a cause of action.* Maybe they could have. Maybe they couldn't have. *But that doesn't constitute a cause of action.* That's something that stockholders can decide. What would get the court to intervene would be evidence of facts of the board and/or management violating its duty of loyalty and duty of due care.

120 Md. App. at 378 (emphasis added); *see also Danielewicz*, 137 Md. App. at 638 (holding that in stock-for-stock merger, where there were only "bald and conclusory allegations" that the exchange ratio was inequitable, the court "cannot disturb the well-settled business judgment doctrine, as it relates to a corporation's directors and the decisions they make in such capacity"); *NHP* at 32 ("The Court finds that Plaintiffs' 'inadequate consideration' claims are merely conclusory and insufficient to rebut the presumption of due care under the business judgment rule.").

## II.   THE DIRECTORS EXERCISED REASONABLE BUSINESS JUDGMENT IN APPROVING DEAL PROTECTION TERMS

Plaintiffs devote a good deal of their Complaint to challenging the Constellation Directors' business judgment in approving what Plaintiffs characterize as improper "deal protection" measures to scare off other bidders. Plaintiffs claim that the "no solicitation" provision, the opportunity for Exelon to match a competing bid, and the termination fee were

"specifically designed to prevent another bidder from making a superior proposal, thus effectively locking up the deal in favor of Exelon." (Compl. ¶¶ 5, 74-76, 81-83.) But Maryland and Delaware courts have refused to second guess directors' judgment and "repeatedly held that provisions such as these are standard merger terms, are not *per se* unreasonable, and do not alone constitute breaches of fiduciary duty." *In re 3Com S'holders Litig.*, No. Civ. A. 5067-CC, 2009 WL 5173804, at * 7 (Del. Ch. Dec. 18, 2009); *see NHP* at 34.

## A. The "No Solicitation" Provision Is Appropriate

No-solicitation provisions are common in merger agreements and do not imply a breach of fiduciary duty. *NHP* at 34-35 (finding no-shop provisions are "standard measures"); *see also McMillan v. Intercargo Corp.*, 768 A.2d 492, 505 (Del. Ch. 2000) (upholding no-shop provision as "rather ordinary"); *In re IXC Commc'ns, Inc. S'holders Litig.*, Nos. Civ. A. 17324 & 17334, 1999 WL 1009174, at *2, *6 (Del. Ch. Oct. 27, 1999) (same).

No-solicitation provisions are particularly uncontroversial where, as here, the Agreement contains a "fiduciary out" that permits the Board to consider and ultimately approve potentially superior proposals. *In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 502 (Del. Ch. 2010) (approving no-shop provision coupled with fiduciary out, which gave the board the ability to engage with any bidders who proposed superior offers). Fiduciary outs are hardly novel in merger agreements and generally satisfy both Maryland and Delaware courts reviewing supposedly preclusive no-solicitation provisions. *E.g., Jasinover v. Rouse Co.*, No. 13-C-04-59594, 2004 WL 3135516, at *10 (Md. Cir. Ct. Nov. 4, 2004); *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 725 (Del. Ch. 1999) (noting no-solicitation clause was connected with "customary" fiduciary out); *In re J.P. Stevens & Co., Inc. S'holders Litig.*, 542 A.2d 770, 776 (Del. Ch. 1988) (same). Courts routinely approve no-solicitation clauses coupled with fiduciary outs like the one seen here. *See, e.g., NHP* at 34 (finding no-solicitation clause coupled with

21

fiduciary outs are "standard measures"); *McMillan*, 768 A.2d at 506 ("the fact that the merger agreement contained a rather standard no-shop provision . . . [that] permitted the Intercargo board to consider an unsolicited proposal that the board determined was likely to be consummated and more favorable to Intercargo's stockholders . . . is hardly indicative of a . . . breach"); *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 997, 1022 (Del. Ch. 2005) (finding Board did not breach its fiduciary duties through inclusion of "no solicitation" clause because agreement allowed for the possibility of post-agreement alternate transactions); *In re Lukens*, 757 A.2d at 725 (dismissing complaint where merger agreement contained "no solicitation" clause with the "customary 'fiduciary out,' allowing the board to adequately inform itself and take action on any unsolicited 'superior proposal' from a third party"); *In re Vitalink Commc'n Corp. S'holders Litig.*, Civ. A. No. 12085, 1991 WL 238816, at *15 (Del. Ch. Nov. 8, 1991) ("[T]he Lockup option and No-Shop acted as no real impediment to third party offers.").

Plaintiffs attempt to maneuver around this settled law by claiming that the fiduciary out in this Merger Agreement is "illusory" because in order to exercise it the Board must "tak[e] into account, to the extent applicable, all legal, financial, regulatory and other aspects" of the alternative proposal, including "the likelihood and timing of consummation." (Compl. ¶ 77 (quoting Ex. B at A-4-5 (Merger Agreement definition of "Company Superior Offer")).) Plaintiffs theorize that because Constellation and Exelon discussed required regulatory approvals for several months before consummating a transaction, "it is doubtful" that another bidder could ever submit a Company Superior Offer "that is likely to obtain regulatory clearance from all necessary federal and state agencies." (Compl ¶ 80.) But plaintiffs' "doubt" does not render anything illusory. And pursuant to Section 6.4(a) of the Merger Agreement, the Board need only "conclude[] in good faith, after consultation with its financial advisors" that an alternate proposal

"constitutes or *could reasonably be expected to result in a Company Superior Offer*." (Ex. B at A-52.) Plaintiffs read into the fiduciary out additional restrictions belied by the term's plain language. Under the fiduciary out, Constellation remains free, at any time prior to the finalization of the merger, to accept superior acquisition proposals from an alternate bidder, furnish the bidder with the due diligence provided to Exelon, and enter into negotiations with the bidder. (*Id.* at A-52 (Section 6.4(a)-(b)).)

More fundamentally, Plaintiffs offer no support for their novel theory that a customary fiduciary out somehow becomes unacceptable – and thus grounds for enjoining a merger vote – simply because the parties to the contract operate in a regulated industry. To the contrary, fiduciary outs are often utilized by counterparties in regulated industries. *See, e.g., Lyondell Chem. Co. v. Ryan*, 970 A.2d 235 (Del. 2009); *Energy Partner, Ltd. v. Stone Energy Corp.*, Civ. A. Nos. 2402-N & 2374-N, 2006 WL 2947483 (Del. Ch. 2006); *Safety-Kleen Corp. v. Laidlaw Envtl. Servs., Inc.*, No. 97 C 8003, 1999 WL 601039 (N.D. Ill. Feb. 4, 1998). In a regulated context, as in others, considering the legal, financial, regulatory and other aspects of *any proposal*, including the likelihood and timing of consummation, is precisely what a board of directors *should do* in carrying out its fiduciary obligations.

Significantly, Constellation's recent history demonstrates the efficacy of fiduciary outs in regulated industries; Constellation exercised a virtually identical fiduciary out to terminate a merger agreement with MidAmerican Energy Holdings Company in December 2008 so that it could complete an alternative transaction with Électricité de France, SA. (Ex. B at 48.) The inherent illogic in Plaintiffs' claim is further evidenced by the "burdensome regulatory approval process" about which they complain. (Compl. ¶ 77.) Constellation and Exelon have invested time and effort into securing regulatory approval for the proposed transaction, trailblazing for

alternative bidders the process necessary to obtain regulatory approval for such a transaction. Put simply, the likelihood of a topping bid is not diminished by the regulatory process associated with this transaction.

### B.   The "Matching Right" Provision Is Appropriate

Similarly, the "matching right" provision in the Merger Agreement is "hardly novel" and neither implies nor establishes a fiduciary breach. *See In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 120 (Del. Ch. 2007); *NHP* at 34 ("matching right" provisions are "standard measures"). Section 6.4(e) of the Merger Agreement provides that if the Board determines it should recommend an alternate proposal, Exelon shall be given information concerning the alternate proposal and the competing bidder, and is allowed five days to submit a matching bid. (*See* Ex. B at A-52-53.) Courts recognize that "it is reasonable for a seller to provide a buyer some level of assurance that he will be given adequate opportunity to buy the seller, even if a higher bid later emerges." *Cogent*, 7 A.3d at 502. Consistent with this understanding, "a board of directors may act decisively to preserve the one definite offer it ha[s] on the table." *NHP* at 34 (internal quotations omitted). As such, a "matching right" provision does not breach a board's fiduciary duty, even when coupled with a "no solicitation" provision and a termination fee. *Id.* (concluding that matching and information rights provisions are "considered standard measures"); *In re Toys "R" Us*, 877 A.2d at 1017 (matching rights are "common contractual feature"); *In re Pennaco Energy, Inc.*, 787 A.2d 691, 707 (Del. Ch. 2001) (same).

### C.   The Termination Fee Is Appropriate

Plaintiffs also challenge a termination fee that would be paid by Constellation in the event that the Board recommends an alternate transaction and terminates the Merger Agreement. (*See* Ex. B at A-5, 66 (Merger Agreement at §§ 1.1, 8.2).) But this claim cannot withstand scrutiny. Maryland and Delaware courts recognize that "[t]ermination fees are regularly used

24

deal protection devices and are not presumptively inappropriate." *In re Terra Indus., Inc. S'holder Litig.*, No. 24-C-10-001302, 2010 WL 5412283, at 20 (Md. Cir. Ct. July 14, 2010); *see also Golden Cycle, LLC v. Allan,* No. Civ. A. 16301, 1998 WL 892631, at *17 (Del. Ch. Dec. 10, 1998) (explaining that "reasonable and proportionate termination fee/expense reimbursement . . . in merger agreements" are appropriate); *In re J.P. Stevens & Co., Inc. S'holders Litig.,* 542 A.2d at 783 ("As to that $17 million termination fee, I can perceive no basis at this time to conclude that, in agreeing to it, the board (or the Special Committee) breached a duty to seek to achieve the best available deal for the shareholders. Such agreements are reasonably conventional and are, of course, not invalid per se.").

While Plaintiffs quarrel with the amount of the termination payment, Plaintiffs' "attack on the termination fee's level is make-weight and at odds with precedent upholding the validity of fees at this level." *Pennaco*, 787 A.2d at 707. The termination fee of $200 million for the $7.8 billion transaction—approximately 2.5% of the transaction value—is well within the range courts routinely find to be reasonable.[6] Both Maryland and Delaware courts characterize approximately 3% of a transaction's value as the "traditional" amount for termination fees in transactions like this merger. *Jasinover*, 2004 WL 3135516, at *10 (upholding 2.5% termination fee as squarely within the 2% to 4% range approved by the courts); *Pennaco*, 787 A.2d at 707 (finding 3% termination fee "modest" and "reasonable").

---

[6]   *See, e.g.*, *NHP* at 34-35 (approving $175 million termination fee that represented approximately 2.4% of the transaction value); *In re Terra Indus. S'holder Litig.*, No. 24-C-10-001302, 2010 WL 5412283 (Md. Cir. Ct. July 14, 2010) (finding 3% termination fee was "not unreasonable"); *Pennaco*, 787 A.2d at 707 (finding 3% termination fee "modest" and "reasonable"); *Goodwin v. Live Entm't*, Civ. A. No. 15765, 1999 WL 64265, at *20 (Del. Ch. Jan. 25, 1999) (approving termination fee of 3.125% plus $1 million in expenses for a total percentage of 4.16%); *In re 3Com*, 2009 WL 5173804, at *7 (approving a "$99 million termination fee that, along with a $10 million expense reimbursement fee, represents over 4% of the equity value of the Merger"); *McMillan*, 768 A.2d at 505-06 (describing 3.5% lockup as an "insubstantial obstacle").

25

In sum, these standard deal protection measures – whether considered individually or collectively – do not provide any support for Plaintiffs' allegations that the inclusion of such measures fall outside the scope of business judgment so as to constitute a breach of the Board's fiduciary duties. "Beyond merely counting the different provisions and explaining why drafters employ such terms, the Plaintiffs have not offered any reason for the Court to conclude that the deal protection devices, on a cumulative basis, are somehow preclusive." *In re Answers Corp. S'holders Litig.*, No. Civ. A. 6170-VCN, 2011 WL 1366780, at *4 (Del. Ch. April 11, 2011).

## III.    THE DISCLOSURE CLAIMS FAIL

Plaintiffs' claim that the Individual Defendants breached their fiduciary duty of candor by filing a "materially misleading S-4" also must fail. (Compl. ¶ 87.). Plaintiffs contend that the Joint Proxy Statement lacks adequate disclosures concerning (i) the financial advisors' fairness opinions; (ii) the sales process leading to the proposed acquisition, and (iii) Constellation's and Exelon's financial projections. (*Id.*) None of these alleged "omissions" presents a colorable disclosure claim and, accordingly, the Court should dismiss this claim.

The duty of candor requires directors to disclose material information within the directors' control regarding a transaction on which shareholders will vote. *Hudson*, 2004 WL 1982383, at *13.[7] An omitted fact or alleged misstatement is material only where there is a substantial likelihood it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *NHP* at 36 (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)). Thus, in order to state a claim for breach of the duty of candor, Plaintiffs must demonstrate that an alleged misstatement or omission is either

---

[7]    The court relied on Delaware law to resolve the non-disclosure allegations "because of the paucity of Maryland law on the subject [of the duty of candor in proxy disclosure]." *Hudson*, 2004 WL 1982383, at *13.

inconsistent with, or significantly different from, the information disclosed in the Joint Proxy Statement. *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1172-74 (Del. 2000). "[S]o long as the proxy statement, viewed in its entirety, sufficiently discloses and explains the matter to be voted on, the omission or inclusion of a particular fact is generally left to management's business judgment." *In re 3Com*, 2009 WL 5173804, at *1.

## A.   Plaintiffs' Claims Regarding the Financial Advisors' Opinions Fail

Plaintiffs' claims that they are entitled to the granular details underlying the financial advisors' opinions, as well as their efforts to create conflicts where none exist, are without merit and should be dismissed.

### 1.   *Plaintiffs' insistence on receiving the granular details underlying financial analysis lacks merit*

Plaintiffs assert a hodgepodge of claims in ¶¶ 91-107 of the Complaint seeking the minutiae underlying Morgan Stanley's and Goldman Sachs' fairness opinions. Plaintiffs theorize that Morgan Stanley and Goldman Sachs failed to disclose "several key inputs and assumptions . . . that underlie the fairness opinion[s]," without which the shareholders cannot adequately evaluate the financial advisors' analyses in deciding how to vote. (Compl. ¶¶ 91, 99.) But the law does not require these disclosures.

Directors need not disclose all available information merely because shareholders might find it helpful. *See NHP* at 36; *see also Skeen*, 750 A.2d at 1174. A board need not, for example, "disclose consistent and redundant facts or disclose insignificant details and reasonable assumptions," nor must it "disclose so much information as to enable shareholders to 'make an independent determination of fair value.'" *NHP* at 34-35 (quoting *In re Staples S'holders Litig.*, 792 A.2d 934, 954 (Del. Ch. 2001)). Rather, "shareholders are entitled to a 'fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations

27

of their board as to how to vote on the merger or tender rely.'" *NHP* at 34-35 (quoting *Globis Partners, L.P. v. Plumtree Software, Inc.*, Civ. A. No. 1577-VCP, 2007 WL 4292024, at *11 (Del. Ch. Nov. 30, 2007)).

The Joint Proxy Statement contains more than the "fair summary" the law requires. In addition to providing the full text of both fairness opinions, (Ex. B at Annex E-F), it includes more than fifteen pages describing Morgan Stanley's and Goldman Sachs' work and fees, including, *inter alia*, descriptions of the analyses performed, the materials reviewed, the assumptions made, and the financial projections relied upon. (Ex. B at 110-126.) Despite these robust disclosures, Plaintiffs nevertheless contend – as always – they are entitled to more.[8]

For instance, the Court need not credit Plaintiffs' demand for information underlying Morgan Stanley's comparable companies and selected precedent transactions analyses or Goldman Sachs' selected companies analysis. (Compl. ¶¶ 92, 95, 100.). "A disclosure that does not include all financial data needed to make an independent determination of fair value is not . . . *per se* misleading or omitting a material fact. The fact that the financial advisors may have considered certain non-disclosed information does not alter this analysis." *In re CheckFree Corp. S'holders Litig.*, 2007 WL 3262188, at *2 (Del. Ch. Nov. 1, 2007). Courts recognize that a proxy statement "fairly describ[ing] the actual analysis undertak[en] in connection with comparable-companies analysis" satisfies directors' disclosure obligations. *In re JCC Holding Co., Inc.*, 843 A.2d 713, 721 (Del. Ch. 2003); *see also In re Best Lock Corp. S'holder Litig.*, 845 A.2d 1057, 1074 (Del. Ch. 2001) (rejecting claim that further disclosure about a comparable

---

[8]    Regardless of the extent of proxy disclosures, plaintiffs in these cases seemingly always claim they need more. *See, e.g., NHP* at 35-36; *In re 3Com*, 2009 WL 5173804; *Globis Partners*, 2007 WL 4292024; *In re CheckFree Corp. S'holders Litig.*, No. Civ. A. 3193-CC, 2007 WL 3262188, at *1 (Del. Ch. Nov. 1, 2007); *In re JCC Holding Co., Inc.*, 843 A.2d 713, 721 (Del. Ch. 2003); *In re Best Lock Corp. S'holder Litig.*, 845 A.2d 1057, 1074 (Del. Ch. 2001).

company analysis was required and stating, "Delaware courts have held repeatedly that a board need not disclose specific details of the analysis regarding a financial advisor's opinion"); *Cnty. of York*, 2008 WL 4824053, at *12 (holding that "a rationale as to the source of, and reasons why [the financial advisor] used certain underlying financial estimates" is generally not material). The minutiae sought by Plaintiffs here is immaterial in light of the fair summary provided.

Nor do Plaintiffs state a colorable disclosure claim by demanding granular details concerning Morgan Stanley's and Goldman Sachs' valuation analyses. (Compl. ¶¶ 93-94, 101-04.) Plaintiffs allege that the Joint Proxy Statement improperly fails to disclose "how Morgan Stanley derived the range of terminal [EBITDA] multiples . . . and discount rate range." (Compl. ¶ 93.) But the "law does not require disclosure of all the data underlying a fairness opinion such that a shareholder can make an independent determination of value." *See Globis Partners*, 2007 WL 4292024, at *13; *see also Abbey v. E.W. Scripps Co.*, Civ. A. No. 13397, 1995 WL 478957, *3 (Del. Ch. Aug. 9, 1995) (finding that financial advisor's "work product (analyses, assumptions, and results" was not material). Plaintiffs fail to plead any facts to explain why these details are material to Constellation's shareholders. They are not. And Courts routinely hold that such "quibbles" are immaterial to the total mix of information owed to shareholders. *See, e.g.*, *In re 3Com*, 2009 WL 5173804, at *6 ("There are limitless opportunities for disagreement on the appropriate valuation methodologies to employ, as well as the appropriate inputs to deploy within those methodologies. Considering this reality, quibbles with a financial advisor's work simply cannot be the basis of a disclosure claim.").

2.     *Plaintiffs' claims of financial advisors' conflicts are make-weight*

Plaintiffs also seek to gin up potential conflicts for Morgan Stanley or Goldman Sachs, arguing they supposedly had undisclosed conflicts. (Compl. ¶¶ 98, 107.) These purported omissions are not material. The Joint Proxy Statement discloses the compensation Morgan

Stanley and Goldman Sachs may receive under the Agreement, as well as the fact that both companies have advised Constellation in the past two years and may do so in the future. (Ex. B at 117, 126). Plaintiffs fail to explain how these disclosures are inadequate or why the specific compensation paid or the past services performed would substantially alter the total mix of information made available. *See NHP* at 40 (finding additional information on the specific compensation due to financial advisors not material).

Prior work relationships and compensation for services are commonplace when leading investment banks advise major companies. Plaintiffs fail to state how such facts render Constellation's reliance on their advice somehow improper. *See Kahn v. Caporella*, Civ. A. No. 13248, 1994 WL 89016, at *6 (Del. Ch. Mar. 10, 1994) (mere fact that legal and financial advisors previously had advised target company did not support contention that they were conflicted); *In re Toys "R" Us*, 877 A.2d at 1005 (that a financial advisor's compensation is in part dependent on a successful merger is commonplace, and when disclosed as it is here, unobjectionable.).

### B.    Plaintiffs' Claims About the Opinions of Exelon's Financial Advisors Are Meritless

The Court should also reject Plaintiffs' novel theory that the Constellation Board breached its fiduciary duties by failing to disclose the minutiae underlying *Exelon*'s financial advisors' fairness opinions. Plaintiffs claim they need "full disclosure of all aspects" of the three fairness opinions provided to Exelon by Exelon's financial advisors in order to determine whether to take equity in Exelon. (Compl. ¶¶ 108, 117, 125.) Plaintiffs ignore the fact that Barclays, Evercore and J.P. Morgan prepared and included in the Joint Proxy Statement opinions analyzing the fairness of the acquisition to Exelon's shareholders only. (Ex. B at Annex B, D-E.) This Court has squarely rejected the argument that shareholders of one company in a stock-for-

stock merger are entitled to data underlying the counterparty's fairness opinions absent an explanation why such shareholders would consider material information prepared solely for the counterparty's shareholders. *See NHP* at 42-43.

Plaintiffs also have not alleged that the omitted facts underlying the fairness opinions prepared by Exelon's financial advisors were known to the Constellation Board or within the Board's control; as such, Constellation is not obligated to disclose this information. *Id.* (no duty where "plaintiffs have not established, by fact or inference, that [the target] had possession or control of the omitted facts concerning the [acquirer's financial advisor's] opinion"); *Hudson,* 2004 WL 1982383, at *14 (disclosure obligations apply only where material information was known to the directors or was within their control); *Cogent*, 7 A.3d at 508 (same).

Nevertheless, Plaintiffs seek "key inputs and assumptions" underlying Barclay's, Evercore's and J.P. Morgan's fairness opinions (Compl. ¶¶ 108, 117, 125.)  For example, Plaintiffs seek disclosure of the granular details underlying Exelon's financial advisor's consolidated trading analyses, selected comparable companies analyses, peer group trading analyses, and valuation analyses.  (*Id.* ¶¶ 109–129.)  In addition to being outside of the Constellation Board's knowledge and control, these demands for the minutiae of Exelon's advisors' assumptions are even more misplaced than Plaintiffs' demands for such information about Constellation's advisors' fairness opinions.

C.    The Joint Proxy Statement Sufficiently Discloses the Sales Process

Plaintiffs' scattershot of minutiae allegedly omitted from the Joint Proxy Statement also fails to identify any material omissions concerning the process that led to the Agreement. (Compl. ¶¶ 88-89.)

*First*, Plaintiffs ask "why" the Board did not contact other potential bidders, seeking its rationale or bases for its courses of action.  (Compl. ¶ 89(i).)  Courts have repeatedly explained

that "[s]uch 'why' questions about decisions not to pursue other possible options are not material." *Jasinover*, 2004 WL 3135516, at \*11 ("[T]he emphasis is on what the Board actually did, not what it could have done had it traveled a different road."); *NHP* at 44; *In re 3Com*, 2009 WL 5173804, at \*5. Not every contact with a potential bidder or alternative discussed among the Board is material. *See In re 3Com*, 2009 WL 5173804, at \*6 (finding there was no disclosure violation where defendants failed "to inform stockholders of other strategic initiatives it was considering").

*Second*, Plaintiffs allegations that the Joint Proxy Statement failed to disclose: "whether the Board considered using exclusive negotiations with Exelon as a bargaining chip"; "whether the Board formally met to discuss defendant Shattuck's negotiations with Exelon prior to December 17, 2010, and what, if anything, the Board authorized or resolved"; and "the reasons behind the Board's decision to engage both Goldman Sachs and Credit Suisse" also must fail. (Compl. ¶ 89(ii)-(iv).) The law simply does not require a "play-by-play description of merger negotiations." *Globis Partners*, 2007 WL 4292024, at \*14; *Hudson*, 2004 WL 1982383, at \*3 (explaining that directors are not required to disclose "so much information as to enable [the stockholders] to replicate the directors' efforts"); *Cogent*, 7 A.3d at 511-12 (finding that company is not required to disclose a "play-by-play description of every consideration or action taken by a Board"); *Repairman's Serv. Corp. v. Nat'l Intergroup, Inc.*, No. 7811, 1985 WL 11540, at \*8 (Del. Ch. Mar. 15, 1985) ("[I]t is not necessary to describe all the bends and turns in the road which led to [the merger]."). As such, not every meeting, decision, or strategic consideration by Constellation's Board is material for disclosure purposes. *See In re 3Com*, 2009 WL 5173804, at \*6 (no disclosure violation where board failed to disclose all "strategic initiatives it was considering").

*Third*, the Court should reject Plaintiffs' allegation that the Joint Proxy must disclose "whether Credit Suisse was asked to render a fairness opinion and why it did not do so." (Compl. ¶ 89(iv).) "In the context of disclosure claims, plaintiffs bear the burden of demonstrating some material *fact* that must be disclosed. Defendants are not required to make this type of negative disclosure." *La. Mun. Police Emps.' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1186-87 (Del. Ch. 2007); *see also In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 204 (Del. Ch. 2007) (explaining "there is no obligation to disclose what the investment banker did not do"); *In re JCC*, 843 A.2d at 721 (finding "there is no obligation on the part of a board to disclose information that simply does not exist"). As such, the Board is not obligated to disclose that Credit Suisse *did not* render a fairness opinion, nor is it obligated to disclose *why* Credit Suisse did not render a fairness opinion. Plaintiffs' conclusory assertion to the contrary is insufficient to survive a motion to dismiss.

*Fourth*, Plaintiffs complain that the Joint Proxy Statement did not disclose "how Morgan Stanley derived the exchange ratio of a 0.945 share of Exelon common stock that it proposed to Barclays" so that they can determine "how Morgan Stanley valued the Company . . . and how the eventual lower Exchange Ratio was reached." (Compl. ¶ 89(v).) Aside from the fact that the Joint Proxy Statement abundantly describes Morgan Stanley's analyses that support exchange ratio ranges that include the 0.945 ratio it proposed to Barclays, this request for minutiae fails. "Delaware courts have held repeatedly that a board need not disclose specific details of the analysis regarding a financial advisor's opinion." *In re Best Lock Corp.*, 845 A.2d at 1074; *In re Dataproducts Corp. S'holders Litig.*, Civ. A. No. 11164, 1991 WL 165301, at *8 (Del. Ch. Aug. 22, 1991) (plaintiffs are not entitled to all of the detailed facts and analysis underlying a financial advisor's methodology). For the same reasons the Board need not disclose all data underlying

33

financial advisors' fairness opinions, see *supra* Section III.A, the Board also is not obliged to disclose every detail of negotiations such that shareholders can determine how the merger terms were reached. *Globis Partners*, 2007 WL 4292024, at *14; *Hudson*, 2004 WL 1982383, at *12; *Cogent*, 7 A.3d at 511-12; *Repairman's Serv. Corp.*, 1985 WL 11540, at *8.

## D.     Plaintiffs' Claims Relating to Financial Projections Fail

Plaintiffs' also seek an extraordinary level of detail regarding Constellation's financial projections, none of which is required under the law. (Compl. ¶ 90.) The Joint Proxy Statement already provides a fair summary of Constellation's projections. (Ex. B at 68-72.) In particular, it contains certain of the financial forecasts prepared by Constellation's and Exelon's management, as well as Exelon's adjustments to Constellation's projections and Constellation's adjustments to Exelon's projections.   Courts have concluded that no further disclosure is required. *See Jasinover*, 2004 WL 3135516, at *12 (finding the absence of certain "internal [] projections" was not material to make out a disclosure claim); *In re 3Com*, 2009 WL 5173804, at *3 (holding that plaintiffs "failed to assert a colorable reason as to why management should be required to provide full versions of the projections underling the already disclosed summaries" and the allegation that management should have provided EBIT or EBITDA estimates did not state a colorable claim); *In re CheckFree*, 2007 WL 3262188, at *2 (rejecting plaintiffs' argument that directors breached their disclosure duties by excluding company projections when the projections were provided to financial advisor for use in rendering fairness opinion); *In re Siliconix S'holders Litig.*, No. Civ. A. 18700, 2001 WL 716787, at *12 (Del. Ch. June 21, 2001) (finding plaintiff not likely to succeed on the merits of a disclosure violation claim for failure to disclose more detailed projections).

Plaintiffs further contend that the Joint Proxy Statement fails to disclose Constellation's projections at the *business levels*, thereby hampering their ability to "independently assess

34

whether the financial analyses set forth in the S-4, which rely on [the company's] projections, adequately value the Proposed Acquisition." (Compl. ¶ 90.) Again, Plaintiffs are not entitled to "so much information as to enable [them] to 'make an independent determination of fair value.'" *NHP* at 34-35; *In re Dataproducts*, 1991 WL 165301, at *8. Moreover, divisional information is only material "where the purchaser utilizes such information in formulating its bid." *In re 3Com*, 2009 WL 5173804, at *5. And the Delaware Supreme Court has warned courts to "guard against the fallacy that increasingly detailed disclosure is always material and beneficial." *Abrons v. Maree*, 911 A.2d 805, 813 (Del. Ch. 2006) (citation omitted). Here, Plaintiffs have not put forth a "colorable claim that management's decision not to disclose divisional information is a disclosure violation because there is no allegation that [Exelon] used such information in formulating its bid." *In re 3Com*, 2009 WL 5173804, at *5.

## IV. MARYLAND LAW PROHIBITS PLAINTIFFS' CLAIMS FROM BEING RAISED AS A DIRECT ACTION

Plaintiffs' direct claims for breach of fiduciary duty also fail for the fundamental reason that Plaintiffs do not have standing to raise a breach of fiduciary duty claim directly against Constellation or its directors. In Maryland, the duties of directors of Maryland corporations are generally defined by statute – specifically, Section 2-405.1 of the Corporations and Associations Article. This framework provides that "[n]othing in this section [which defines the duty of directors] creates a duty of any director of a corporation *enforceable otherwise than by the corporation or in the right of the corporation.*" Md. Code Ann., Corps & Ass'ns § 2-405.1(g) (emphasis added).

Under this statutory framework, courts repeatedly have held that the duties of a corporate director run "to the corporation and not, at least directly, to the shareholders." *Werbowsky*, 362 Md. at 599. As such, shareholders of Maryland corporations do not have individual standing to

sue the corporation or its directors for alleged breaches of fiduciary duties. *Patterson v. Patterson*, No. 03-C-05-005429, 2006 WL 990998, at *5 (Md. Cir. Ct. 2006) (dismissing breach of fiduciary duty claims against corporation seeking injunctive relief because "[p]laintiff is barred from bringing an action against the Defendant directors. . .  on his own behalf . . . "). Rather, such claims may only be brought derivatively. *Id.*

This rule applies in the context of cases challenging the fairness of stock-for-stock transactions, just like any other case asserting a breaching of fiduciary under Maryland law. *See Danielewicz*, 137 Md. App. at 616-17 (requiring that challenge to stock exchange be brought derivatively); *see also City of St. Clair Shores Gen. Emps. Ret. Sys. v. Inland W. Retail Real Estate Trust, Inc.*, 635 F. Supp. 2d 783, 797-98 (N.D. Ill. 2009) (applying Maryland law and requiring shareholders' direct claims for breach of fiduciary duty against directors of REIT for their approval of a share-for-share transaction be brought derivatively).[9] A shareholder's failure to bring his claim derivatively is grounds for dismissal of the claim. *See, e.g.*, *City of St. Clair Shores*, 635 F. Supp. 2d at 797-98 (applying Maryland law, dismissing shareholders' claims against directors because they were not brought derivatively).

Here, Plaintiffs have asserted two direct causes of action: breach of fiduciary duty against the Individual Defendants, and aiding and abetting against Constellation and the Exelon Defendants.  Because Maryland law prohibits either claim from being raised as a direct action, both claims must be dismissed.

---

[9] While the Court of Appeals held in *Shenker* that claims for breach of fiduciary duty in the context of a *cash-out merger* may be brought directly, 411 Md. at 346, this Court recently held in *NHP* that the holding of that case has no application to a stock-for-stock merger like the Exelon deal that does not involve a change in control. *See generally NHP* at 15-25.

## V.    THE DERIVATIVE CLAIMS MUST BE DISMISSED BECAUSE PLAINTIFFS FAILED TO MAKE DEMAND

### A.    Derivative Actions Are "Extraordinary"

It is a fundamental tenet of corporate governance that "[s]hareholders are not ordinarily permitted to interfere in the management of the company." *Werbowsky*, 362 Md. at 599. Rather, "the business and affairs of a corporation, including the decision to institute litigation, are managed under the direction of its board of directors." *Bender v. Schwartz*, 172 Md. App. 648, 665 (2007). In making such decisions, the business judgment rule entitles directors to a strong presumption that they will act properly and in the best interest of the corporation and thus, protects them from shareholder second-guessing. *Werbowsky*, 362 Md. at 618-19; *see also Wittman*, 120 Md. App. at 376 (same).

A derivative action is "an extraordinary equitable device" that permits a shareholder to litigate a ***corporate*** claim where the corporation's directors wrongfully refuse to do so. *Werbowsky*, 362 Md. at 599; *Bender*, 172 Md. at 665. "[B]ecause a shareholder's derivative action necessarily intrudes upon the managerial prerogatives ordinarily vested in the directors" and to prevent abuse of this remedy by "disgruntled" shareholders, the law prescribes certain conditions that must be satisfied before a shareholder may bring such an action. *Werbowsky*, 362 Md. at 600. In particular, before a shareholder may prosecute a derivative suit, "the shareholder must either make a demand on the board of directors that the corporation bring the suit, or show that demand is excused as futile." *Bender,* 172 Md. at 666 (citations omitted). This demand requirement is an "important" and logical extension of the deference afforded to corporate directors and the presumption that they will "act properly and in the best interest of the corporation." *Werbowsky*, 362 Md. at 618-19.

Given the unique nature of derivative litigation and its potential for abuse, courts presiding over these types of cases serve an important gate-keeping function. Where, as here, a plaintiff fails to plead particularized facts demonstrating that it has satisfied the demand requirement to bringing a derivative suit, courts should terminate the litigation at the outset. *See, e.g., Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 104 (1991) ("Under state law, the determination whether a derivative representative can initiate a suit without making demand typically is made at the outset of the litigation . . . ."); *Werbowsky*, 362 Md. at 620-21 (noting that if "the complaint fails to allege sufficient facts which, if true, would demonstrate the futility of a demand, it is entirely appropriate to terminate the action on a motion to dismiss"). *See also In re Merrill Lynch Focus Twenty Fund Inv. Co. Act Litig.*, 218 F.R.D. 377 (E.D.N.Y. 2003) (granting motion to dismiss for failure to plead demand futility under Maryland law).

## B.   The Futility Exception Is "Very Limited"

In its seminal case on demand futility, the Court of Appeals opined that the "demand requirement is important" because, among other things, it gives "directors – even interested, non-independent directors – an opportunity to consider, or reconsider, the issue in dispute." *Werbowsky*, 362 Md. at 619. As a result, the modern trend has been "to enforce more strictly the requirement of pre-suit demand and at least to circumscribe, if not effectively eliminate, the futility exception." *Id.* at 607. Although Maryland has declined to join other states that have eliminated this exception in its entirety, it has deemed the exception to be a "very limited" one. *Id.* Specifically, the futility exception will apply *only* when the allegations "*clearly* demonstrate, in a very *particular* manner" that

> a majority of the directors are *so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule*.

38

*Id.* at 620 (emphasis added).[10] Under this standard, "demand will seldom be excused[.]"  *In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d 873, 878 n.7 (D. Md. 2005); *accord Sekuk Global Enters. Profit Sharing Plan v. Kevenides*, Nos. 24-C-03-007496, 24-C-03-007876, 24-C-03-008010, 2004 WL 1982508, at \*4 (Md. Cir. Ct. May 25, 2004).   Of those courts that have applied *Werbowsky*, virtually every one has found that demand was not excused and accordingly dismissed the complaint.[11]  The same result should follow here.

### C.   Plaintiffs Fail to Plead Any Particular Facts to Satisfy the Futility Exception

In *Werbowsky*, the Court of Appeals made clear that a demand is not excused by

---

[10] In *Werbowsky*, the Court held that demand also would be excused where the complaint demonstrated that "a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation."  362 Md. at 620.  Plaintiffs state conclusorily that "the Company would be irreparably harmed" without the desired relief, (Compl. ¶ 135), but present no factual allegations to support that conclusion.

[11] The following cases have dismissed derivative complaints for failure to plead demand futility under *Werbowsky*: *Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 138-142 (2d Cir. 2004); *Caston v. Hoaglin*, 2009 WL 3078214, at \*5 (S.D. Ohio Sept. 23, 2009) (slip copy); *City of St. Clair Shores Gen. Employees Ret. Sys. v. Inland W. Retail Real Estate Trust, Inc.*, 635 F. Supp. 2d 783 (N.D. Ill. 2009); *Washtenaw Cnty. Employees' Ret. Sys. v. Wells Real Estate Inv. Trust, Inc.*, 2008 WL 2302679, at \*13-15 (N.D. Ga. Mar. 31, 2008); *In re Infosonics Corp. Derivative Litig.*, 2007 WL 2572276, at \*6-8 (S.D. Cal. Sept. 4, 2007); *In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d 233, 241 (S.D.N.Y. 2006); *In re Oppenheimer Funds Fees Litig.*, 419 F. Supp. 2d 593, 596 (S.D.N.Y. 2006); *In re Key Energy Servs., Inc. Derivative Litig.*, 2006 WL 5979882, at \*2-4 (W.D. Tex. July 10, 2006); *In re Am. Mut. Funds Fee Litig.*, 2005 WL 3989803, at \*5-6 (C.D. Cal. Dec. 16, 2005); *In re CNL Hotels & Resorts, Inc. Sec. Litig.*, 2005 WL 2219283, at \*4-6 (M.D. Fla. Sept. 13, 2005); *In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d 873, 877-80 (D. Md. 2005); *Jolly Roger Fund LP v. Sizeler Prop. Investors, Inc.*, 2005 WL 2989343, at \*7-8 (D. Md. Nov. 3, 2005); *In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d 451, 469-71 (D.N.J. 2005); *Benak v. Alliance Capital Mgmt. L.P.*, 2005 WL 1285652, at \*1-3 (D.N.J. May 23, 2005); *In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, 2005 WL 2677753, at \*7-8 (S.D.N.Y. Oct. 19, 2005); *In re Davis Selected Mut. Funds Litig.*, 2005 WL 2509732, at \*3-4 (S.D.N.Y. Oct. 11, 2005); *In re Dreyfus Mut. Funds Fee Litig.*, 428 F. Supp. 2d 342, 353-54 (W.D. Pa. 2005); *In re Merrill Lynch Focus Twenty Fund Inv. Co. Act Litig.*, 218 F.R.D. 377, 380-81 (E.D.N.Y. 2003); *Swope v. Quadra Realty Trust, Inc.*, 2009 WL 2349955 (N.Y. Sup. Ct. July 16, 2009); *Moonlight Inv., Ltd. v. John*, 192 S.W.3d 890, 892-93 (Tex. App. 2006); *Danielewicz*, 137 Md. App. at 638; *Andrews v. Hollerbach*, 2006 WL 6160393 (Md. Cir. Ct. Aug. 3, 2006); *Sekuk*, 2004 WL 1982508, at \*4-5.  One post-*Werbowsky* case that did find demand futility adequately pled under Maryland law, *Felker v. Anderson*, 2005 WL 602974, at \*1-3 (W.D. Mo. Feb. 11, 2005), has been criticized for "ignor[ing] *Werbowsky*'s clear admonition that a court should not 'excuse the failure to make demand simply because a majority of the directors approved or participated in some way in the challenged transaction or decision.'"  *Washtenaw Cnty.*, 2008 WL 2302679, at \*14 (citation omitted); *see also In re CNL Hotels*, 2005 WL 2219283, at \*5 (finding *Felker* not persuasive because it was not clear "how to square [its] holding" with *Werbowsky*").

allegations that

> a majority of the directors approved or participated in some way in the challenged transaction or decision, or on the basis of generalized or speculative allegations that they are conflicted or are controlled by other conflicted persons, or because they are paid well for their services as directors, were chosen as directors at the behest of controlling stockholders, or would be hostile to the action.

362 Md. at 618. Here, Plaintiffs' allegations are thinly disguised legal conclusions without any particular support. Plaintiffs state only that the Individual Defendants "have directly participated in the wrongs complained of herein," have "proven [themselves] to be beholden to, and controlled and dominated by defendant Shattuck," and that the Company "would be irreparably harmed" without the desired relief. (Compl. ¶¶ 134-35.) These allegations are nothing more than the same allegations rejected as insufficient in *Werbowsky*, and therefore the Complaint should be dismissed with prejudice.

## VI.    PLAINTIFFS' COUNT FOR AIDING AND ABETTING SHOULD BE DISMISSED

Plaintiff tack on to their Complaint claims that Constellation and Exelon aided and abetted the alleged breach of fiduciary duty by the Individual Defendants. These claims fare no better than their underlying breach of fiduciary duty claims against the Individual Defendants. An aiding and abetting claim requires a plaintiff to "allege facts" that show "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach." *Malpiede v. Townson*, 780 A.2d 1075, 1096-97 (Del. 2001) (internal quotations omitted). As demonstrated above, Plaintiffs' underlying fiduciary duty breach claims fail as a matter of law, so necessarily their aiding and abetting claims fail as well. Moreover, the Complaint utterly fails to allege *facts* that Constellation or Exelon "knowingly participated" in any alleged breach by the Board. As such, Plaintiffs have failed to state a claim for aiding and abetting a fiduciary breach.

## CONCLUSION

For the reasons stated above, Defendants respectfully request that this Court dismiss Plaintiffs' Complaint with prejudice for failure to state a claim upon which relief can be granted.

DATED: July 28, 2011

James D. Mathias
David Clarke, Jr.
Benjamin D. Schuman

DLA Piper LLP (US)
6225 Smith Avenue
Baltimore, Maryland  21209-3600
(410) 580-4208  (Telephone No.)
(410) 580-3208  (Facsimile No.)

james.mathias@dlapiper.com
david.clarke@dlapiper.com
ben.schuman@dlapiper.com

James P. Gillespie*
Brant W. Bishop*

Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005-5793
(202) 879-5190 (Telephone No.)
(202) 879-5200 (Facsimile No.)

james.gillespie@kirkland.com
brant.bishop@kirkland.com

*Attorneys for Defendants Constellation Energy Group, Inc., Mayo A. Shattuck, III, Yves C. de Balmann, Ann C. Berzin, James T. Brady, James R. Curtiss, Freeman A. Hrabowski, III, Nancy Lampton, Robert J. Lawless, John L. Skolds, and Michael D. Sullivan*

*admitted *pro hac vice*

41

| | | |
|---|---|---|
| IN RE CONSTELLATION ENERGY GROUP, INCORPORATED SHAREHOLDER LITIGATION | * | IN THE |
| | * | CIRCUIT COURT |
| | * | FOR |
| | * | BALTIMORE CITY |
| | * | Case No.: 24-C-11-003015 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## ORDER

Upon consideration of the Constellation Defendants' Motion to Dismiss, the opposition to the motion, and arguments of counsel, it is this ___ day of _____, 2011,

**ORDERED** that the Constellation Defendants' Motion to Dismiss is **GRANTED**.

**IT IS FURTHER ORDERED THAT** the Consolidated Amended Class Action Complaint is **DISMISSED** with prejudice.

_____

Honorable Audrey J.S. Carrion
Circuit Court for Baltimore City

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 28th day of July, 2011, copies of the foregoing Motion

to Dismiss, Memorandum in Support, and proposed Order were sent via electronic mail to:

Patrick C. Smith
DeHay & Elliston, LLP
36 South Charles Street, Suite 1300
Baltimore, Maryland 21201

*Liaison Counsel for Plaintiffs*

Seth D. Rigrodsky
Brian D. Long
Rigrodsky & Long, P.A.
919 N. Market Street, Suite 980
Wilmington, Delaware 19801

Juan E. Monteverde
Faruqi & Faruqi, LLP
369 Lexington Avenue, 10th Floor
New York, NY 10017

*Co-Lead Interim Counsel for Plaintiffs*

Charles J. Piven
Brower Piven, P.C.
1925 Old Valley Road
Stevenson, Maryland 21153

*Counsel for Plaintiff Lon Engel*

Benjamin D. Schuman